1               UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
2

3

UNITED STATES OF AMERICA              )
4                                     )
vs.                                   )  Criminal Action
5                                     )
HERZZON SANDOVAL,                     )  No. 15-10338-FDS
6   EDWIN GUZMAN,                     )
CESAR MARTINEZ,                       )
7   ERICK ARGUETA LARIOS,             )
                    Defendants        )
8

9

BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10

11

                     JURY TRIAL DAY 4
12

13

                     TESTIMONY ONLY
14

15      John Joseph Moakley United States Courthouse
                    Courtroom No. 2
16                  1 Courthouse Way
                    Boston, MA 02210
17

                    February 2, 2018
18                     9:00 a.m.

19

20

21

22

                    Valerie A. O'Hara
23                 Official Court Reporter
        John Joseph Moakley United States Courthouse
24               1 Courthouse Way, Room 3204
                    Boston, MA 02210
25               E-mail: vaohara@gmail.com

1    APPEARANCES:

2    For The United States:

3        United States Attorney's Office, by CHRISTOPHER J. POHL,
     ASSISTANT UNITED STATES ATTORNEY, and KELLY BEGG LAWRENCE,
4    ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
     Boston, Massachusetts 02110;

5
     For the Defendant Herzzon Sandoval:
6
         Foley Hoag LLP, by MARTIN F. MURPHY, ESQ. and
7    MADELEINE K. RODRIGUEZ, ATTORNEY,
     155 Seaport Boulevard, Boston, Massachusetts 02210;
8
     For the Defendant Edwin Guzman:
9
         Lawson & Weitzen, by SCOTT P. LOPEZ, ESQ.,
10   88 Black Falcon Avenue, Suite 345, Boston, Massachusetts 02210

11   For the Defendant Erick Argueta Larios:

12       THOMAS J. IOVIENO, ESQ., 345 Neponset Street
     Canton, MA 02021;
13
     For the Defendant Cesar Martinez:
14
         Stanley W. Norkunas, 11 Kearney Square,
15   Howe Building, Suite 202, Lowell, Massachusetts 01852.

16

17

18

19

20

21

22

23

24

25

```
 1                          TESTIMONY ONLY

 2              THE CLERK:  All rise.

 3              (JURORS ENTERED THE COURTROOM.)

 4              THE COURT:  Good morning, ladies and gentlemen.  We're

 5    having a little bit of trouble here with the stenographer's

 6    feed.  I think we're all right.  It's one of the reasons we're

 7    starting a little late here.  We'll do the best we can.

 8    All right.  We're ready to go.  You understand you're still

 9    under oath?

10              THE WITNESS:  Yes, your Honor.

11              THE COURT:  Mr. Pohl, whenever you're ready.

12                   JEFFREY ELLIOT WOOD, JR., RESUMED

13                      DIRECT EXAMINATION, RESUMED

14    BY MR. POHL:

15    Q.   Good morning, Special Agent Wood.

16    A.   Good morning, sir.

17    Q.   We left off yesterday with you identifying some

18    photographs, a garage.  Do you recall that?

19    A.   Yes, sir.

20              MR. POHL:  All right.  And could I have Exhibit 1?

21              THE CLERK:  Yes.

22              MR. POHL:  Thank you.

23    Q.   All right.  Special Agent Wood, again, this is for the

24    record, Exhibits 1.1 through 1.3.  Can you remind us where we

25    left off yesterday, what are we looking at here?
```

1  A.   This is a garage in Everett where the Eastside

2  Locos Salvatrucha would have their meetings.

3  Q.   And the garage is on the left-hand side of this particular

4  picture; is that correct?

5  A.   Yes.

6  Q.   1.2.  What are we looking at, Special Agent Wood?

7  A.   That's the bay that you would drive in and a car would be

8  worked on, but that's inside the garage.

9       MR. POHL:  You can leave this picture up.  Thank you.

09:17AM 10  Q.   Would I be correct -- when did you begin conducting

11  surveillance at this location in your investigation?

12  A.   Personally I started in 2015.  The task force started in

13  2014.

14  Q.   All right.  So just for a few minutes, I'm going to talk

15  about the run up to 2014.  I think you testified yesterday that

16  CW-1 began working with the FBI and had been brought back from

17  El Salvador in 2013; is that correct?

18  A.   Yes.

19  Q.   All right.  And can you describe for the jury the kinds of

09:17AM 20  things that CW-1 did at the FBI's direction in 2013 in this

21  investigation?

22  A.   Well, in 2013, we were directing the CW, the cooperating

23  witness to meet with people and get to know them, find out are

24  these targets, are they MS-13 gang members, and he met drug

25  dealers, he met some MS-13 gang members, and at that point then

1    we started directing him to make controlled purchases of drugs

2    from drug dealers to start infiltrating himself and making

3    friends with those MS-13 that he had met.

4    Q.    So, you mentioned making drug purchases.  Are you familiar

5    with a term "controlled purchase"?

6    A.    Yes.

7    Q.    What is a controlled purchase?

8    A.    A controlled purchase, that's when we direct the

9    cooperating witness to purchase drugs from people who are

09:17AM 10   distributing them to the public.

11   Q.    And does the FBI utilize a specific set of procedures when

12   you make controlled purchases of evidence like drugs?

13   A.    Yes, we do.

14   Q.    What can you tell the jury about that?

15   A.    We will attempt to corroborate everything the cooperating

16   witness tells us, so he'll come and tell us Joe can sell me

17   drugs.  So, at that point, okay, he will make a consensually

18   recorded call to Joe with us and ask to purchase drugs, so we

19   record that telephone conversation.  At that point, we've

09:17AM 20   established a time and a place, an amount of drugs and the cost

21   of drugs.

22        We then search the cooperating witness' person and his

23   vehicle, if he has one, or her vehicle, make sure that they

24   don't have any drugs, any weapons, any money that they

25   shouldn't have on them.  We then provide the cooperating

1    witness with a recorder, a transmitter and the money to

2    purchase the drugs.

3            We establish surveillance in the area where the drug

4    purchase will take place.  We have law enforcement officers out

5    in the area.  We will follow the cooperating witness to that

6    location, we will do our best to see and listen through the

7    transmitter to the drug deal.

8            After the drug deal is complete, we follow the

9    cooperating witness back to a predetermined meeting location.

09:17AM 10    We'll retrieve the drugs, we'll retrieve any leftover money,

11    the recorder, the transmitter, then we will research the CW and

12    his or her vehicle for any drugs, money or anything that he

13    shouldn't have, and then we will debrief the source to get his

14    or her version of the events what occurred during that

15    controlled purchase of evidence.

16    Q.    And I think you said, I want to key on two things you

17    talked about.  The first is that whenever possible try to

18    record the meeting itself, correct?

19    A.    Yes.

09:17AM 20    Q.    All right.

21    A.    That's through the body recorder.

22    Q.    And I think the second thing you said you tried through

23    using a transmitter to be able to listen in realtime to events

24    as they're occurring, correct?

25    A.    That is right, yes.

1   Q.   And after you sort of walked us through calls, search, the

2   buy, post-buy, debriefing, after you debriefed the cooperating

3   witness, what do you do with the recorder?

4   A.   Well, we take the recorder back to our office, and we hook

5   it up to a computer, and we take that recording that's on that

6   device and put it onto a DVD or CD, and then we can watch it or

7   listen to it, depending on whether it's audio/video or just

8   audio recording.

9   Q.   In the earlier stages of this investigation, in 2013, you

09:17AM 10   used the cooperating witness, who we've called CW-1, who's also

11   called by MS-13 Pelon, to make controlled purchases of

12   evidence; is that correct?

13   A.   That's correct, we did.

14   Q.   And those controlled purchases of evidence included drugs,

15   correct?

16   A.   It included drugs and false documents, social security

17   cards, something that would make and appear as a legitimate

18   U.S. citizen.

19   Q.   All right.  So you purchased false documents from people

09:17AM 20   that were selling drugs?

21   A.   Yes.

22   Q.   In the course of those buys, Special Agent Wood, did the

23   FBI identify an MS-13 gang member who was present with CW-1

24   during some of those buys?

25   A.   Yes, we did.

1    Q.    Who was that?

2    A.    Muerto.

3          MR. POHL:  For the witness.

4    Q.    I've got a photograph in front of you, Special Agent Wood.

5    Who is that?

6    A.    That's Muerto.

7          MR. POHL:  Your Honor, this is Exhibit Number 6, and

8    I'd offer it.

9          THE COURT:  All right.  It's admitted, Exhibit 6.

10          (Exhibit No. 6 received into evidence.)

11          THE COURT:  Muerto or Muerto?

12          THE WITNESS:  Muerto.

13          THE COURT:  Muerto?

14          THE WITNESS:  Yes, your Honor.

15    Q.    Who is Muerto?

16    A.    He is a homeboy with Eastside Locos Salvatrucha.

17    Q.    And during the sort of controlled purchases of evidence

18    that you discussed in this phase of the investigation, what can

19    you tell the jury about CW-1 purchasing drugs with Muerto?

09:17AM 20    A.    Muerto introduced him to one of the drug dealers that we

21    purchased drugs from on one occasion.  Muerto helped with the

22    purchase of drugs and sold it right back to an undercover law

23    enforcement officer, and at that point he was becoming friendly

24    with the cooperating witness, and they would socialize

25    together.

1   Q.   All right.  It's fair to say that CW-1 and Muerto, Muerto

2   was present during several of the controlled purchases of the

3   drugs that you made at this phase of the investigation,

4   correct?

5   A.   Yes, he was present, yes.

6   Q.   And would I also be correct that CW-1, once you identified

7   Muerto as being a party to that, CW-1 also provided Muerto with

8   money being on the deals themselves?

9   A.   Yes, he did.

09:17AM 10   Q.   All right.  I think that that relationship between CW-1

11   and Muerto, those controlled buys occurred in 2013, and I think

12   through 2014, if my memory serves me.  What was the next event

13   concerning CW-1's introduction into the gang or into MS-13 that

14   you became familiar with?

15   A.   Well, Muerto introduced him to his clique.

16   Q.   And at some point did you become aware of the Eastside

17   Locos Salvatrucha clique?

18   A.   Yes, it was either late 2013 or 2014.

19   Q.   And after CW-1 became a member of the Eastside Loco

09:17AM 20   Salvatrucha clique in 2014, how did that further your

21   investigation into Eastside specifically and MS-13 generally?

22   A.   Well, once he became a member, it enabled us now to

23   actually have an informant, a cooperating witness who would be

24   able to gather intelligence and evidence of the criminal

25   activities conducted by the gang because he was now a member of

1    the gang, and he had inner knowledge of the gang, he had access

2    to the gang.

3    Q.   All right.  And let's go back.  Would I be correct, at

4    least in this phase of the investigation in 2014, at least a

5    significant part of your information that you were going to do

6    about the Eastside clique came from meetings that took place at

7    this garage in Everett?

8    A.   Yes, that is correct.

9    Q.   Can you tell the jury sort of something about the clique

09:17AM 10   meetings, how often they were scheduled and when they were

11   scheduled?

12   A.   They could be scheduled at any time.  Typically the

13   cooperating witness would receive a telephone call.  He would

14   call us and say, "Yeah, I've been ordered to a meeting, it's

15   going to occur tonight."  Sometimes it happened on a monthly

16   basis, sometimes it occurred every two weeks, you just never

17   knew, and they would gather at that point.  We'd meet the

18   source, we'd follow him to that location, and then he would go

19   inside the garage, and we would wait until he was done, and

09:18AM 20   then he'd call us and let us know when he was cleared, and we

21   would debrief him on the events that occurred inside the

22   garage.

23   Q.   All right.  So you talked about -- let me ask the question

24   this way.  How successful or how often were you able to record

25   clique meetings in 2014?

1    A.    I think we had one or two, maybe three, tops, in 2014.  We

2    did not have good recording equipment that we could secrete on

3    the witness' person, and so we were not very successful.

4    Q.    Would you -- what were the kinds of things you would do

5    when you were going to cover or conduct surveillance of a

6    clique meeting with CW-1?

7    A.    Well, the task force would establish surveillance as close

8    as we could to the garage, and typically we have a transmitter

9    on the cooperating witness and a recorder.  We could not put a

09:19AM 10    transmitter on the cooperating witness because it would be a

11    device that would be noticed during a search before the

12    meeting, and it would expose him resulting in his death.

13            MR. LOPEZ:  Objection, your Honor.  Motion to strike.

14            THE COURT:  Yes, that will be struck.  Go ahead.

15    A.    Well, we were never able to listen realtime to the

16    meetings, and when we were finally successful, we were able to

17    secrete a recorder so we could actually record audio and video

18    of the meetings.

19    Q.    But that was a process?

09:20AM 20    A.    Yes.

21    Q.    Took a long time for you to be in a position to be able to

22    do that?

23    A.    Yes.

24    Q.    And the fact that the meetings were called sometimes at

25    short notice, how did that impact your ability to record them?

1    A.    We would scramble, we'd have to move very quickly once we

2    had an order to meet him, get it on him and get him out to the

3    meetings.

4    Q.    Eventually in this phase of the meeting in 2014, CW-1 was

5    able to record and provide information concerning members of

6    the Eastside Locos Salvatrucha clique, correct?

7    A.    Yes, he did it at least I believe two times, if not three

8    times in 2014 and in 2015.  We were successful and recorded

9    several meetings.

09:20AM 10    Q.    All right.  So, through those recordings -- well, let me

11    ask this.  Did you personally conduct surveillance at the

12    garage in 2014?

13    A.    No.

14    Q.    Agents did, other agents that you worked with, did they

15    conduct surveillance in 2014?

16    A.    They did, yes.

17    Q.    Would I be correct that in 2015, you did conduct, you,

18    personally, did conduct surveillance of meetings that took

19    place in the garage?

09:21AM 20    A.    Yes, I did.

21    Q.    Would I also be correct that you have reviewed video and

22    audio recordings of clique meetings that CW-1 was able to

23    record inside the garage?

24    A.    Yes, I was.

25    Q.    Through those surveillance activities and through your

1  review of those recordings, have you been able to identify

2  members of the Eastside Locos Salvatrucha clique?

3  A.    Yes.

4        MR. POHL:  For the witness.

5  Q.    I'm going to show you a series of pictures for you first,

6  Special Agent Wood.  This picture, which is premarked as

7  Exhibit 2, do you recognize that?

8  A.    I do.

9  Q.    Who is that?

09:22AM 10  A.    That is Casper.

11  Q.    Pulling up Exhibit 3, who is that?

12  A.    That is Playa.

13  Q.    Putting up Exhibit 4, who is that?

14  A.    That is CheChe.

15  Q.    And putting up Exhibit 5, who is that?

16  A.    That is Lobo.

17  Q.    All right.

18        MR. POHL:  Your Honor, I'd move 2 through 5 in

19  evidence.

09:22AM 20        THE COURT:  All right, they're admitted, 2 through 5.

21        (Exhibit No. 2 through 5 received into evidence.)

22  Q.    Special Agent Wood --

23        MR. POHL:  Now for the jury.  Exhibit 2 is up.

24  Q.    Who is that?

25  A.    That is Casper.

1    Q.    Do you see Casper in court?

2    A.    I do.

3    Q.    In addition to surveillance and reviewing video recordings

4    concerning ESLS clique meetings, how do you know Casper?

5    A.    I met him in 2015.

6    Q.    Okay.  Could you stand up and point him out to the jury?

7    A.    Casper is sitting in the back row farthest away from you I

8    guess that's a pinkish-colored shirt.

9    Q.    Thank you.  All right.  Next, Exhibit 3.

09:23AM 10    A.    That's Playa.

11    Q.    Okay.  Do you see Playa in the courtroom?

12    A.    I do.

13    Q.    Could you point him out to the jury?

14    A.    Playa is again sitting in the back row.  He's wearing a

15    suit and a red striped tie.

16    Q.    Exhibit 4.

17    A.    That's CheChe.

18    Q.    Do you see CheChe in court?

19    A.    I do.

09:23AM 20    Q.    Point him out to the jury.

21    A.    CheChe is sitting in the row farthest from you, and he's

22    wearing a green plaid shirt.

23    Q.    And Exhibit 5.

24    A.    That's Lobo.

25    Q.    Do you see Lobo in the courtroom?

```
 1    A.    I do.

 2    Q.    Could you point him out to the jury.

 3    A.    Lobo is sitting in the front seat closest to you, and he's

 4    wearing a blue -- a dark-colored jacket.

 5    Q.    Special Agent Wood, in 2014 and 2015, you were able to

 6    record a number of clique meetings with the ESLS, correct?

 7    A.    Yes.

 8    Q.    And would it be fair to say that the recordings were

 9    predominantly if not exclusively in the Spanish language?

10    A.    They were.

11    Q.    And you personally do not speak Spanish?

12    A.    I do not.

13    Q.    And reviewing what was said, you relied on transcripts

14    prepared of those meetings, correct?

15    A.    That and talking to my task force officer who speaks

16    Spanish.

17    Q.    Okay.  You anticipated my next question.  There are people

18    that you work with on this case that speak both Spanish and

19    English, correct?

20    A.    Yes.

21    Q.    So I want to talk not about what was being said but

22    essentially maybe what you saw when you watched sort of the

23    clique meetings.  In reviewing the clique meetings that were

24    videotaped, did they follow a particular pattern at the start?

25    A.    Yes.
```

1    Q.    What was that?

2    A.    Everyone would be together in the garage, and then Casper

3    would bring it to order.

4    Q.    How would he do that?

5           MR. MURPHY:  Objection, your Honor.

6           MR. IOVIENO:  Objection, your Honor.

7           THE COURT:  Is this a summary?  What is this exactly?

8    He wasn't there?

9           MR. POHL:  No, it would be that he reviewed the video

09:25AM 10   recordings of the events.

11          THE COURT:  With the understanding this is based on

12   his review of the video, I'll allow it.  Overruled.

13          MR. MURPHY:  I object specifically as to foundation

14   concerning his ability to speak Spanish, so limited to visual

15   observations.

16          THE COURT:  Well, I guess why don't you lay a

17   foundation that he looked at the videos and that he reviewed, I

18   assume he did, translations so he could understand those.

19          MR. POHL:  Of course.

09:26AM 20   Q.    Special Agent Wood, both through your conversations with

21   task force agents that do speak Spanish and your review of drug

22   transcripts of those recordings and your review of the

23   recordings themselves, were you able to sort of determine

24   a -- did the meetings sort of begin in a similar fashion?

25   A.    Yes.

1    Q.    All right.  And how would the meetings begin?

2    A.    Casper would call --

3            MR. IOVIENO:  Objection, your Honor.  May we be heard

4    at sidebar?

5            THE COURT:  All right.

6            (THE FOLLOWING OCCURRED AT SIDEBAR:)

7            MR. IOVIENO:  My objection is this gentleman does not

8    speak Spanish, and he's testifying to what someone called to

9    order based on his review of transcripts that were written on,

09:27AM 10    that were drafted by some other people.  There's a

11    confrontation issue.  Those other people need to testify as to

12    that, not this gentleman.  He's testifying as to what

13    Mr. Sandoval called a meeting to order.  That's an oral

14    representation, not a visual observation.

15            THE COURT:  Well, I guess I have two questions.  Is he

16    summarizing tapes that we are going to be watching or listening

17    to anyway, or they are not in evidence because they're

18    voluminous?

19            MR. POHL:  I think it's more the latter than the

09:27AM 20    former.  We will have clips of some of the meetings, and I do

21    think there's a clip of sort of the beginning of the meeting.

22            THE COURT:  We need to turn a square corner here.  He

23    needs to testify that he -- you know, let's say that there's 20

24    tapes and you are going to play clips of four of them, he needs

25    to say I looked at all 20 tapes, I followed along in some way,

1   in other words, with English translations, and I am summarizing

2   what happened in these 20 meetings, I'll permit it, but you do

3   have to lay a foundation.

4           MR. MURPHY:  Yes.  It's that following along with the

5   English translation that presents the problem here because he's

6   essentially testifying to the content of the meetings based on

7   evidence that has not yet been admitted.  He doesn't speak

8   Spanish.  We're not going to be able to cross for the meetings

9   which they're not going to offer tapes.  We're not going to be

09:28AM 10   able to cross.

11           THE COURT:  But you have all that evidence, you have

12   all that evidence.  I assumed the government produced tapes of

13   all these meetings, right?

14           MR. MURPHY:  That's right, your Honor, but this is

15   hearsay and a confrontation clause, not for him to testify

16   about what somebody else told him, people were talking about on

17   this tape.  We can't confront the witnesses translated videos

18   that aren't going to be offered into evidence.

19           THE COURT:  So your testimony is the only person who

09:29AM 20   could summarize it is someone who spoke Spanish because even if

21   someone like him reasonably relied on translations, as all of

22   us do, under these circumstances, he couldn't testify about it.

23   I mean --

24           MR. MURPHY:  I don't think he should be allowed to

25   testify as a summary witness at all on these issues because

 1  he's summarizing facts.

 2          THE COURT:  That's what a summary witness does, in

 3  other words, the only alternative is to play all 20, I'm using

 4  20, I don't know what the number is, but it's a substitute for

 5  playing all 20 tapes.  That's the point of Rule 1006 is to

 6  avoid that kind of thing where it's voluminous and it's

 7  time-consuming.

 8          MR. LOPEZ:  And, your Honor, it's overview evidence

 9  that the First Circuit strenuously frowns upon for this

09:30AM 10  particular purpose of confrontation rights.

11          THE COURT:  The summary evidence is permitted,

12  overview evidence.

13          MR. LOPEZ:  Well, that's overview evidence, what went

14  on at these meetings based on what somebody else told him.

15          THE COURT:  Well, you are just characterizing it

16  differently.  I mean, it has to be a summary, it has to fit

17  within Rule 1006 or we are not going to do it, but Rule 1006

18  does permit summaries of voluminous transcripts, and, again, I

19  don't want to be here for the rest of our lives, you know,

09:30AM 20  forcing the government to play each and every clip of each and

21  every meeting seems to me to be a fruitless enterprise.  If

22  they can be summarized and you have the tapes and you can point

23  out the way the summary is not fair.

24          In terms of the translation issue, I think I guess

25  your concern is that if it was improperly translated that you

1   don't have a right to confront the translator, right, is that

2   the idea?

3           MR. LOPEZ:  Yes.

4           THE COURT:  Because that's the person that he is

5   relying on?

6           MR. MURPHY:  Right, it can't only be the summary, it

7   has to be based on inadmissible evidence under 1006, your

8   Honor.

9           THE COURT:  And the translation would be admissible if

09:31AM 10  it were offered, right?  In other words, if we did call whoever

11  translated.  I guess why don't we find out how these were

12  translated, whether it was done orally while he was watching,

13  or maybe you know.  Do you know the answer to that?

14          MR. POHL:  I think they were -- I think they were

15  reviewed by Spanish-speaking agents who were working on the

16  case, and then draft summaries were prepared, but those have

17  been worked on throughout the investigation and up until, you

18  know, shortly before the trial.

19          THE COURT:  So summaries -- so the government prepares

09:31AM 20  these, I forget what they're called but summaries or tapes?

21          MR. POHL:  Yes.

22          THE COURT:  As opposed to verbatim transcripts.  Who

23  prepared those?

24          MR. POHL:  I think it was typically a Spanish-speaking

25  agent who prepared a report that summarized the conversations,

1    then they proceeded to draft transcripts, which are typically

2    done by some FBI linguists, and the final transcripts were done

3    by either Spanish agents themselves or Ms. Huacuja.

4        THE COURT:  But has he reviewed final transcripts of

5    all these meetings?

6        MR. POHL:  I don't know if I could say that.

7        THE COURT:  Yes, go ahead.

8        MR. POHL:  I think what I'll do to make it easier, I

9    can save this for one of the Spanish-speaking agents who will

09:32AM 10    be able to do it realtime, which is going to be next week.

11    I'll just discuss what you can see on the recordings, which is

12    Casper essentially making motions to make people circle up and

13    having Playa collect money, which is frankly all I was trying

14    to get out.

15        THE COURT:  Lay the foundation, let's do that.

16        MR. POHL:  Thank you.

17        (SIDEBAR CONFERENCE WAS CONCLUDED)

18        THE COURT:  Thank you for your patience, ladies and

19    gentlemen.

09:33AM 20    Q.    All right.  Special Agent Wood, without going into what

21    was said, let's talk about what you see on the recordings, all

22    right.  Specifically I think you testified a moment ago that

23    Casper calls the meeting to order.  What specifically do you

24    see on the recordings that you've reviewed of the clique

25    meetings that sort of leads you to say that the meetings began

1    by Casper calling it to order?

2    A.    The group came together and formed a group, a true group.

3    Q.    When you say a group, what is it?  When you say formed,

4    what sort of did it form?

5    A.    A circle, instead of being in different little ones and

6    twos, they come together as a whole group.

7    Q.    And, again, without saying, without talking about what was

8    said, sort of as the group comes together and forms a circle,

9    in the review of the meetings that you have, is it possible to

09:34AM 10    identify who the person that begins to speak first?

11    A.    Yes.

12    Q.    And who is that?

13    A.    Casper.

14    Q.    All right.  Is there other activity that you see as the

15    clique begins to form a circle by any of the other members of

16    ESLS?

17    A.    Yes.

18    Q.    And what do you see beside sort of the circle forming and

19    Casper beginning to speak?

09:34AM 20    A.    When it works properly, you can see Playa collecting

21    money.

22    Q.    And when you say Playa collect money, what do you mean by

23    that?

24    A.    Each homeboy has to pay dues to the gang, and Playa would

25    collect the dues from the members.

1    Q.    All right.  So those kinds of meetings when you could

2    record them, when you had recording equipment that you thought

3    you could use safely with the cooperating witness, you were

4    able to record some of those meetings in 2014?

5    A.    Yes.

6    Q.    All right.  And I think you testified a moment ago that

7    you sort of used the same procedures and had more success and

8    recorded more meetings in 2015?

9    A.    Yes.

09:35AM 10    Q.    All right.  Before we move onto 2015, I want to talk about

11    another investigative technique that you used in 2014 in this

12    investigation.  Special Agent Wood, are you familiar with the

13    term "protection detail"?

14    A.    I am, yes.

15    Q.    How are you familiar with that term?

16    A.    It's an undercover operation technique that we utilize in

17    the FBI to determine if I believe criminals are willing to be

18    involved in the distribution of illegal narcotics.

19    Q.    Okay.  And have you used this kind of technique in other

09:36AM 20    cases?

21    A.    I have.

22    Q.    Can you describe for the jury, I'm sure every case is

23    different and every case has wrinkles, but did you utilize, did

24    the FBI utilize protection detail operations in this case?

25    A.    We did, yes.

1    Q.    All right.  And do you know from your work in the case how

2    many different times the FBI utilized or conducted surveillance

3    of protection detail operations in this case?

4    A.    I do, yes.

5    Q.    How many?

6    A.    Three.

7    Q.    All right.  And of those three, how many were you

8    personally -- did you conduct surveillance on any of those

9    three?

09:36AM 10   A.    I did.

11   Q.    When was that?

12   A.    That was in October of 2014.

13   Q.    Can you tell the jury sort of the ballpark the three

14   protection details were committed or conducted?  When?

15   A.    In 2014.

16   Q.    By months?

17   A.    I know for sure it was October and December, 2014, and I

18   knew it was the springtime, late spring, I believe, in 2014.

19   Q.    Okay.  And so --

09:37AM 20           THE COURT:  Late spring, 2014?

21           THE WITNESS:  Yes, your Honor.

22   Q.    I'll make that clear in case it's not.  All three of the

23   protection details that were conducted in this case were in the

24   year 2014, correct?

25   A.    Yes, that is correct.

25

```
          1   Q.   So you used it in other cases, and you used it here.  Can
          2   you tell the jury exactly what it is that was done in this case
          3   for protection detail?
          4   A.   We directed the cooperating witness to ask if people
          5   wanted to volunteer, and we paid for protecting drug shipments
          6   that would initiate here in Massachusetts from a member of a
          7   cartel who was sending his product to a drug trafficker in
          8   New Hampshire.
          9   Q.   All right.  I think you testified yesterday that
09:38AM  10   CW-1 essentially advertised himself as a drug dealer, correct?
         11   A.   He did.
         12   Q.   And the operation, you said that you directed CW-1 to ask
         13   MS-13 gang members if they were willing to protect drug
         14   shipments, correct?
         15   A.   Yes.
         16   Q.   And you said they were coming from a cartel, right, but in
         17   point of fact, let's be clear, where did these drugs originate
         18   from, and where did they start at and where did they go to?
         19   A.   Well, the drugs were seized in previous cases that we have
09:38AM  20   in our evidence storage locker.  FBI agents will remove the
         21   drugs, test the drugs to make sure that they still have the
         22   presence of that illegal substance within them, it's not fake
         23   product.  We then give it to an undercover officer, in this
         24   case, the undercover officer then would provide it to the
         25   cooperating witness.  The cooperating witness would drive to
```

1    New Hampshire with members of the MS-13 gang members that

2    volunteered with him and follow cars.  In New Hampshire, they'd

3    meet with another undercover officer.  The CW would then

4    provide that undercover officer with the drugs and obtain money

5    from that undercover officer.  They would return to

6    Massachusetts, and then the CW would take the money that the

7    undercover officer provided him and pay the MS-13 gang members

8    for their time for protecting that controlled drug delivery.

9    Q.   All right.  So, I mean, there's a lot going on there, and

09:39AM 10    I want to make sure everybody understands this.  Let's use the

11    one that you were personally on surveillance for in October of

12    2014, all right.  How does that protection detail start?

13    A.   We've already established that we're going to do a drug

14    detail.

15    Q.   And you establish that how?

16    A.   We've directed the cooperating witness to ask people that

17    he knows in the gang if they want to help him protect a drug

18    shipment and transport it from Massachusetts to New Hampshire.

19    Q.   And what kinds of quantities are we talking about,

09:40AM 20    Special Agent Wood?

21    A.   In the first one in the spring, the second one in

22    October --

23         MR. IOVIENO:  Objection to anything else other than

24    the October one, your Honor.

25         THE COURT:  Objection as to anything other than

1    October?

2              MR. IOVIENO:  Yes.

3              THE COURT:  All right.  Overruled.

4    A.    In October, we used one kilogram of cocaine.

5    Q.    All right.  How did the kilogram of cocaine get from the

6    FBI agents to agents that were preparing to run the protection

7    detail?

8    A.    I signed the drugs out of evidence.

9    Q.    And I think you testified earlier that it was your

09:41AM 10    standard practice to test the drugs to make sure that they are,

11    in fact, cocaine?

12    A.    Yes.

13    Q.    All right.  Was that done in this case?

14    A.    I did do that, yes.

15    Q.    You personally did that?

16    A.    I did.

17    Q.    How did you do that?

18    A.    I removed the FBI packaging, the kilogram of cocaine from

19    its packaging, I used a knife, cut into the packaging, took a

09:41AM 20    very, very small quantity out, and I put it into our cocaine

21    test kit, and that tests for the presence of cocaine.

22    Q.    And when you did that in this case, what was the result of

23    the field test?

24    A.    It tested positive for the presence of cocaine.

25    Q.    All right.  You take the kilogram of cocaine, correct?

1    A.    I do.

2    Q.    And where does that kilogram of cocaine go to?

3    A.    I took it to an undercover officer.

4    Q.    All right.  The other undercover officer, let's call him

5    Undercover Officer 1, okay, Undercover Officer 1 job in the

6    protection detail is what?

7    A.    The undercover officer will meet with the cooperating

8    witness and provide him with that cocaine.

9    Q.    Okay.  So, in other words, Undercover Officer 1 is I think

09:42AM 10   you said the word cartel, he's a big drug dealer who's giving a

11   kilogram of cocaine to CW-1?

12   A.    Yes.

13   Q.    At least as far as his story is concerned for the other

14   people that are present in the deal, correct?

15   A.    Yes.

16   Q.    So the undercover officer, and I know we talked about

17   procedures earlier, and I don't want to spend a lot of time on

18   that now, but would I be correct that this same kind of

19   procedures you used to make controlled purchases of evidence

09:42AM 20   that you described earlier in the case, you did all that again

21   in this case, correct?

22   A.    Yes, we did.

23   Q.    And through the use of protection details?

24   A.    We did.

25   Q.    Meaning -- well, you called -- well, what precisely does

1   that mean?

2   A.   Well, prior, leading up to the protection detail, the

3   cooperating witness made consensually recorded telephone calls,

4   text messages to the gang members who volunteered to do the

5   protection detail.  Prior to the detail, we met with the

6   cooperating witness, searched him and his vehicle for money,

7   contraband, weapons and outfitted him with a car that had a

8   hide in it, audio video recording in it and a kill switch on.

9   Q.   Why a kill switch?  First of all, what is a kill switch?

09:43AM 10   A.   We had the ability to shut the engine off in the vehicle.

11   Q.   Remotely?

12   A.   Yes.

13   Q.   Why do you have a kill switch in CW-1's car?

14   A.   Well, in case the gang members decide to steal the drugs

15   and they're going to try to flee with the drugs, we can try to

16   kill the car, and they won't get away.  The car is going to

17   stop right there in the road.

18   Q.   All right.  Drugs go from you at the FBI to the undercover

19   Officer Number 1, Undercover Number 1 then provides them with a

09:44AM 20   cooperating witness, correct?

21   A.   Yes.

22   Q.   All right.  And the MS-13 members, when the drugs are

23   there, where are the MS-13 members who are protecting the drug

24   shipments?

25   A.   Well, in October, when I was there, we had one in the car

1        and then two in a follow car.

2        Q.    Do you recall who was present in the car with CW-1 in

3        October, 2015?

4        A.    I did remember.  I can't remember right now.  It just

5        escaped my head, I'm sorry.

6        Q.    But would I be correct that there are -- you were

7        personally on the October one.  Are you also familiar with the

8        December production detail, December, 2014?

9        A.    I am.

09:44AM 10       Q.    And both of those, how are you familiar with that one?

11       A.    Well, for the December one, prior to the December one, I

12       was an acting supervisor for a month, and we had to do

13       a -- every six months, we have to renew our ability to do an

14       undercover operation, so I had to be the supervisor in that

15       meeting with my fellow supervisors and the executive management

16       to seek approval to obtain permission to do the October and

17       December controlled purchase, the delivery protection details.

18       Q.    All right.  So, in both the October and the

19       December protection detail, there were MS-13 gang members in

09:45AM 20       the car, correct?

21       A.    Yes.

22       Q.    And there were other cars as well?

23       A.    They had a follow car, yes.

24       Q.    Okay.  What's a follow car?

25       A.    They had a follow car that would follow the CW and the

1    drugs, and whoever is in that car, and they would be out there

2    conducting countersurveillance looking for police officers that

3    may spot the car or potential rivals that may try and steal the

4    drugs.

5    Q.    Special Agent Wood, shortly after the last protection

6    detail in December, 2014, did you become aware of a murder that

7    took place in Chelsea?

8    A.    I knew there were several murders in Chelsea, yes.

9    Q.    Okay.  Let me skip ahead.  Was I correct that you actively

09:47AM 10    begin to work as a co-case agent in this case in January of

11    2015?

12    A.    Yes.

13    Q.    So that prior to this time, you were involved in

14    surveillance of the investigation, but your role changed at the

15    beginning of that year?

16    A.    Yes.

17    Q.    All right.  How did the investigation with CW-1 sort of

18    progress during 2015?

19    A.    In 2015, he became a gypsy cab driver.  He had a vehicle,

09:47AM 20    and he started driving in Chelsea, and at that point because he

21    had a vehicle, he was able to meet other MS-13 gang members

22    from other cliques in New England.

23    Q.    All right.  So, I'm sure everybody probably knows what a

24    gypsy cab drive is, but to be 100 percent sure, what's a gypsy

25    cab driver?

1    A.    It's an unlicensed cab driver.  It's a common way of

2    transportation in East Boston, Chelsea, in the El Salvadorian

3    community where they don't have licenses but ladies and men

4    will have a vehicle, and they'll act as a taxicab driver.

5    Q.    So CW-1, you tasked CW-1 with essentially being a gypsy

6    cab driver?

7    A.    Yes.

8    Q.    And through that sort of step in the investigation, that

9    increased CW-1's ability to access both people in ESLS as well

09:48AM 10    as members of other cliques operating in Massachusetts?

11          MR. LOPEZ:  Objection.

12          THE COURT:  Sustained.  Rephrase.

13    Q.    Special Agent Wood, let's say beginning around the time

14    that CW-1 was sort of acting as a gypsy cab driver, how

15    many -- well, what kinds of -- how many different clique

16    members -- well, when CW-1 began acting as a gypsy cab driver,

17    what kinds of evidence would you be able to gather through the

18    use of CW-1 acting as a gypsy cab driver?

19    A.    We outfitted the vehicle with an audio/video recorder, and

09:49AM 20    he would be able to consensually record conversations with gang

21    members.

22    Q.    And so using the recordings, you said you outfitted the

23    car with a recording device that enabled you to see the people

24    that were in the car, correct?

25    A.    After downloading the recording equipment, we could see

1    and hear the people in the car having conversations with our

2    cooperating witness, yes.

3    Q.   All right.  And by recording those conversations with the

4    individuals that were in the car with CW-1, were you able to

5    identify them?

6    A.   Yes.

7    Q.   All right.  And in identifying them, were you able to

8    determine whether or not they were members of cliques other

9    than ESLS?

09:50AM 10   A.   Yes.

11   Q.   And point of fact, what kind of -- well, let me

12   specifically talk about one particular instance in which CW-1

13   provided a ride to an MS-13 gang member.  Are you familiar with

14   a murder that took place on September 20th, 2015 in East

15   Boston?

16   A.   Yes.

17   Q.   And how are you familiar with that?

18   A.   Our cooperating witness gave a ride to the individual who

19   committed that murder.

09:51AM 20   Q.   And in giving that ride to the person who committed that

21   murder, was the FBI able to record a conversation with that

22   person where he described the murder?

23   A.   Yes.

24   Q.   And where he admitted that he committed the murder?

25          MR. IOVIENO:  Objection, your Honor.

```
 1              MR. MURPHY:  Objection, your Honor.

 2              THE COURT:  Sustained.

 3    Q.   Well, let's talk about the recording itself.

 4              THE COURT:  Are you showing this to the jury?

 5              MR. POHL:  This is for the witness at this point, your

 6    Honor.  Just play a portion of it.

 7              (Video played for the witness)

 8    Q.   Before we go any further, Special Agent Wood, do you

 9    recognize the person in the front seat of that car?

10    A.   I do.

11    Q.   Who is that?

12    A.   Animal.

13    Q.   And who is Animal?

14    A.   Animal is an MS-13 gang member.  At that time he was a

15    paro for ESL -- ELS, Everett Loco Salvatrucha.

16    Q.   And the murder -- well, are you familiar with a murder

17    that took place on September 20th, 2015, correct?

18    A.   Yes.

19    Q.   And that was of Irvin De Paz?

20    A.   Yes.

21    Q.   Do you recall when this recording between CW-1 and Animal

22    was made?

23    A.   In October of 2015.

24    Q.   Now, you don't speak Spanish, correct?

25    A.   No.
```

1   Q.   But I'm correct that you reviewed this recording prior to

2   your testimony today, correct?

3   A.   Yes.

4   Q.   And you've also reviewed the -- am I correct that in the

5   portion of the video that we're going to watch here,

6   essentially the person who is speaking is the person in the

7   front seat, correct?

8   A.   Yes.

9   Q.   And that person is somebody that you know and have

09:53AM 10   identified as Animal?

11            MR. MURPHY:  Objection, your Honor.  Leading.

12            THE COURT:  Who is the person?

13            THE WITNESS:  This is Animal, your Honor.

14            THE COURT:  Thank you.

15            MR. POHL:  Thank you.

16            So, your Honor, I would offer 104, which is a clip of

17   the video recording from October, 2015, and I'd also ask

18   permission to read 103, which is a transcript of that

19   recording.

09:53AM 20            MR. IOVIENO:  Objection.

21            MR. MURPHY:  Objection, your Honor.

22            THE COURT:  All right.  Is this a renewal of the

23   earlier objection?

24            MR. MURPHY:  No, your Honor.

25            THE COURT:  All right.  Let me see you.

1          (THE FOLLOWING OCCURRED AT SIDEBAR:)

2          MR. MURPHY:  Your Honor, with the Court's permission,

3     if Ms. Rodriguez could address this.

4          THE COURT:  Ms. Rodriguez.

5          MS. RODRIGUEZ:  Your Honor, with regard to the

6     transcripts, I believe your Honor relied on *Diaz-Arias* in order

7     to primarily allow the government to identify the speakers.  In

8     that ruling specifically, the Court established that there are

9     certain steps that are needed to take place before the jury can

09:54AM 10     review a transcript, and Agent Wood, not speaking Spanish and

11     no one authenticating the transcription, those are missing at

12     this point in order for the jury to be able to follow along

13     with the English translation.

14          THE COURT:  Rather than interrupt this witness'

15     testimony, I'm going to admit this de bene subject to being

16     tied up and properly authenticated at the risk of the

17     government, it's a mistrial in case that isn't done, but I'm

18     doing this on the assumption that there will be someone who

19     will testify and describe the translation process and certify

09:55AM 20     that it's an accurate translation.

21          MR. POHL:  Thank you, your Honor.

22          MS. LAWRENCE:  I believe that based on part of our

23     conversations, our understanding is that you are not objecting?

24          THE COURT:  To the actual translation?

25          MR. MURPHY:  No.

1          MS. LAWRENCE:  Just to identify the speakers, and to

2     this extent, I think Mr. Pohl did ask if he could see the

3     person in the video, and that would be the basis for

4     identifying the person speaking in this particular video.

5          THE COURT:  I know you object to some of the speaker

6     designations and to the way they're designated on the

7     transcript.  Do you also object as to the accuracy of the

8     translations?

9          MS. RODRIGUEZ:  We may, your Honor, object in certain

09:55AM 10     instances to the accuracy of the translations.

11          THE COURT:  Well, still, I'm going to admit it

12     de bene.

13          MR. IOVIENO:  Your Honor, this will also be a

14     *Petroziello* objection as well.

15          THE COURT:  I think those are all preserved.

16          (SIDEBAR CONFERENCE WAS CONCLUDED)

17          THE COURT:  Ladies and gentlemen, let me explain

18     something here.  I expect we're going to be presented with a

19     number of video and audio recordings.  I think they're all

09:56AM 20     going to be in Spanish.  I expect that later on the government

21     will be able to establish through a witness or otherwise that

22     these were translated into English.  You're going to be

23     provided with transcripts I think now of the conversations to

24     be able to follow along.

25          There may be issues as to whether the translation is

1    accurate or whether the correct speaker is identified.  Those

2    are issues for you to decide.  You're going to have transcripts

3    where the government has put labels indicating the government's

4    belief as to who is speaking.  You can accept that or not,

5    depending on what your view of the evidence is.  You don't have

6    to accept any label at all.  You can conclude, for example,

7    that the government made a mistake or made a mistake as to some

8    people and not others or that it's not possible to tell, and

9    you also can conclude if there is evidence that the translation

09:57AM 10    is not accurate.

11            But, again, this is not the witness who translated the

12    conversation.  We are going to -- I'm going to permit the

13    playing of the video, which is in Spanish, the reading of the

14    transcript, which is in English, and, again, its accuracy and

15    who is speaking is up to you.

16            As a footnote to that, some of you may speak Spanish,

17    but we all have to be on the same page here, so the English

18    translation is what you need to work from, in other words, you

19    can't independently apply your own expertise in Spanish to

09:58AM 20    ascertain what's going on here.  We all have to be on the same

21    page in English, and there may be, again, competing testimony

22    from different translators if there's an objection about what

23    it actually means.

24            So with that, and subject to my comment at sidebar, I

25    will permit this, and, I'm sorry, do we have an exhibit?

1              MR. POHL:  The recording, your Honor, is 104.  I'd

2       offer that.  The transcript is 103.

3              THE COURT:  They're admitted, 103 and 104.

4              (Exhibit Nos. 103 and 104 received into evidence.)

5              MR. POHL:  Ladies and gentlemen, there are transcript

6       binders on your chairs.

7              THE COURT:  And I'll ask you those include things we

8       haven't gotten to yet, so only open when appropriate to the tab

9       marked, okay.  I'll ask you to not read ahead.  Go ahead.

09:59AM 10             MR. POHL:  Thank you.

11      Q.   Special Agent Wood, I think what I'll do the, first I'm

12      going to play with video with you and then we'll read the

13      transcript.  All right?

14      A.   Yes, sir.

15      Q.   So first before I press play on this recording, can you

16      tell the -- it's in Spanish, but can you tell the ladies and

17      gentlemen of the jury what they're going to see on this video

18      as they watch it?

19      A.   They're going to see a video that is focused in on the

09:59AM 20      passenger, the front passenger seat.  In that seat will be an

21      MS-13 paro by the name of Animal.  You may be able to see in

22      the back seat there are some MS-13 paros in the back seat and

23      the cooperating witness is the driver.  You can't see him.  You

24      may see his hand coming in and out but the camera is not

25      focused in that area.

40

1    Q.    Okay.  The clip goes 30 seconds or so, but is there

2    something on the video itself that Animal in the passenger seat

3    does?

4    A.    Yes, they actually exchange a gang sign, so you will see

5    the gang sign.

6             THE COURT:  Actually, let me give another instruction

7    to the jury before we go any farther with that.  Agent Wood has

8    testified thus far about MS-13, about things like the origin or

9    colors or gang signs, and he's also testified about this case

10   specifically, in other words, things that he saw or heard or

11   did.

12            It's up to you to determine the credibility of all

13   witnesses.  Some witnesses testify about what they saw or heard

14   or did.  That's usually the way this works, but other witnesses

15   have or say that they have particular knowledge or expertise

16   about a subject and are allowed to testify in that regard.

17            Here, Agent Wood has done both.  He says because of

18   his training and education, he knows certain things about

19   MS-13, and I permitted that testimony, and he's also testifying

20   about what he did in the course of this investigation.

21            At the end of the trial, I'm going to give you

22   instructions about how you evaluate the testimony of different

23   kinds of witnesses, but I want you to understand that he is

24   doing both.  He says that he knows things about MS-13 based on

25   his training and education, and you're to evaluate that based

1    on his credibility, the sources of the information that he

2    relies on, the accuracy of his conclusions and so on, and

3    you're also evaluating him, again, on what he says he saw,

4    heard and did, and those are at least slightly different ways

5    to evaluate a witness.

6           One, again, is testifying about his perceptions, and

7    the other about testifying about things that he learned, and,

8    again, it's entirely up to you to evaluate the credibility of

9    any witness.  You can believe everything they say, none of it,

10:02AM 10   some of it, it's completely up to you.

11          With that, Mr. Pohl.

12          MR. POHL:  Thank you very much, your Honor.

13   Q.   Special Agent Wood, we'll play the video now.  I'm sorry,

14   before I press play, you had said something about a hand sign

15   or gang sign at the end?

16   A.   You see the tapping of the horns, the MS-13 sign.

17   Q.   Is there anything, sort of anything on the recording that

18   you see concerning sort of a physical demonstration of the

19   murder itself?

10:02AM 20   A.   Yes.

21   Q.   What is that?

22   A.   You see Animal reach back and make a motion as if he was

23   stabbing in the back or stabbing yourself in the back.

24   Q.   All right.

25          (Video played in Spanish)

1    Q.    That motion at the end, is that what you were referring

2    to, the MS-13 gang sign?

3    A.    Yes.

4    Q.    What is that again?

5    A.    The horns.  (Indicating)

6    Q.    You have 103 in front of you, Special Agent Wood?

7    A.    I do.

8    Q.    Special Agent Wood, I think what I'll do, I believe this

9    is a two-party conversation in this portion with maybe one

10:05AM 10    other person's voice in the back seat at the end.  I'm going to

11    read the portion Animal, and I'll ask you to read the portion

12    that's dedicated to CW-1.

13    A.    Yes.

14         THE COURT:  Again, ladies and gentlemen, I'll just

15    remind you, it's up to you to decide whether or not at the end

16    of the day these translations are accurate and the designations

17    of the witness are accurate.  Go ahead.

18         MR. POHL:  Thank you, your Honor.

19    Q.    "Animal:  Yeah, perhaps when I was -- when I was a paro, I

10:05AM 20    used to hang around those areas."

21    A.    "CW-1:  Are you a homeboy now?"

22    Q.    "Animal:  The thing is, who knows what they will make me,

23    a chequeo or homeboy."

24    A.    "CW-1:  No, man, with the thing I heard you did, that's

25    bullshit.  No way, ask for it directly."

1    Q.   "Animal:"  There's an unintelligible passage.

2    A.   "CW-1:  Listen, I'm telling you, I'm a homeboy, I know

3    what I mean, I'm from the La Maras, and I'm telling you,

4    chequeo, bullshit.  No dude.  You know that when you pull

5    something off like that..."

6    Q.   "Animal:  You know it!"

7    A.   "CW-1:  And, hey, you just didn't take down just any

8    motherfucker, some idiot."

9    Q.   "Animal:  No, a major culero!"

10:06AM 10    A.   "CW-1:  A major culero.  I had already smashed his head,

11    dude.  Didn't they tell you?"

12    Q.   "Animal:  Yes, he couldn't stand to see me."

13    A.   "CW-1:  He couldn't stand to see you?"

14    Q.   "Animal:  He couldn't stand -- he couldn't see me without

15    running away from me."

16    A.   "CW-1:  Because he knew the beast was going to take him,

17    the son of a bitch."

18    Q.   "Animal:  I had beaten that culero several times before,

19    and he had never been able to stop me, dude."

10:06AM 20    A.   "CW-1:  No fucking way!"

21    Q.   "Animal:  He could never stop me, the culero, and whenever

22    he would see me, he would immediately run."

23    A.   "CW-1:  Scooby and I, ask Scoopy.  I gave him a fucking

24    beating with Snoopy."

25    Q.   "Animal:  That Scooby, the dude also has some good

1   stories, the doggie."

2   A.   "CW-1:  Yes, with me, ask that dude.  I speak for that

3   dude, man."

4   Q.   "Animal:  Well, yeah, we have done shit on the streets.  I

5   have gone with these kids there.  We have them on the ropes."

6   A.   "CW-1:  So how many times did you stab him?"

7   Q.   "Animal:  I stabbed the culero three times, but I stabbed

8   him with a thing like this."

9   A.   "CW-1:  Pretty."

10:07AM 10   Q.   Then, "David:  I have a knife here that's exactly the same

11   as his, dude."

12         Then, "Animal:  The thing is that culero..."

13   A.   "CW-1:  And where did you stab him, in the chest or in

14   the..."

15   Q.   "Animal:  The first one I stabbed him right here and he

16   was falling dead, right.  I reached him, then I was behind him,

17   dude, and I reached him.  He stared at me, and he asked me if I

18   was going to, if I was going to stab him.  I told him, "Yes,

19   the Mara rules you, chavala," I said to him."

10:08AM 20   A.   "CW-1:  And he still talked to you?"

21   Q.   "Animal:  Exactly, dude, the guy was down, but he still

22   managed to get up.  I was amazed when he stood up."

23   A.   "CW-1:  You know that damned guy was strong because I once

24   hit him on the head really with a bat and he stood up again,

25   too; imagine."

1    Q.    "Animal:  Well, you know, the culero got up and said to

2    me, "You're going to pay for this," he said to me.  I was

3    already across the street, but I knew what I had done, what I

4    had done to him.  I knew that he was going to drop dead."

5    A.    "CW-1:  You had already stabbed him in the back or not

6    yet?"

7    Q.    "Animal:  The thing is, precisely, I was already running.

8    I had already stabbed him and was running away thinking the guy

9    was finished, man, then the guy stood up."

10:08AM 10   A.    CW-1:  "No fucking way!  And he said that?"

11   Q.    "Animal:  He told me, "You'll pay for this," but he did

12   not have time to say who did it."

13   A.    "CW-1:  What the fuck?  Didn't you go back to hit him?"

14   Q.    "Animal:  Uh-huh.  But the problem is there was some woman

15   approaching doggie, and you know that that would have been a

16   problem."

17   A.    "CW-1:  So the guy got right up and he... after you

18   stabbed him, the son of a bitch stood up again?"

19   Q.    "Animal:  That culero, he would run a little bit and fall

10:09AM 20   over and over again, so I caught up to him again, and that's

21   when I finished him off, man."

22   A.    "CW-1:  Awesome, dude, fucking cool, man."

23   Q.    "Animal:  The thing was that the culero, you know, the

24   beast had to take him."

25            Special Agent Wood, I want to ask you about some of

1    the terms in that transcript.

2    A.    Yes.

3    Q.    I think you testified about this yesterday, so I don't

4    want to go over old ground, but the words "paro" and "chequeo,"

5    in the course of your work as an FBI agent and traveling to

6    El Salvador and working on the MS-13 investigation, are you

7    familiar with those terms?

8    A.    I am.

9    Q.    And what is a paro?

10:10AM 10    A.    Paro is a brand new recruit in the gang.  They're still

11    being observed, being tested to make sure that they would

12    become good homeboys within the gangs.

13    Q.    What's a chequeo?

14    A.    A chequeo, they've been already committing some kinds of

15    crimes with the gang, and they are now more up on a

16    probationary status.  They've already passed that first

17    observation phase, and now they are earning their bones to

18    become a full-blown homeboy with the gang.

19    Q.    All right.  And the term was used a couple times in the

10:10AM 20    transcript, culero.  Have you had heard that term?

21    A.    I have.

22    Q.    What is a culero?

23    A.    Basically asshole.

24    Q.    Is it frequently used to identify or describe gang rivals

25    by MS-13?

1    A.    Yes.

2    Q.    Special Agent Wood, in September and October, 2015, did

3    the status in the investigation change of MS-13?

4    A.    Yes.

5    Q.    All right.  And without going into specifics, would I be

6    correct that the case began to change from gathering evidence

7    to preparing the charge?

8    A.    Yes.

9    Q.    And as we began to prepare to -- well, let me sort of

10:12AM 10    bound the time that we're talking about.  When were the arrest

11    issues in this case?

12    A.    January of 2016.

13    Q.    So in that period of time, you began to --

14         MR. MURPHY:  I'm sorry, I'm waiting for the question

15    to finish, but I was going to object on the grounds it's

16    leading.

17    Q.    Special Agent Wood, when you -- what were the -- what

18    steps -- in order to charge this case, CW-1 was -- you were

19    continuing to have contact with CW-1 through the end of 2015,

20    correct?

21    A.    Yes.

22    Q.    Okay.  And in order to charge this case, were there any

23    steps that you needed to take concerning CW-1 or CW-1's family

24    before you could complete this phase of the investigation?

25    A.    Yes.

1  Q.   And what were those?

2  A.   I had to receive permission from Washington D.C. to

3  extract CW-1's family from El Salvador.

4  Q.   And why did you ask for permission to extract CW-1's

5  family from El Salvador?

6  A.   Because I knew from my investigation they would be killed.

7       MR. MURPHY:  Objection, your Honor.  Motion to strike.

8       THE COURT:  I'm going to strike it in that form.  I

9  think he can give his reasons, but no one can predict the

10:14AM 10  future.

11  Q.   I think in your testimony yesterday, Special Agent Wood,

12  you discussed your work on this MS-13 investigation, correct?

13  A.   Yes.

14  Q.   As well as conversations with agents in El Salvador,

15  correct?

16  A.   And throughout the United States.

17  Q.   And throughout the United States.  And point of fact, in

18  2015 -- well, did you -- I think during your testimony

19  yesterday, you talked about the fact that you went to

10:14AM 20  El Salvador twice?

21  A.   I did.

22  Q.   And once was 2005.  When did you go for the second time?

23  A.   2015.

24  Q.   So, I want to ask you some questions about 2015 and in

25  your time in El Salvador in 2015, but in your conversations

1    during your time in El Salvador with the El Salvadorian agents

2    and with agents that were working on other MS-13 cases, what,

3    if anything, did you learn concerning MS-13's position

4    concerning informants?

5            MR. MURPHY:  Objection, your Honor.

6            THE COURT:  Overruled.

7    A.    That they would kill the informants.

8    Q.    And I think you testified that that was something that you

9    learned early on in your sort of work in learning about MS-13.

10:15AM 10   Did you have conversations concerning that while you were in

11   El Salvador in 2015?

12   A.    Yes.

13   Q.    And did the fact that you believed that MS-13 would target

14   and kill informants lead you to make an investigative decisions

15   in this case concerning CW-1?

16   A.    Yes.

17   Q.    And what was that?

18   A.    That I would have to submit a proposal to have him placed

19   in the witness protection program.

10:16AM 20   Q.    Okay.  What about CW-1's family?

21   A.    I've learned from communicating with the El Salvador

22   police officers, FBI agents, and listening to conversations

23   that we recorded that they would, if they could not find the

24   CW, they would kill his family.

25            MR. MURPHY:  Objection, your Honor.  Motion to strike,

 1    hearsay.

 2             MR. IOVIENO:  Objection.

 3             THE COURT:  Overruled.

 4    Q.   So when you --

 5             THE COURT:  Just to be clear, you're testifying as a

 6    general proposition as opposed to these specific individuals,

 7    in other words, you're testifying with your hat on and knowing,

 8    having special knowledge, what you say is special knowledge

 9    about the gang, in other words, this is their general practice

10:17AM 10    as opposed to having special knowledge about any individual on

11    trial here?

12             THE WITNESS:  Your Honor, I have a taped conversation

13    where the leader, the United States leader of the East Coast

14    Program said if you can't find the family, kill their families,

15    or if you can't find the cooperating witnesses, kill their

16    families.

17             THE COURT:  All right.  That's in part what you're

18    relying on, it's not a statement of anything?

19             THE WITNESS:  Yes, your Honor.

10:17AM 20             THE COURT:  Go ahead.

21    Q.   All right.  So, what did you -- prior to charging the

22    case, what did you -- what steps did you take to protect CW-1's

23    family in El Salvador?

24    A.   I applied to have them enter the country under a special

25    benefit parole package, and we had to fill out a Threat

1    Assessment.  At that point, we had our Homeland Security

2    investigation partners sign off on our request, then we sent it

3    to the FBI headquarters.  They sent it to HSI headquarters, and

4    once that is all approved, then we can bring the family into

5    the United States.

6    Q.   And you said that the arrest warrants were executed in

7    January, 2016.  Had that process been completed in January,

8    2016?

9    A.   No.

10:18AM 10    Q.   All right.  What steps did you take to keep CW-1's family

11    safe before or immediately after January, 2016 while the

12    process of admitting them into the United States legally was

13    underway?

14    A.   I directed the TAG, the FBI agents, and the El Salvadorian

15    police officers working together to enter the village that the

16    family lived in, remove them from the village and place them in

17    a hotel in an undisclosed location to keep them safe.

18    Q.   How long did they stay at that hotel?

19    A.   I believe approximately at least a month.

10:19AM 20    Q.   While you were in El Salvador in 2015, did you begin to

21    receive information about MS-13 attempting to impose, MS-13 in

22    El Salvador attempting to impose more order and control over

23    cliques operating in the United States?

24    A.   Yes.

25    Q.   And how?  And, again, those were through your

1    conversations with the El Salvadorian police, correct?

2    A.    Through conversations and through actual briefings, they

3    actually provided us with briefings on how MS-13 was morphined,

4    had been morphined, and they provided to me and my partners who

5    were down there at the same time.

6    Q.    And those briefings and in the conversations that you had

7    down there, what steps was MS-13 attempting to take from

8    El Salvador to control the actions of the cliques in the

9    United States?

10:20AM 10          MR. MURPHY:  Same objection, your Honor.

11          THE COURT:  All right.  I'll allow it.  Overruled.

12    Again, this is a general matter, correct?

13          MR. POHL:  Yes.

14          MR. MURPHY:  Can I have a continuing objection to

15    this, today's order?

16          THE COURT:  Yes.

17          MR. MURPHY:  Thank you.

18          THE COURT:  Just to be clear, I want both Mr. Pohl and

19    the witness to make clear when you're talking about general

10:20AM 20    terms, MS-13, and this specific group of people who are on

21    trial here.

22          MR. POHL:  Yes, your Honor.

23          THE COURT:  All right.  Go ahead.

24    A.    Yes, the MS-13 leadership wanted to take more control of

25    the smaller cliques that were operating within the

1    United States and within El Salvador, so they decided to create

2    programs and cliques that would fall under those programs.

3    Q.   And do you know from those conversations and briefings how

4    many programs are -- well, just generally, how many programs

5    exist with the MS-13 attempting to control actions of the

6    cliques in the United States?

7    A.   Several dozen programs.

8    Q.   And was one of those programs that you learned about while

9    you were in El Salvador something called the East Coast

10:21AM 10   Program?

11   A.   Yes.

12   Q.   And what is the East Coast Program?

13   A.   The East Coast Program focuses primarily on the East Coast

14   of the United States, but it can include cliques throughout the

15   entire United States and the world, but typically for

16   Massachusetts, New York, Rhode Island, New Jersey, Maryland,

17   Washington D.C., Northern Virginia, North Carolina, it's now in

18   Tennessee, but you have cliques that are all operating under

19   the East Coast Program, but we know they're in Columbus, we

10:22AM 20   know they're in Houston, we know that some of the -- there's

21   presence of cliques here in Massachusetts that are in Spain and

22   El Salvador.

23   Q.   So, again, in general terms, all right, the existence of a

24   program, let's use the East Coast Program as an example, the

25   point of the program from the MS-13 leadership in El Salvador

1    is to do what with cliques in the United States?

2    A.    It's to control the cliques and give them more guidance.

3    There had been a lot of uncontrolled violence, clique on clique

4    violence, and one of the objectives of creating the program was

5    to force the clique leaders to present evidence of wrongdoing

6    amongst other clique members before just going out on their own

7    to kill them, so that was one of the goals.

8         The other goal was to have money sent back to

9    El Salvador for that program where the cliques from that

10:23AM 10    program in El Salvador would be able to have some of that

11    money, and then, of course, all the way back up to the MS-13

12    leadership.  The MS-13 leadership is in control of all the

13    programs and all the cliques.

14    Q.    All right.  So that's what leaders in El Salvador want

15    from the cliques here in the United States.  What's the benefit

16    of an MS-13 clique or clique member in the United States?

17    Where is the benefit to that person in or that clique in

18    joining the East Coast Program or any program?

19         MR. IOVIENO:  Objection, your Honor.

10:24AM 20         THE COURT:  Overruled.

21    A.    Well, if a clique member gets deported to El Salvador,

22    because the cliques are sending money back to El Salvador, that

23    clique member now has the ability to have some money and

24    protection when he returns to El Salvador.  He's got a program

25    to fall under, a new clique to go to, and he has protection

1   from the rival gang, and he has the ability to get right back

2   into the gang and get on his feet.

3   Q.    Receiving that information from El Salvador, did that sort

4   of, when you returned to the United States, Massachusetts, and

5   continued this investigation, did that briefing impact your

6   investigation into MS-13 here?

7   A.    Yes.

8   Q.    All right.  And through CW-1, did you and the agents that

9   you work with begin to intercept discussions or communications

10:25AM 10   concerning the ESLS clique and the East Coast Program?

11   A.    Yes.

12   Q.    And as a result of the communications that you

13   intercepted, did you take any steps regarding any members of

14   the Eastside Locos Salvatrucha clique?

15   A.    I did.

16   Q.    And who was that?

17   A.    Casper.

18   Q.    And specifically what, can you tell the jury what you did?

19   A.    Myself, two task force officers, trooper Brian Estevez,

10:25AM 20   who speaks Spanish, and Detective Robert Impeba from the Revere

21   Police Department, we met Casper in Revere and warned him that

22   his life was in danger.

23   Q.    And do you remember when that -- when you met with Casper

24   to deliver that warning?

25   A.    It was in the summer of 2015, and we met in a parking lot.

1    Q.    Special Agent Wood, after that conversation with Casper,

2    you continued to record conversations through CW-1 with a

3    variety of MS-13 gang members, including people from the

4    Eastside Locos Salvatrucha clique, correct?

5    A.    That is right, yes.

6    Q.    Were you able to record additional clique meetings of ESLS

7    at the garage that we've seen pictures of after you delivered

8    that warning to Casper?

9    A.    Yes, we did.

10:27AM 10    Q.    And after did some of those -- and did you record

11    conversations through CW-1 with Casper after you delivered,

12    personally after you delivered that warning?

13    A.    Yes, we did.

14         MR. POHL:  Can I have Exhibit 108 first for the

15    witness.

16    Q.    Special Agent Wood, one of the recordings that you had

17    with Casper, do you recall a recording that was made in this

18    investigation in December, early December of 2015?

19    A.    Yes.

10:28AM 20    Q.    December 6th, 2015?

21    A.    Yes.

22    Q.    All right.  Is this conversation similar to the video clip

23    we saw with Animal a few minutes ago?

24    A.    Yes.

25    Q.    In what way?

1    A.    We have an MS-13 gang member in the front seat of CW-1's

2    car.

3             MR. MURPHY:  Objection to this narrative summary.

4             THE COURT:  All right.  I will allow him to just

5    generally describe what's on this without -- there is a person

6    sitting in the car.  I'll strike "MS-13."  There's no

7    foundation for that at this point.

8    A.    There's an individual in the front seat of the CW's car,

9    the recording equipment is turned on, and the CW and the

10:29AM 10   individual has a conversation.

11   Q.    Okay.  And there's a video recording of this conversation,

12   correct?

13   A.    Yes.

14   Q.    And I'm showing you a picture that is 108.  Do you

15   recognize that picture?

16   A.    I do.

17   Q.    Is that a still photo from the video itself?

18   A.    Yes.

19   Q.    And do you recognize the person that is depicted in the

10:30AM 20   front seat of CW-1's car?

21   A.    I do.

22   Q.    Who is that?

23   A.    Casper.

24             MR. POHL:  I'd offer 108, your Honor.

25             THE COURT:  It's admitted 108.

```
 1              (Exhibit No. 108 received into evidence.)

 2              MR. POHL:  For the jury.

 3              THE COURT:  Is it time to take a break?

 4              MR. POHL:  Sure.

 5              THE CLERK:  All rise.

 6              THE COURT:  Let me see counsel at sidebar.

 7              (SEALED SIDEBAR DISCUSSION WAS HELD CONCERNING JUROR)

 8              (SEALED SIDEBAR WAS CONCLUDED)

 9              (A recess was taken.)

10:45AM 10      THE CLERK:  All rise.

11              MR. POHL:  Do you want Special Agent Wood here?

12              THE COURT:  Let's go to sidebar.

13              MR. POHL:  Thank you.

14              (SEALED SIDEBAR DISCUSSION WAS HELD CONCERNING JUROR)

15              THE CLERK:  All rise for the jury.

16              (JURORS ENTERED THE COURTROOM.)

17              (SEALED SIDEBAR DISCUSSION WAS HELD CONCERNING JUROR)

18              (SIDEBAR CONFERENCE WAS CONCLUDED)

19              (SEALED SIDEBAR DISCUSSION WAS HELD CONCERNING JUROR)

10:52AM 20      (SIDEBAR CONFERENCE WAS CONCLUDED)

21              THE COURT:  All right.  Mr. Pohl.

22              MR. POHL:  Thank you very much, your Honor.

23    Q.   All right.  So I think when we left off, Special Agent

24    Wood, we had admitted this photograph of 108, correct?

25    A.   Yes.
```

1    Q.    And the person seated in the front seat of CW's car is

2    who?

3    A.    Casper.

4    Q.    You've reviewed this video recording before your testimony

5    here today, correct?

6    A.    Yes.

7    Q.    And before I sort of offer my next exhibit, the video

8    portion of the recording is difficult to view, correct?

9    A.    Yes.

10:54AM 10    Q.    And why is that?

11    A.    The sun, some light burns out the camera.

12    Q.    All right.  So I'm going to pull up an audio recording

13    that goes with this clip.  You viewed that before your

14    testimony today?

15    A.    Yes.

16    Q.    And this is a conversation between who and who?

17    A.    It's Casper having a conversation with the CW and Animal

18    on the phone.  We got him to speak on the phone.

19    Q.    Okay.  So the people in the car are CW-1 and Casper?

10:55AM 20    A.    Yes.

21    Q.    And during the call there's a phone call made?

22    A.    Yes the.

23    Q.    And the person on the phone call, can you hear the phone

24    call?

25    A.    Yes.

1    Q.    Essentially it's on speaker phone?

2    A.    Yes.

3    Q.    And the person that's speaking is based on the review of

4    the recordings and the transcripts that the FBI has made is

5    Animal?

6    A.    Yes.

7              MR. MURPHY:  Objection, your Honor.  Same objection.

8              THE COURT:  All right.  Overruled.

9              MR. POHL:  Your Honor, I would offer 107, which is the

10:56AM 10    recording, and I would offer 106, which is the transcript of

11    the recording subject to discussion we had earlier today at

12    sidebar.

13             MR. IOVIENO:  Same objection.

14             THE COURT:  All right.  I'll give a standing objection

15    to defendants on the transcripts, and they're admitted 107 and

16    106, and, again, I'm not going to say this, but just to remind

17    you one more time, it's up to you at the end of the day whether

18    you accept the transcripts and translations that the government

19    has offered.

10:56AM 20             (Exhibit Nos. 106 and 107 received into evidence.)

21             (Video played in Spanish)

22    Q.    All right.  Special Agent Wood, now turning to

23    Exhibit 106, which is the transcript, I'd like to read the

24    transcript with you.  If you could read CW-1, I realize there

25    is besides CW-1 and Casper and Animal, if you could read CW-1,

1    I'll read Casper and Animal.  If you could begin, "CW-1 says."

2    A.    "CW-1:  Let's see what happens.  I want to mention

3    something to you.  Hey, they are... do you remember the hit

4    that the kid that was with the Everetts, the paro, the one that

5    did the hit over there," and something not understandable.

6    Q.    "Casper:  Oh, the one that went down on the beach."

7    A.    "CW-1:  No, man, the other one, the one at the beach was

8    done by the Molinos."

9    Q.    "Casper:  Yeah, the Molinos, right."

11:01AM 10    A.    "And they took some Everetts with them."

11    Q.    "Casper:  Uh-huh."

12    A.    CW-1:  "So over there."

13    Q.    "Casper:  Oh, you are talking to me about the other one,

14    the chavala."

15    A.    "CW-1:  The one the one that killed that chavala."

16    Q.    "Casper:  Yeah."

17    A.    "CW-1:  That kid, dude, was only a paro."

18    Q.    "Casper:  Uh-hum."

19    A.    "CW-1:  Crazy told him to post the photo to see if he

11:01AM 20    really wanted to be with MS."

21    Q.    "Casper:  Uh-huh."

22    A.    "CW-1:  And the kid went and did it.  Now that he did it,

23    he has been isolated, and now they only want to beat him up and

24    the group that was with him.  There were four or five with

25    him."

1    Q.    "Casper:  Uh-huh."

2    A.    "CW-1:  So it's now only beatings.  They just beat one of

3    them just because he was texting with a girl in California, and

4    the girl in California was also texting with ChuCho from the

5    Everetts.  So just because the two of them were texting with

6    that girl, they beat the kid, and that day they went to get him

7    from New Jersey.  I don't know if Muerto explained it to you."

8    Q.    "Casper:  He told me something about it more or less."

9    A.    "CW-1 just to come and beat the crap out of him because he

11:02AM 10   was not answering the phone at work."

11   Q.    "Casper:  Unintelligible."

12   A.    "CW-1:  They beat him up!  So then..."

13   Q.    "Casper:  So what are you saying that the kid wants to

14   roll with us?"

15   A.    "CW-1:  No, the kid told me that he... he said, "Fuck, I

16   like MS, doggie, with the Everett side," he said clearly.  "I

17   am up to here because they keep me on beating me up."  They

18   just want to beat him up, man."

19   Q.    "Casper:  Uh-huh."

11:02AM 20   A.    "CW-1:  Fuck, he says, "I am the dude that already posted

21   the picture up there solid, man."  Then he said, "Fuck, I want

22   to be in a side like yours, fuck, if you guys will take me,

23   talk to your cabezon, and I will leave immediately, and you can

24   check out my record, and I will tell you everything about my

25   screw-ups."

1    Q.   "Casper:  Yeah, man, it's better if he rolls with us over

2    here."

3    A.   "CW-1:  Right.  And he told me that he's in New Jersey and

4    that they beat him over there yesterday and broke his finger,

5    then he said that he called over here to check in to say, you

6    know, that they had beaten him up, so what do you think they

7    told him?  We are going to come get you right now to beat you

8    big time.  You better go into hiding.  Then he told me, "Hey,

9    dude, I can't take it anymore.  The only thing that is keeping

11:03AM 10    me here is that I owe them $300 from when I moved there, but as

11    soon as I am done paying, doggie, I will go there, and if you

12    guys will jump me in there, I will go to you guys so I wanted

13    to see," he told me.  "If you want, you talk, and I will

14    explain, if you want, we can call him right now and let him

15    tell you himself.""

16    Q.   "Casper:  No, that is not necessary, I believe your word,

17    understand?"

18    A.   "CW-1:  No, because we just spoke, dude, and the kid is

19    cool."

11:04AM 20    Q.   "Casper:  No, man, no problem, he doesn't need to see me,

21    but we have to move him along."

22    A.   "CW-1:  Uh-huh."

23    Q.   "Casper:  You have already explained to me, and as to the

24    kid, what we need to do now is to bring him over."

25    A.   "CW-1:  There are five of them."

1    Q.    "Casper:  There are five that we have to bring over here.

2    They have to have hang out with us for a while."

3    A.    "CW-1:  Unintelligible."

4    Q.    "Casper:  Not in the motherfucking garage either."

5    A.    "CW-1:  No."

6    Q.    "Casper:  Don't think that with all the problems and

7    everything, I'm going to go see the kid."

8    A.    "CW-1:  No, that's what I wanted tell you, understand?  If

9    he's going to come down here with us, doggie, it's better if I

11:04AM 10    tell him to wait.  I'm going to tell him that this evening

11    because, you know, I'm going to explain that to him directly,

12    you know, so that we can get past this, you know, and Muerto

13    should take him.  The kid has experience, doggie."

14    Q.    "Casper:  No shit."

15    A.    "CW-1:  Yes, man; because like I'm telling you, I know

16    what's going on with the kid.  I already hung out with him here

17    before he did the murder, I used to see him.  So, fuck, they

18    have already killed, doggie, if they had not killed...speaking

19    clearly, fuck."

11:05AM 20    Q.    "Casper:  Yes."

21    A.    "CW-11:  Fuck, how do you see a kid that killed a good hit

22    like that, and he didn't just hit a culero; you know that he

23    didn't just hit any low level culero."

24    Q.    "Casper:  No."

25    A.    "CW-1:  So now he says that he's afraid if he hangs out

1    with us..."

2    Q.   "Animal:"  Oh, phone call ringing.  "What's up?"

3    A.   "CW-1:  Hey, doggie."

4    Q.   "Animal:  What's up, doggie?"

5    A.   "CW-1:  I'm here with cabezon."

6    Q.   "Animal:  Right on, doggie, that's awesome, doggie.  I am

7    also on the line, dog."

8    A.   "CW-1:  Hey, hang up over there, doggie, and stay on the

9    line with me."

11:05AM 10    Q.   "Animal:  Yes, doggie, keep talking.  I'm not on the line

11    now, doggie."

12    A.   "CW-1:  Oh."

13    Q.   "Animal:  My woman was on the line, but I hung up."

14    A.   "CW-1:  Okay, look, explain quickly to the doggie, he is

15    here with me.  I told you that I was going to come to talk to

16    him in person."

17    Q.   "Animal:  Oh, yes, put him on the phone."

18    A.   "CW-1:  Here he is."

19    Q.   "Casper:  What's up, dude?  How are you doing?"

11:06AM 20         "Animal:  What's up, doggie?  We are all fine.  I was

21    talking with the doggie to see if he could help me get a spot

22    in your clique, dog.  I want to go over there to hang with your

23    clique, dog, to see if you can also help me shelter the kids

24    that I have over there, dog."

25         "Casper:  Yeah, man, it would be awesome, but like I

1  was explaining to this homie here, it would be good if you

2  could drop by this area here to see how things work here and to

3  explain a few things to, you know, then if you agree and

4  everyone agrees..."

5        "Animal:  Yes, Pelon knows what's going on, dog.  I

6  have heart, unintelligible, the barrio, and I'm coming from the

7  heart, but I also don't like being marginalized like the side

8  is doing.  You know, doggie, they have me on ice.  I do what

9  they tell me, doggie, and later, they tell me the opposite.

11:07AM 10  Yes, I'm telling you straight out, doggie, I really want to

11  hang with your side, doggie."

12       "Casper:  Awesome.  As I was explaining, homie, come

13  by this area, homie, you will meet all of us, you know, you

14  will find out how we think as a group, homie, and if your way

15  of thinking coordinates with ours, then it's great, then

16  everything will be solid, and we will see what decisions we

17  will make because it's not only my decision, they all have to

18  check you out, too, you know."

19  A.   "CW-1:  That's what I told him."

11:07AM 20  Q.   "Animal:  That's what I'm saying.  That's what I'm saying.

21  The thing is that when I come over there, it would be to stay,

22  doggie, because..."

23  A.   "CW-1:  The Everetts have forbid him to be here."

24  Q.   "Animal:  Right now here I can't even go up there, doggie,

25  like you, because I am broke right now, doggie."

1      "Casper:  All right, dude, pay attention.  We have a

2  meeting now, and I'm going to bring this conversation up to the

3  table with the dogs here, understand?  When I talk to them,

4  Pelon will listen to everything and he can call you to tell you

5  what happens next."

6      "Animal:  Yes, that's great.  Unintelligible.  You

7  know, I have the past because I already have the past since I

8  already did big things, unintelligible."

9      "Casper:  Yes."

11:08AM 10      "Animal:  Because I'm broke, unintelligible, and doing

11  that.  I don't know if I can take off right now because I

12  am -- dude, I owe them $300, but, yes, I really want to do that

13  thing, but I don't want to hang with that side."

14      "Casper:  All right, dog, then there is no problem.

15  We are going to discuss that shit with these dudes, as I said,

16  and then, yes, we will be in touch.  This dude here will let

17  you know what decisions have been made in that regard.

18  Understand?"

19      "Animal:  All right, doggie, we are all set.  Call me

11:09AM 20  any time.  I will be here, doggie, I'm here.  Unintelligible."

21      "Casper:  All right.  Awesome, dog, take care of

22  yourself over there, dog."

23      "Animal:  All right, doggie, you got it."

24      "Casper:  You got it."

25  A.    "CW-1:  Yeah, that's what I told you, you know what I

1    mean, because they can't be calling me like this, but I wanted

2    you to know the kid, the bottom line is that what he wants is

3    to get away from the Everetts.  He said to me, "Shit, doggie,

4    if you guys take me in, do you think there will be a problem?"

5    I said, "No, once you're with us, they won't do anything to

6    you.""

7    Q.   "Casper:  Right.  What the fuck would they do to him?  But

8    we also have to talk to the Everetts, dude."

9         And then there's a new voice in the back seat, "Negro:

11:10AM 10  Yes, before we jump him in and all that shit."

11        "Casper:  Yes, we'll go see them, and we'll tell them

12   before jumping him over, look, this dude is going to hang with

13   us, so respect him, homies, to avoid any consequences or

14   problems, understand?"

15   A.   "CW-1:  But they have to accept, man."

16   Q.   "Casper:  For sure.  And why wouldn't they?  It's the same

17   barrio, MS-13."

18        There's an unidentified speaker:  "It's their call."

19        "Casper:  That's right."

11:10AM 20  A.   "CW-1:  That's right because they think they are superior,

21   dude, and what I don't want is..."

22   Q.   "Casper:  The dude is going to the MS-13 barrio, homeboy,

23   and we belong to the MS-13.  The dude is not going to another

24   barrio, and they have to accept it.  If they don't like it,

25   they can stuff it."

1    Q.    Special Agent Wood, during the meeting between the

2    cooperating witness and Casper was here in Massachusetts,

3    correct, during that recording?

4    A.    Yes.

5    Q.    Then the call with Animal, you can't tell from the phone

6    call where the person was, correct?

7    A.    Not from the phone call, no.

8    Q.    Were you in the course of this investigation able to

9    determine if where Animal was in early December of 2015?

11:11AM 10          MR. MURPHY:  Objection as to time frame, when the

11    determination was made.

12          THE COURT:  All right.

13    Q.    After the phone call was made, did you and the agents you

14    worked with take any steps to locate Animal?

15    A.    Actually we had done it before that in November.

16    Q.    Okay.  And how would you have done that?

17    A.    We surveilled the CW to New Jersey where he met with

18    Animal while we were surveilling him.

19    Q.    After that phone call, did CW-1 -- well, did you direct

11:12AM 20    CW-1 to do anything concerning Animal?

21    A.    Yes, we did.

22    Q.    And what was that?

23    A.    We directed the CW-1 to go down to New Jersey, pick up

24    Animal and bring him back to Massachusetts.

25    Q.    Okay.  And why did you do that?

1    A.    Because we wanted to have a better idea of the location of

2    where Animal would be.

3    Q.    And why would you want to have a better location of where

4    Animal would be?

5    A.    We were attempting to bring charges against MS-13 gang

6    members, and he was one of our targets.

7    Q.    So, Special Agent Wood, let me ask you a couple questions

8    about that.  Look, you had the tape of Animal in 2013, right?

9    A.    Yes.

11:13AM 10    Q.    It was pretty clear he did the Irvin De Paz murder from

11    the tape, correct?

12    A.    Yes.

13    Q.    Why didn't you go ahead and arrest him in 2013 once you

14    got the tape or got the translation of the tape?

15    A.    Because we had to take safety precautions of the CW and

16    his family before we could make an arrest.

17    Q.    What do you mean by that?  If you had arrested Animal for

18    the murder, why would that have put CW-1 and CW-1's family in

19    jeopardy?

11:13AM 20    A.    Because his identity would come out as the cooperating

21    witness, and we weren't -- the CW-1's identity would have been

22    known because during the arrest and the release of the tape to

23    show the evidence we had against Animal would have identified

24    the CW.

25    Q.    So, would it be fair to say that that was --

1          MR. MURPHY:  Leading, your Honor.

2          THE COURT:  Sustained.

3     Q.   All right.  I'll move on.  That would be the reason why

4     ultimately you didn't arrest Animal shortly after October,

5     2015?

6          MR. MURPHY:  Objection, leading.

7          THE COURT:  It is leading, but overruled.

8     A.   Yes.

9     Q.   Special Agent Wood, in the course of this investigation,

11:14AM 10  did you have -- did targets of the investigation in 2015 of

11     yours -- did you have evidence that targets of your

12     investigation went to New Jersey?

13     A.   Yes.

14     Q.   All right.  And did you have information that targets of

15     the investigation traveled between New Jersey and

16     Massachusetts?

17          MR. MURPHY:  Objection, your Honor.

18          THE COURT:  Overruled.

19     A.   Yes.

11:15AM 20  Q.   Just a few more questions, Special Agent Wood.  So you

21     gave the warning to Casper in sort of late summer or so of

22     2015, correct?

23     A.   Yes, I did.

24     Q.   All right.  Animal recordings in October of 2015, correct?

25     A.   Yes.

1    Q.    All right.  Did you in the course of your investigation

2    record any clique meetings of ESLS after the murder and the

3    recording of Animal in October, 2015?

4    A.    Yes.

5    Q.    All right.  And let me ask first about a recording from

6    October of 2015.  Do you recall that?

7    A.    There was many, but, yes.

8    Q.    Well, there was one in October, 2015?

9    A.    Yes.

11:16AM 10    Q.    And then after the conversation that you had that we just

11    played here between CW-1 and Casper and Animal, did the task

12    force succeed in recording a clique meeting of ESLS?

13    A.    Yes.

14    Q.    And specifically on January 8th of 2016?

15    A.    We did, yes.

16    Q.    And have you reviewed that video recording before your

17    testimony here today?

18    A.    I have.

19    Q.    And I'm going to pull up Exhibit 32.2 for the witness.

11:17AM 20    I'm just going to play a quick portion for the witness.

21            (Video played for the witness)

22    Q.    Do you recognize that, Special Agent Wood?

23    A.    I do.

24    Q.    How do you recognize it?

25    A.    I've reviewed this recording several times.

1    Q.   And this is an excerpt of a much longer recording; is that

2    correct?

3    A.   Yes.

4    Q.   All right.  And what is this a recording of?

5    A.   This is a recording of the jump-in promoting Animal into a

6    full homeboy as an MS-13 gang member.

7    Q.   What clique?

8    A.   ESLS.

9    Q.   All right.  And you reviewed the entire video recording,

11:18AM 10    correct?

11    A.   Yes.

12    Q.   And are you able through reviewing the entire video

13    recording to identify particular clique members who were

14    present at the clique meeting?

15    A.   Yes.

16    Q.   Were you able to -- let me ask you this.  Do you recall

17    whether the defendants that you've identified here, Casper,

18    Playa, CheChe and Lobo, were those individuals present for this

19    clique?

11:18AM 20    A.   Yes.

21    Q.   And the jump-in that you talked about yesterday, just to

22    be clear, based on your experience, conversations with other

23    agents, your work on this case, what is a jump-in ceremony in

24    the MS-13?

25    A.   When a gang member is being promoted to a homeboy, you're

1     a full-fledged member of the gang, they have anywhere from 2 to

2     4, 5 people who are already homeboys who will beat that person

3     for 13 seconds, typically, not all the time, but typically the

4     clique leader will count slowly from 1 to 13, and while they're

5     counting the other members start punching and kicking him for

6     the 13 seconds, then after the 13 seconds, the entire clique

7     will welcome that member into the gang, and they will welcome

8     him as a homeboy into the MS-13 gang.

9            MR. POHL:  Your Honor, I'd offer 32.2, and I'd ask

11:19AM 10   permission to play it.

11           THE COURT:  All right.  It's admitted.  32.2.

12           (Exhibit No. 32.2 received into evidence.)

13     Q.   Special Agent Wood, can you explain to the jury what it is

14     that they're going to be seeing here?

15     A.   Animal is going to be in the garage standing there,

16     they're going to say begin basically.  I can't -- then you

17     start hearing the counting.  You start seeing -- when the

18     camera can focus properly, you start seeing that he's getting

19     hit, kicked, he falls to the ground, they stand him up, they

11:20AM 20   continue on for 13 seconds, and then they all celebrate when

21     they're done and welcome him into the gang.

22           MR. POHL:  I'd ask permission to play now.

23           THE COURT:  Yes.

24           MR. POHL:  Thank you.

25           (Video played in Spanish)

1    Q.   The person in the center there is who?

2    A.   That's him.

3         (Video played in Spanish)

4    Q.   Special Agent Wood, there's at sort of the tail end of the

5    video recording concerning a hand motion.  Did you see that?

6    A.   I did.

7    Q.   And did you recognize that hand motion?

8    A.   I did.

9    Q.   And what was that hand motion?

11:22AM 10   A.   Once again, it was the hand sign of MS-13, the horns.

11        MR. POHL:  Thank you, sir.

12        THE COURT:  Cross-examination.

13                        CROSS-EXAMINATION

14   BY MR. IOVIENO:

15   Q.   Good morning, Agent Wood.

16   A.   Concerning, sir.

17   Q.   My name is Thomas Iovieno.  I represent Mr. Larios.

18   Directing your attention to the beginning of your investigation

19   when you became the supervisor, that was in 2015?

11:23AM 20   A.   The case agent, sir.

21   Q.   The case agent.  Were you supervisor of the investigation

22   at that time?

23   A.   I don't call it a supervisor, I call it a case agent.  I'm

24   a lead investigator.  I'm a supervisor now.

25   Q.   Were there other lead investigators involved in the

1    investigation at that time?

2    A.    Yes.

3    Q.    And you indicated you don't speak Spanish, correct?

4    A.    No.

5    Q.    And you were still involved in the investigation prior to

6    becoming the lead agent, correct?

7    A.    Yes.

8    Q.    And what was your involvement prior to becoming the lead

9    agent?

11:24AM 10    A.    I participated as a surveilling agent, I participated in

11    providing guidance to my law enforcement partners from the task

12    force.  That was my primary role at that point for the case.  I

13    had other cases that I was working on.

14    Q.    And you had other cases involving other gangs, correct?

15    A.    Yes.

16    Q.    And, in fact, you participated in an operation, Operation

17    Melting Pot?

18    A.    I have, yes.

19    Q.    And that involved another street gang in Massachusetts,

11:24AM 20    correct?

21    A.    Yes.

22    Q.    And it's fair to say there are a number of gangs in and

23    around Massachusetts besides MS-13, correct?

24    A.    Yes.

25    Q.    And in New England, there's approximately maybe over 125

1    separate street gangs; is that fair to say?

2    A.    Yes.

3    Q.    And so your attention during this period of time wasn't

4    devoted solely to this investigation, correct?

5    A.    At that point, no.

6    Q.    And when you became more involved with this investigation,

7    I think you testified that you regularly read reports,

8    transcripts of recordings to familiarize yourself with what was

9    going on, correct?

11:25AM 10    A.    Yes.

11    Q.    And even when you went back to El Salvador, you kept

12    abreast of what was happening with the investigation, right?

13    A.    Yes.

14    Q.    Okay.  And some of the recordings that you reviewed were

15    recordings that were in Spanish, and you don't speak Spanish,

16    and so you reviewed the transcript, correct?

17    A.    Yes.

18    Q.    So you were reviewing what other people had -- what they

19    thought the transcripts, the transcripts -- strike that.  You

11:25AM 20    were reviewing information in the form of transcripts that

21    other people had made?

22    A.    Yes.

23    Q.    And those were in English?

24    A.    Yes.

25    Q.    And you were relying on what they had put down in the

1    transcripts as the English version of what they had heard,

2    correct?

3    A.    Yes.

4    Q.    And you indicated that you identified a number of people,

5    you identified Mr. Larios from reports and photographs early on

6    in the investigation, correct?

7    A.    Yes.

8    Q.    And you identified those exhibits here today, correct?

9    A.    Yes.

11:26AM 10    Q.    And when you reviewed all the reports, did you learn of an

11    individual by the name of Jose Argueta Rodriguez?

12    A.    Do you know his street name?  I'm more familiar with the

13    street names of the gangs than the true names.

14    Q.    His street name was Lobo.

15    A.    Yes.

16    Q.    And this was another individual with a street name "Lobo,"

17    correct?

18    A.    Yes.

19    Q.    And, in fact, Pelon, CW-1, when he initially came up here

11:26AM 20    in late 2012, is that fair to say?

21    A.    Late 2012, early '13, yes.

22    Q.    And his job, you tell me if I'm wrong, was to get

23    intelligence and go out and meet some of the players that you

24    were investigating, right?

25    A.    Yes.

1    Q.    And he did that by selling drugs, setting up drug deals?

2    A.    He purchased drugs, yes.

3    Q.    And he actually lived with someone, correct?  Do you know

4    where he lived at that time early in the investigation?

5    A.    I don't.

6    Q.    You know he lived with Jose' Argueta Rodriguez, also known

7    as Lobo?

8    A.    I do not.

9    Q.    Had you reviewed a report that indicated he had lived with

11:27AM 10    this other Lobo?

11    A.    I have not reviewed that report, no.

12    Q.    But, in any event, you reviewed a number of reports in

13    this case, and you're familiar with an individual identified as

14    Lobo that's not Mr. Larios, correct?

15    A.    Yes, I know there was another Lobo, yes.

16    Q.    And, in fact, you made a photo array key as part of the

17    investigation, right?

18    A.    We did, yes.

19    Q.    And in that photo array key, you put down the key

11:28AM 20    identifies a name of an individual in what you think is a

21    photograph, right?

22    A.    We have the photographs of people and their names, yes.

23    Q.    And you put a photo array together of the Eastside clique,

24    right?

25    A.    Yes, we did.

80

1    Q.   And inside those photographs, you put a photograph of

2    Jose' Argueta Rodriguez, correct?

3    A.   Yes.

4    Q.   Okay.  And you identified in the key the street names of

5    all the individuals, and Mr. Rodriguez was identified in that

6    key, he was put down as one of the photos, correct?

7    A.   I believe so, yes.

8    Q.   And you also put down all the street names of the

9    individuals in that key, correct?

11:28AM 10    A.   Yes.

11    Q.   But you didn't put down the key name of Mr. Rodriguez, did

12    you?

13    A.   I'd have to review the key.

14    Q.   Do you have an independent memory of that?

15    A.   I don't.

16    Q.   But, in any event, you recall another individual by the

17    name of Lobo?

18    A.   Yes.

19    Q.   And you don't recall if CW-1, Pelon, lived with him at any

11:29AM 20    time, do you?

21    A.   I don't, no.

22    Q.   So you also indicated in your testimony that MS-13 members

23    generally have tattoos of MS-13?

24    A.   I said it changed, some do, some don't.

25    Q.   And you're not aware of any photograph of Mr. Larios with

1    an MS-13 tattoo, correct?

2    A.    I'm not, no.

3    Q.    And you indicated that -- you talked about becoming a

4    homeboy, and you talked about how later on in the

5    investigation, toward the end of it, that the requirements had

6    changed somewhat for someone to become a homeboy, correct?

7    A.    Yes.

8    Q.    And early on in the investigation, there wasn't any

9    requirement to become a homeboy involving a murder, correct?

11:30AM 10    A.    I said violent crime, serious assaults and up to murder,

11    yes.

12    Q.    So someone could become a homeboy by committing a series

13    of assaults, serious assaults?

14    A.    Yes.

15    Q.    Early on in say 2000, correct?

16    A.    Yes.

17    Q.    Up until 2015, that was still part of the requirement, if

18    you will?

19    A.    I would say it was changing before that.

11:30AM 20    Q.    It began to change toward the middle of the investigation,

21    2014?

22    A.    Yes.

23    Q.    All right.

24    A.    I would say that's more a generalization of it changing,

25    yes.

```
 1   Q.   And there was an individual you identified as Muerto,

 2   correct?

 3   A.   Yes.

 4   Q.   And Muerto, what's his full name?

 5   A.   Again, I'd have to see it in front of me.

 6   Q.   Jose' Hernandez?

 7   A.   I believe that's correct.

 8   Q.   And during the course of your investigation, Muerto became

 9   a confidential witness, correct?

10   A.   I call that a cooperating defendant.

11   Q.   I'm sorry, a cooperating --

12   A.   A cooperating defendant.   A cooperating witness is before

13   indictment.

14   Q.   And he agreed to cooperate with the government, correct?

15   A.   He did.

16   Q.   And Muerto, you had conversations during the course of

17   your investigation with Muerto, correct?

18   A.   We did, yes.

19   Q.   And he became a cooperating witness, you had conversations

20   with him, correct?

21   A.   I have not personally, no, but law enforcement officers

22   assigned to the case have, yes.

23   Q.   And he provided you with information, correct?

24   A.   Yes, he did.

25   Q.   And as a result of the conversations you had with him, did
```

11:31AM (line 10)
11:31AM (line 20)

1    you learn when he became --

2          THE COURT:  I thought you said you didn't have any

3    conversations with him, did you?

4          THE WITNESS:  I did not have specific, but I've

5    reviewed a few of the reports, and I know that my law

6    enforcement partners have spoken to him during proffer

7    sessions, your Honor.

8    Q.   In your review of the reports, did you learn when Muerto

9    became a homeboy?

11:32AM 10          MR. POHL:  Objection.

11          THE COURT:  I'll allow it.

12    A.   I don't remember the exact time frame.  I'm somewhat

13    familiar of -- I wouldn't say the time frame, but I knew, I

14    remember reading about when he was recruited.

15    Q.   And that was when he was in Los Angeles?

16    A.   In high school, yes.

17    Q.   And he was a young man in Los Angeles, and is it your

18    understanding he became a homeboy because he was good at

19    fighting in the streets?

11:33AM 20    A.   I didn't read the particulars of that, I just knew that he

21    was recruited in high school and became a homeboy.

22    Q.   But there's no indication in your investigation that he

23    had committed a murder?

24    A.   That's correct.  We don't have any information right now,

25    no.

1   Q.   Well, you didn't have any information right now, you

2   didn't have any during the course of your investigation?

3   A.   No, we didn't have any information.

4   Q.   And he was alleged to be a homeboy?

5   A.   He was a homeboy.

6   Q.   Just because someone is a homeboy doesn't mean they have

7   committed a murder, correct?

8   A.   As I said earlier on, you didn't have to commit a murder.

9   Generally speaking, during the course of our investigation,

11:33AM 10   it's been more towards coming to the point of where you needed

11   to commit a murder, so it's morphed since I first started

12   learning about MS-13 in 2002 until the present.

13   Q.   But say prior to 2010, that wasn't a requirement, to

14   commit a murder to become a homeboy?

15   A.   No.

16   Q.   And you indicated that -- well, can you tell us the name

17   of the other cliques in and around the area you were

18   investigating, there's the East Boston?

19   A.   We have East Boston Loco Salvatrucha, we have the Everett

11:34AM 20   Loco Salvatrucha, we have TLS, we have the Psychos, we had

21   Hollywood, we had the Molinos, we had the Worcesters, we had

22   Chelsea, Eastside, and I'm forgetting one, but I would say we

23   had 10 cliques by the time of the indictment of MS-13 operating

24   here in the Greater Boston area.

25   Q.   And at some point the investigation began, and you went

1    down to El Salvador to speak with the TAG, task force.  Is it a

2    task force down there?

3    A.    It's the transnational anti-gang unit.  It could be

4    considered a task force, yes, easily.

5    Q.    And at that time they already had a source that they were

6    using or operating with, correct?

7    A.    In 2015, I'm sure they have many sources.

8    Q.    Well, a source with CW-1, correct?

9    A.    I went in 2015.  The source was already developed in 2012.

11:35AM 10    I never went down there to meet that source.  Other people did.

11    Q.    And it's Detective Millett and Detective Connolly,

12    correct?

13    A.    That would be Sergeant Millett and Detective Connolly.

14    Q.    Sergeant Millett?

15    A.    Yes.

16    Q.    And so they went down to El Salvador.  Did they have the

17    conversations with the TAG representatives?

18    A.    It started before that, sir.  Sergeant Millett was down in

19    El Salvador.  We sponsored him for a coordination-type meeting

11:35AM 20    that occurred here in the United States and in El Salvador, so

21    we had El Salvadorian, Honduran, Guatemalan police officers

22    that traveled to the United States.

23        One of the locations they came to was Massachusetts,

24    and Sergeant Millett was the key law enforcement officer from

25    this location that coordinated that meeting.  He and those

1    officers and other local and state law enforcement officers

2    from other around the country then traveled to Los Angeles, and

3    then from there they traveled to El Salvador.  While in

4    El Salvador, a special agent assigned to the TAG introduced

5    Sergeant Millett to the cooperating witness.

6    Q.    And that cooperating witness is CW-1, right?

7    A.    That is right.

8    Q.    And CW-1 had -- you are aware that he had served a prison

9    sentence in Florida, correct?

11:36AM 10    A.    Absolutely.

11    Q.    And he had been deported to El Salvador?

12    A.    Upon completing his prison sentence, yes.

13    Q.    And he then became a source with this TAG, correct?

14    A.    That's correct.

15    Q.    And the plan was for CW-1 to come up here, and you were

16    having problems with MS-13 in Massachusetts; fair to say?

17    A.    Yes.

18    Q.    And the plan was for him to come up and infiltrate MS-13

19    up here in Massachusetts, right?

11:37AM 20    A.    The way you phrased the question initially, I wouldn't say

21    we wanted him to be MS-13, we wanted him to pose something

22    different, but it morphed where he became a member of MS-13 and

23    then was able to actually infiltrate the clique, yes.

24    Q.    So initially it was for him to come up and gather

25    intelligence, if you will; is that fair to say?

1  A.   Gather intelligence and evidence, and, as I said, we

2  weren't planning on him becoming a full gang member.

3  Q.   So, in order to do that, you had an agreement with him,

4  right?

5  A.   We did have an agreement, yes.

6  Q.   And it was a written agreement, right?

7  A.   Yes.

8  Q.   And in that agreement, you agreed to provide him with

9  certain benefits, right?

11:37AM 10  A.   Yes.

11  Q.   In return for his working for you, correct?

12  A.   Yes.

13  Q.   And what was his responsibilities under that agreement?

14  A.   To -- he was volunteering to work with us.  He had to

15  provide truthful information to us that there would be no

16  promises or rewards but that he would be and could be

17  compensated for his cooperation with us.

18  Q.   And when you say compensated, you were going to pay him,

19  correct?

11:38AM 20  A.   Yes.

21  Q.   And how much money did the FBI pay CW-1?

22  A.   The government prior to entering witness protection paid

23  him slightly over $196,000, but it wasn't directly.  Not all of

24  that money was directly to him.

25  Q.   It was for his housing?

1   A.   Well, we had most of that money was expenses, so it was

2   for housing, food, bills, money that we provided him so that he

3   could socialize with targets of the investigation, and then

4   once we got -- we did have one or two service payments where

5   that would be more money for his cooperation in the sense that

6   he could do with what he saw fit with that money.

7        It wasn't for those bills, it wasn't actually, okay,

8   here's some money for your cooperation, you can spend it as you

9   see fit, and then a large portion of that money was also

11:39AM 10  provided to him and his family for housing and food while we

11  were keeping them protected waiting for the Office of

12  Enforcement Operations at Department of Justice headquarters to

13  approve our application to have him enter and his family enter

14  the witness protection program and then also motel that was

15  paid to the hotel and family members in El Salvador to keep

16  them safe until we could get them into the United States.

17  Q.   And that was offered by the FBI, correct?

18  A.   The FBI and Department of Justice.

19  Q.   That means Department of Justice?

11:40AM 20  A.   Yes.

21  Q.   All right.  In addition, when he entered witness

22  protection, he also received approximately $300,000; is that

23  fair to say?

24  A.   Yes, that is correct.

25  Q.   That was for the United States Marshals, correct?

1    A.    That is correct, yes.

2    Q.    And you say that money didn't go directly to him, but

3    would you agree with me that during the period of time during

4    the investigation he was working as a gypsy cab driver?

5    A.    Yes.

6    Q.    And living in the community?

7    A.    He did live in the community, yes.

8    Q.    And the money that you gave him, he didn't have to come up

9    with himself?

11:40AM 10    A.    No.  I would disagree with that statement the way it's

11    asked.  The money we provided him, he had to conduct work for

12    us, he had to gather evidence, and when he gathered evidence,

13    it was based at our direction, and once we corroborated what he

14    told us through the evidence gathered, then we made sure he did

15    receive the payments that we told him we would pay him to live

16    here in the United States.

17    Q.    Okay.  But he also had bills to pay, he had housing

18    expenses to pay?

19    A.    Yes.

11:41AM 20    Q.    Okay.  And he didn't have to come up with his own money to

21    do that?

22    A.    No.

23    Q.    The money you gave him from the government he could use

24    for those purposes?

25    A.    Well, we directed him to pay for his housing.

1    Q.   So the money he earned didn't have to come out of his own

2    pocket to pay his living expenses?

3    A.   That's correct.

4    Q.   So all his living expenses, rent, mortgage, lights,

5    utilities, he didn't have to come up with any of that?

6    A.   He did by working for us, yes.

7    Q.   So the money he gained working for you, as long as he

8    worked for you, he would be getting this money, almost $200

9    from the Federal Government?

11:41AM 10    A.   That's not how it broke down.  It broke down to where we

11    paid him I believe it was around $2,000 a month during the

12    investigation to pay his bills, as long as he followed our

13    rules, and then I would say that would take us to under

14    $100,000, and then to keep him and his family safe upon the

15    indictments, the rest of the money came in to pay for housing

16    and food and bills while we kept him protected until he entered

17    the witness protection program.

18    Q.   But you also brought his family members to the

19    United States, too?

11:42AM 20    A.   Yes.

21    Q.   During the course of the investigation?

22    A.   No, upon the indictment.

23    Q.   Only upon the indictment did you bring his family?

24    A.   That's correct.

25    Q.   You offered protection to them in El Salvador during the

1    course of the investigation?

2    A.    Not until we were indicting because we couldn't get them

3    out in time before we indicted, so while we were waiting to

4    receive permission to bring them into the United States, we put

5    them into a hotel and paid for their hotel rooms and paid for

6    their food, so at that point a large sum, I would say over

7    $30,000 was paid directly to the hotel and then food, the cost

8    of food was provided to them so that they could eat while we

9    had them in a hotel until we could get them into the

11:43AM 10    United States.

11    Q.    And that was about 18 members of his family; is that fair

12    to say?

13    A.    No, he already had some immediate members of the family

14    living here in the United States, so once we indicted, we made

15    sure the entire family, and I believe it was 16 or 18,

16    including him, we housed together until we could enter them

17    into the witness protection program.

18    Q.    And part of the benefits you gave him also was immigration

19    benefits, Court action?

11:43AM 20    A.    We provided -- we sought deferred action to keep them in

21    the country during the investigation, yes.

22    Q.    You said them.  Who is the "them" that you were referring

23    to?

24    A.    The CW and his family.

25    Q.    So there were family members that came from El Salvador?

1    A.    As I said, there was already family members here in the
2    United States before he was brought back, paroled back into the
3    country to work with us.

4    Q.    So that was, what, eight or ten of those?

5    A.    I think that was closer to six.

6    Q.    About six members that you provided immigration benefits
7    to deferred action?

8    A.    We provided the deferred action, yes.

9    Q.    And that was a benefit to his family, correct?

10   A.    Yes.

11   Q.    And these benefits would keep coming in, deferred action
12   is renewed every year?

13   A.    We did it every year, yes.

14   Q.    And that's something you have to get permission for and
15   renew it, every year it has to be renewed?

16   A.    Every year we filled out the paperwork, sent it to the
17   Homeland Investigations, they approved it and allowed them to
18   stay in the country.

19   Q.    As long as CW-1 was working with the FBI, working in the
20   investigation, he got these benefits for himself and his
21   family?

22   A.    Yes.

23   Q.    And the only part of the bargain that he had with you was
24   to be truthful?

25   A.    There was other things, yes.

1    Q.    Okay.  The main was to be honest and truthful with you?

2    A.    Yes.

3    Q.    And I think you indicated that he signed an actual written

4    agreement?

5    A.    Yes.

6    Q.    And this was new to you, signing a written agreement, this

7    is the first one that you had a cooperating witness sign an

8    actual cooperation agreement?

9    A.    This is the first one I had done, yes, but I wasn't the

11:45AM 10    case agent then.  It was the first time in my career here in

11    Boston that my unit had ever signed an agreement like this with

12    a cooperating witness.  I know it's been done throughout the

13    United States with the FBI in other informants, but this is the

14    first one I somehow had direct involvement with at some point

15    or another.

16    Q.    And after the investigation concluded, you testified that

17    he CW-1 went into the witness protection program, correct?

18    A.    Yes, he did.

19    Q.    And that's operated by the United States Marshals, not

11:45AM 20    your area, correct?

21    A.    That is absolutely true, yes.

22    Q.    And I think you testified they gave him approximately

23    $300,000 in benefits?

24    A.    Yes.

25    Q.    And they gave immigration benefits and jobs to his family

1   and to CW-1?

2   A.   Yes, the Marshals are designed to get the family members

3   working so that they're productive citizens.

4   Q.   And you testified you made the recommendation that CW-1

5   and his family go into witness protection, there's a process

6   involved with it, right?

7   A.   Yes, it is.

8   Q.   And part of it is you're filling out some kind of

9   application, some kind of federal form recommending CW-1 as a

11:46AM 10   good candidate for the witness protection?

11   A.   Not just the CW-1 but his family.

12   Q.   And you recommended -- well, let's talk about CW-1.  You

13   recommended that CW-1 was a good candidate for witness

14   protection, correct?

15   A.   I did, yes.

16   Q.   And that he had been honest during your investigation.

17   Did you put that into your application?

18              MR. POHL:  Objection, your Honor.

19              THE COURT:  Let me see counsel at sidebar.

11:46AM 20              (THE FOLLOWING OCCURRED AT SIDEBAR:)

21              THE COURT:  What's the objection?

22              MR. POHL:  Your Honor, I think we're getting to the

23   area we talked about this morning prior to the jury coming in,

24   whether CW-1 is actually a witness at trial.  This line of

25   questioning is inappropriate and separate and apart from

1    conversations concerning, you know, sort of I think up until

2    this point, this is information that, you know, is a classic

3    promise, reward or inducement, and Special Agent Wood would be

4    authorized to talk about, but anything past that I think is

5    going to run afoul of the statute or the fact that you're

6    impeaching the CW-1 through Special Agent Wood.

7            THE COURT:  Mr. Iovieno.

8            MR. IOVIENO:  Your Honor, I believe on direct

9    examination this witness testified that he made a

11:48AM 10   recommendation to the witness protection program.  Part of that

11    recommendation is the character and fitness of the applicant,

12    that the door was open when that testimony was brought in.

13           There's also testimony from one of the transcripts

14    that CW-1, I think, indicates he smashed someone over the head

15    with a bat, which would bring into other bad acts that CW-1

16    participated and opens the door, I think the government opened

17    the door.

18           THE COURT:  Well, I don't remember that he testified

19    about character and fitness on direct, opening the door to

11:48AM 20   what?  Again, how is this not impeachment of CW-1 to a

21    third-party witness?  What is the goal here other than to make

22    the FBI look about bad?  What is the goal?

23           MR. IOVIENO:  The goal is to portray that he was not a

24    good candidate for witness protection and that he knew he was

25    not a good candidate for witness protection based on his past

1    conduct.

2         THE COURT:  And what does that show?  In other words,

3    how does that move the ball forward in this case?  How does

4    that -- how is that relevant to the defense of this case?

5         MR. IOVIENO:  It's showing that CW-1 was the

6    instigator of all the violent crime, particularly Animal being

7    brought over, and that he was untrustworthy, and that

8    his -- and that the FBI knew about it.

9         THE COURT:  Okay.  We keep going around in circles,

11:49AM 10    and the FBI knew about it, and, therefore, what, the FBI is

11    bad, the FBI is incompetent?

12         MR. IOVIENO:  That CW-1 is bad.

13         THE COURT:  I'll let you get in CW-1 is bad with the

14    right evidence, particularly calling CW-1, but just showing

15    that the FBI is bad or incompetent or asleep at the switch, I'm

16    not sure I follow how it --

17         MR. IOVIENO:  With respect to the robberies committed

18    by CW-1.

19         THE COURT:  Again, why?  Mr. Murphy, I'll hear you.

11:49AM 20         MR. MURPHY:  Number 1, I think, your Honor, as I said

21    before, it goes to the kind of evidence, the kind of

22    information, the quality of information that this agent was

23    relying on when he formed his opinions.  He was relying in part

24    that someone, the evidence will show, was lying to him.

25         THE COURT:  Okay.  There's no foundation for that.  He

1    can ask the questions how much he relied on what he learned

2    from CW-1, and maybe we can take it from there.

3              MR. MURPHY:  So that's point 1.  Point 2, your Honor,

4    is that he clearly testified on direct examination about the

5    Threat Assessment, and we have asked the government for the

6    Threat Assessment.  The threat assessment should be produced

7    because it's *Jencks*, and I would ask for an order that it be

8    produced now while I'm here.

9              THE COURT:  And what is the Threat Assessment?

11:50AM  10         MR. POHL:  Your Honor, I think the Threat Assessment

11    is a document that is prepared by the sponsoring agency to

12    provide information concerning the candidate's admission into

13    the witness protection program.

14              My understanding is Mr. Murphy asked for this in the

15    run-up to the trial.  I sort of conferred with colleagues in

16    the office that had this issue come up.  My understanding is

17    that those documents are not discoverable, and even if they

18    were discoverable, it would still be information about CW-1,

19    who's not testifying, all right, so it would include good and

11:51AM  20   bad things about CW-1, but the bad things would be inadmissible

21    anyway.

22              THE COURT:  Let's take this a step at a time.  As to

23    the question that is pending, I'm going to sustain the

24    objection.  You can ask about the foundations of his expert

25    testimony, and we'll see where that goes, and as to the Threat

1    Assessment, I'm going to deny it without prejudice because I

2    don't know what the document is precisely, and I don't know

3    what it bears on, and it can be taken up when the jury is not

4    waiting.

5            MR. LOPEZ:  Your Honor, can we ask you to review it in

6    camera?

7            THE COURT:  Maybe.  Again, I don't know what it is.

8            MR. POHL:  Thank you.

9            (SIDEBAR CONFERENCE WAS CONCLUDED)

11:52AM 10    Q.   Let's put another question to the witness.  During your

11    investigation, you relied on many factors, reports, we talked

12    about that, recordings, is that fair to say?

13    A.   Yes.

14    Q.   All right.  And you lied a lot about the confidential

15    informants, confidential informants who were providing

16    information to you, right?

17    A.   I don't agree with the way the question is asked.  I would

18    say that we listened to what the cooperating witnesses and

19    confidential informants tell us, and then we corroborate what

11:53AM 20    they tell us through recordings and the gathering of evidence.

21    We just don't take their word for it.

22    Q.   Because you don't trust the cooperating witnesses,

23    correct?

24    A.   I guess that would be somewhat of a fair type explanation,

25    but I just don't listen to one person and just say, okay, you

1  said that, and that's true, I have to have evidence to say it's

2  true.

3  Q.   Well, you testified at a prior hearing, correct?

4  A.   Yes.

5  Q.   And you testified that you don't trust your cooperating

6  witnesses; do you recall testifying to that?

7  A.   Yes, I mean, that's a fair thing that, yes, my witnesses

8  are criminals, so I have to go and prove what they tell me so

9  that I know what they're telling is the truth when they tell

11:53AM 10  me.

11  Q.   And you have to corroborate what they tell you, and you do

12  that by gathering other evidence, such as recordings?

13  A.   Yes.

14  Q.   In this case, CW-1, he was the only one recording meetings

15  of Eastside, correct?

16  A.   Yes.

17  Q.   All right.  And he was the only one recording

18  conversations inside cars, right?

19  A.   Yes.

11:54AM 20  Q.   And he was equipped with the recorder that you gave him

21  both on his person and it looks like he had maybe a camera in

22  his hat, something of that nature?

23  A.   We put it on his person, yes.

24  Q.   So you had the ability to listen, is it realtime

25  listening?

1    A.   It depended on what was going on.  There were times that

2    we could listen in realtime, there were times we could not.

3    Q.   And you also -- strike that.  CW-1 had the ability not to

4    record things, correct?

5    A.   Well, if he didn't have a recorder, yes, then he didn't

6    have the ability to record things.

7    Q.   And he had a lot of conversations that weren't recorded;

8    is that fair to say?

9    A.   Yes.

11:55AM 10  Q.   And because you couldn't record everything?

11   A.   That's correct.

12   Q.   And you had to rely on what he reported back to you as to

13   what was happening during various meetings, right?

14   A.   We didn't use anything he told us without a recording for

15   evidence to charge anyone.

16   Q.   That's not the question though.  The question is you had

17   to rely upon what he told you, what had happened at a various

18   meeting, you had to rely on him, right?

19   A.   Well, again, the way you're asking the question, I'm

11:55AM 20  trying to answer it to the best of my ability, but I listened

21   to what he has to say, but I don't take that as truth until I

22   have evidence that I would get through a recording.

23   Q.   But what he said to you was important into your

24   investigation when an incident wasn't recorded?

25   A.   We would write it down and put it in a report, yes, but,

1    as I said, we wouldn't rely on that until we had proof of it.

2    Q.   And, in particular, you couldn't rely on it with CW-1

3    because he was not truthful with you, right?

4         MR. POHL:  Objection.

5         THE COURT:  I'll allow that question.  Go ahead.

6    A.   I disagree.

7    Q.   You disagree that he was untruthful with you during your

8    investigation?

9    A.   No, I didn't say that.  I said I disagree that I don't

11:56AM 10   rely on things -- I don't rely that he was being untruthful

11   through the course of the investigation.

12   Q.   But on certain occasions, he was being untruthful?

13   A.   I would say he didn't tell us, just like I don't tell

14   everybody everything, so, yeah, I don't know if that's

15   untruthful.

16   Q.   He didn't disclose certain incidents that occurred during

17   the investigation?

18   A.   No.

19   Q.   You became aware of those later on in the investigation?

11:57AM 20   A.   Yes.

21   Q.   And you confronted CW-1 with those allegations?

22   A.   Yes.

23   Q.   When you confronted him, who was there?

24   A.   Myself and Assistant United States Attorney Peter Levitt.

25   Q.   And you meet regularly with or you've met regularly with

1    CW-1, correct, during the course of the investigation?

2    A.    Yes.

3    Q.    You had meetings where you admonished him, correct?

4    A.    Yes.

5    Q.    And those occurred how long?

6    A.    Admonishments occurred every year, criminal admonishments

7    occur every 90 days, which we call authorized illegal activity.

8    Q.    And those were occasions where you met specifically with

9    CW-1 with other agents or an agent, and the purpose of having

11:57AM 10    someone else there is to have a witness; is that fair to say?

11    A.    Yes.

12    Q.    And you admonished him about his work with you?

13    A.    We admonish him yearly on the -- well, it's an Attorney

14    General guideline, but every year, the FBI admonishes their

15    sources of what they can and can't do, and then if we grant the

16    ability for a cooperating witness to break the law, and that's

17    in a very controlled setting, it's as I described before, if we

18    authorize you to buy drugs, we authorize you to buy drugs when

19    we're with you, not when you're out on your own, but every 90

11:58AM 20    days, we will go over the instructions allowing them and

21    instructing them on how they can and can't break the law.

22    Q.    And you did that with CW-1 repeatedly during the

23    investigation?

24    A.    Every year he got admonishments, and every 90 days he got

25    his authorized illegal activity admonishments.

1    Q.    And specifically during the winter of 2014 and 2015, you

2    had these admonishment meetings, correct?

3    A.    I started in 2015.

4    Q.    But you were aware the investigation also had them prior

5    to you being involved?

6    A.    I know that they have to do it every 90 days, so it

7    started when he first got here, and once he was authorized to

8    break certain laws, he got it every 90 days.

9    Q.    And that would involve sitting down with CW-1, and he was

11:59AM 10    given admonishments, and he would acknowledge those

11    admonishments.  Did he have anything in writing or would he

12    just verbally tell you, yes, I understand?

13    A.    The yearly admonishments, he does not have to sign; the

14    every 90 days to break the law admonishments, he has to sign.

15    Q.    And he signed those every 90 days, correct?

16    A.    Yes, he did.

17    Q.    And during the period where he signed saying he had not

18    broken the law, had you become aware that he, in fact, violated

19    the law?

11:59AM 20              MR. POHL:  Objection.

21              THE COURT:  Let's take our 12:00 break.

22              THE CLERK:  All rise.

23              THE COURT:  Let me see counsel at sidebar.

24              (THE FOLLOWING OCCURRED AT SIDEBAR:)

25              THE COURT:  Remind me, in the first trial, there was

1    evidence that he committed robberies and was terminated; am I

2    right?  I can't remember what I learned at the first trial.

3         MR. POHL:  Let me see if I can do this quickly.

4    Shortly before the indictments were issued, agents interviewed

5    Clacker, CW-2.  He provided information that he -- and they

6    discussed all of his criminal activities with people in his

7    clique, with other MS-13 gang members, and one of the things he

8    disclosed was that he had done some street robberies with gypsy

9    cab drivers, and one of the people he identified as being

12:01PM 10    somehow involved in that was Pelon.

11         Pelon, the agents then -- and I think that was the

12    conversation that Mr. Iovieno just referenced.  Special Agent

13    Wood and AUSA Levitt confronted the cooperating witness about

14    it, he eventually acknowledged that he had done, and, you know,

15    there was a discussion about whether he should be charged, what

16    impact that charging decision would have on WITSEC, and

17    ultimately it was decided to provide that information to OEO

18    and factor that into the application, and then several months

19    after the case was charged, eventually he and his family were

12:02PM 20    admitted into WITSEC.

21         THE COURT:  One of the reasons I'm asking is for the

22    reasons I've indicated, I have concerns about going down this

23    path, but if it is already out, in other words, if he already

24    testified in open court and trial, then it's easy, I'll let him

25    do the same testimony.

1           MR. POHL:  Well, let me get there, I don't remember.

2      I mean, that's the story.  I don't remember --

3           THE COURT:  On that assumption, I'm going to allow him

4      to elicit that he participated in robberies and then was

5      terminated.

6           MR. POHL:  Oh, no, no, no.

7           MS. LAWRENCE:  No, he wasn't terminated, and it was in

8      a different context.

9           THE COURT:  There was a gap.

12:02PM 10           MS. LAWRENCE:  Clacker was part of that trial in a

11      different way that it would be here.

12           MR. POHL:  So, in other words --

13           THE COURT:  We'll take it a step at a time.

14           MR. LOPEZ:  Clacker testified there were 30 to 40

15      robberies.

16           MR. POHL:  Excuse me, understand, understand, Clacker

17      was a witness in the November trial.

18           THE COURT:  Right.

19           MR. POHL:  So Clacker's testimony about his own

12:02PM 20      criminal activity was a live issue at that trial, and

21      discussing in the context of CW-1 in that trial makes sense

22      because Clacker is going to say what he did, and that included

23      street robberies, and that would include CW-1.  None of that is

24      present here, all right.

25           Clacker is listed on our witness list, but we haven't

1    called him yet, and I don't know that we will call him, and,

2    respectfully, I don't think the fact that in a totally

3    different trial with totally different players and in a totally

4    different context that automatically means that evidence comes

5    in at this trial.

6              THE COURT:  Okay.  I thought there was a simple

7    answer, which there may not be.  Okay.  Let me go back then.

8    How is evidence that he participated in street robberies

9    relevant to Wood's testimony as opposed to confronting CW-1

10   himself?

11             MR. IOVIENO:  He was relying on information that was

12   provided through the course of the investigation, and he was

13   being lied to throughout the course of the investigation.  He

14   met every 90 days with this young man, and he was being lied

15   to.

16             MR. MURPHY:  Your Honor, the other thing I would add

17   is that there was testimony on direct examination:  We directed

18   him to do this, we directed him to do this.  It presents an

19   incomplete picture of the FBI's investigation if the jury isn't

20   allowed to know that this guy was also freelancing on the side.

21             There's been testimony without objection about his

22   cooperation agreement, and I would like to put a redacted copy

23   of that into evidence.  With that evidence and it's relevant,

24   the FBI and the Marshal Service and the Department of Justice

25   kept this from the parties despite the fact --

1           THE COURT:  Again, who are you impeaching with this?

2   You're impeaching CW-1?

3           MR. MURPHY:  It's not impeachment really, your Honor.

4           THE COURT:  What is it?

5           MR. MURPHY:  What it is, it's relevant evidence to

6   show that this witness' testimony about the investigation has

7   omitted critical facts, the omission being that the man that he

8   was using posing as a drug dealer, infiltrating MS-13 was also

9   committing crimes on his own behind the FBI's back.

12:05PM 10           THE COURT:  And, therefore, and therefore --

11           MR. MURPHY:  And, therefore --

12           THE COURT:  What is your legal conclusion or factual

13   conclusion that flows from that?

14           MR. MURPHY:  The legal conclusion is that the jury is

15   entitled to see a full picture of what the FBI's investigation

16   of this case was like and not a sanitized version.  The

17   government should not be allowed to say we directed this guy,

18   he shouldn't be allowed to testify, but there was a cooperation

19   agreement.  We aren't allowed to bring out the fact that he was

12:05PM 20   doing things behind their back.  It's essentially the idea,

21   your Honor, that having brought all of this testimony out

22   suggesting that the, you know, suggesting that this witness is

23   an MS-13 expert, the fact that --

24           THE COURT:  Well, there still will be no foundation

25   that he relied on anything CW-1 said.

1          MR. MURPHY:  But even if it didn't rely, and, you

2     know, we'll maybe try that again, but even if he didn't rely,

3     the fact that this MS-13 expert was running an informant, was

4     pulling the wool over his eyes for a year and a half goes

5     directly to his credibility.

6          How can he be an expert if the one guy that he's

7     dealing with to learn about MS-13, who's infiltrating MS-13, he

8     can't even keep track of what he's doing?

9          In addition, I would say the government brought out on

12:06PM 10   direct, you know, the reasons why Animal was not arrested when

11    he was arrested, we should be able to explore that as well.

12          MR. LOPEZ:  Your Honor, can I add?

13          THE COURT:  Yes.

14          MR. LOPEZ:  That my theory of the defense is that they

15    kept CW-1 active after knowing that he committed crimes, that

16    they kept Animal active and didn't arrest because they wanted

17    to manufacture and create that beat-in scene so they could

18    argue that these guys agreed to do murder, and, therefore, this

19    evidence goes to that agent's motivations and bias with respect

12:07PM 20   to this case, and it seems to me that we get to explore that.

21          THE COURT:  Well, I'm not sure about that theory, I

22    mean, my client committed a crime because you didn't arrest the

23    person who you were going to commit the crime with earlier, I'm

24    not sure I'd allow that.

25          MR. LOPEZ:  It's that there was no evidence out of my

1   guys, my client wasn't involved in any murders, any attempted

2   murders.

3        THE COURT:  We just heard a tape that said he agreed

4   to beat the guy in.  Anyway, we'll get to that, we'll get to it

5   later.

6        All right.  On this issue, suppose you're right,

7   Mr. Murphy, as to which I have serious doubts because I'm

8   having trouble fitting this into any legal or factual theory,

9   isn't it enough to say, "Isn't it true that he committed

12:08PM 10   robberies and didn't know about it?"  "Yes."

11        What more do you need beyond that?

12        MR. MURPHY:  I think not an enormous amount of

13   details.

14        THE COURT:  What else do you need beyond that?

15        MR. MURPHY:  Well, you also need to know that he

16   committed --

17        MR. LOPEZ:  Assault.

18        MR. MURPHY:  -- an assault, stabbings behind his back.

19        MR. LOPEZ:  And then lied about it.

12:08PM 20        THE COURT:  And, again, therefore, and therefore what,

21   in other words --

22        MR. IOVIENO:  That was his motivation to continue

23   working for the FBI was to keep the gravy train rolling for him

24   and his family, and that's what his motivation was.

25        MR. MURPHY:  And, therefore the --

1          THE COURT:  Which is all fair game with CW-1, again,

2     you're impeaching someone else with this testimony.  How are we

3     impeaching him?  That's what I'm trying to find out.

4          MR. IOVIENO:  It was his investigation.

5          MR. MURPHY:  It's his investigation, I will say that.

6     He has been portrayed as an MS-13 expert.

7          THE COURT:  Right.

8          MR. MURPHY:  He has been portrayed -- all law

9     enforcement methods have been discussed.  He's essentially

12:09PM 10     been, over our objection, allowed to testify about MS-13

11     generally, about the facts that he --

12          THE COURT:  Structural history, gang symbols, colors.

13     It's very basic stuff.

14          MR. MURPHY:  The purpose.  So if the person who -- if

15     his job as an FBI agent in this case beginning in 2015, I think

16     he will say part of his job was to run this CI, if he can't

17     even do that, then why should the jury trust the quality of the

18     opinions that he's rendering about what MS-13 is generally?

19          I think it goes to his -- I think it goes to his

12:09PM 20     credibility.  He's here as an -- he's here as -- it would be

21     like if you were calling an expert about driving, and, you

22     know --

23          THE COURT:  And his teenage son was a bad driver?

24          MR. MURPHY:  It's not his teenage son, your Honor,

25     because you don't have a deal with his teenage son, it wasn't

1    his job to monitor the activities.

2         THE COURT:  His job is not to monitor everything he

3    does, surely, that's absurd, you know, that he's supposed to

4    baby sit him 24-7.

5         All right.  Let's do this.  It's ten after twelve.

6    Let me chew on this for five, ten minutes while you all use the

7    facilities, and we'll come back.

8         MR. MURPHY:  Thank you, your Honor.

9         (SIDEBAR CONFERENCE WAS CONCLUDED.)

12:10PM 10    (A recess was taken.)

11         THE CLERK:  All rise.

12         THE COURT:  Let me see the lawyers at sidebar.

13         (THE FOLLOWING OCCURRED AT SIDEBAR:)

14         THE COURT:  All right.  To the extent this evidence is

15    offered to impeach CW-1, it's clearly irrelevant.  To the

16    extent the evidence is offered to impeach Wood's testimony as

17    an expert witness, no foundation has been laid that he relied

18    on it, and it seems doubtful under the circumstances given the

19    basic nature of his testimony that he did, but we'll see where

12:19PM 20    that goes, so the question is:  Is this evidence relevant to

21    impeach him as an FBI agent, that is, a case agent running this

22    case that shows somehow that he is not competent because he is

23    not supervising his cooperating witness somehow or is being

24    duped by him?  And that goes to his credibility.

25         I have grave doubts that that is relevant, however,

1    what I'm going to do is I'm going to permit you to elicit in

2    bare bones fashion that CW-1 committed serious crimes, if this

3    is what happened, during the time that he was a cooperating

4    witness and leave it at that, nothing further.

5         In other words, you are not aware he was committing

6    robberies or whatever, and that may open the door to the

7    government rehabilitating him maybe as to the good things CW-1

8    did, which may lead us to the knives at Deer Island, I don't

9    know, I haven't decided yet, but that's what I'm going to do,

12:20PM 10    and, frankly, I'm putting my thumb on the scale because it's a

11    criminal case, but I do think it's irrelevant, but I'm going to

12    permit it for prudence sake.  Okay.

13         MR. POHL:  Thank you, your Honor.

14         (SIDEBAR CONFERENCE WAS CONCLUDED)

15         THE CLERK:  All rise for the jury.

16         (JURORS ENTERED THE COURTROOM.)

17         THE CLERK:  Thank you.  You may be seated.

18         THE COURT:  Counsel, put a new question to the

19    witness.

12:23PM 20    Q.    You were talking about the admonishment sessions to CW-1?

21    A.    Yes.

22    Q.    And directing your attention to around December of 2015,

23    you become aware of information that CW-1 had committed some

24    serious violent crimes throughout the investigation?

25    A.    Yes.

1    Q.    And as a result of that, did you have a meeting with CW-1

2    I think in January of 2016?

3    A.    I had a meeting December of 2015.

4    Q.    I'm sorry, December?

5    A.    Yes.

6    Q.    Okay.  You had a meeting with him and you confronted him

7    about that, correct?

8    A.    Yes.

9    Q.    And he initially denied it, right?

12:23PM 10            MR. POHL:  Objection.

11            THE COURT:  I'll allow that, overruled.

12    A.    Yes.

13    Q.    And then I believe you testified that then subsequently

14    after the investigation was over, you recommended him for the

15    witness protection program, correct?

16    A.    I had already recommended him for the witness protection

17    program before it was over.  I started the process of the

18    paperwork in October, November of 2015 to enter him into

19    WITSEC.

12:24PM 20    Q.    You started the process to enter him into the witness

21    protection program before you became aware that he had

22    committed a violent crime?

23    A.    Yes.

24    Q.    Did you amend that application at all?

25    A.    Yes.

1    Q.    And at some point, CW-1 was admitted into the witness

2    protection program along with his family?

3    A.    Yes.

4    Q.    And at some point he was terminated?

5    A.    Yes.

6    Q.    How long after he entered was he terminated?

7    A.    Over a year.

8    Q.    And was it your understanding he was terminated because he

9    had committed a violent crime?

12:25PM 10          MR. POHL:  Objection.

11          THE COURT:  Sustained.

12    Q.    Let me go back a little bit and talk about when I first

13    started questioning you, you mentioned the gentleman by the

14    name of Jose' Argueta Rodriguez, correct?

15    A.    Yes, you mentioned him, yes.

16    Q.    He was also known as Lobo?

17    A.    Yes.

18    Q.    So there were two Lobos who were hanging around with

19    Eastside, correct?

12:25PM 20    A.    Yes.

21    Q.    And you indicated you didn't recall if he had lived with

22    Pelon; is that correct?

23    A.    That's correct.

24          MR. IOVIENO:  Can I have the document camera just for

25    the witness.

1    Q.    I'm going to show you a document and just direct your

2    attention to the -- just read that to yourself.

3    A.    Yes.

4    Q.    Does that refresh your recollection whether or not Pelon

5    had once lived with Jose' Argueta Rodriguez, also known as

6    Lobo?

7    A.    Reading it, that's what it says, but, again, as I said, I

8    was not involved in this part of the investigation at this

9    time, so this is the first time I'm reading it.

12:26PM 10    Q.    But it's fair to say that with any CW, particularly CW-1,

11    you wanted to protect him, correct?

12    A.    Yes.

13    Q.    And it was important to know who he resided with?

14    A.    Yes.

15    Q.    He never resided with Mr. Larios, correct?

16    A.    That's correct.

17    Q.    So the only other Lobo that you were aware of was this

18    Mr. Jose' Argueta Rodriguez?

19    A.    I knew there were two Lobos, so your client and the other

12:26PM 20    one.

21    Q.    And we talked about the photo array, the photo key, and

22    you indicated that you had not put the name "Lobo" down next to

23    the name "Jose' Argueta Rodriguez," correct?

24    A.    I didn't make the key itself, so, no, I did not put it

25    down.

1    Q.    Have you seen the key before?

2    A.    I have, yes.

3          MR. IOVIENO:    The document camera just for the

4    witness.

5    Q.    Can you tell us what that document is?

6    A.    That's the Eastside Locos Salvatrucha photo array key,

7    yes.

8    Q.    Can you tell the jury what a photo array key is?

9    A.    In this case, it wasn't a photo array, it was more of a

12:27PM 10    photo book, and the photo book contained photographs of members

11    and associates of Eastside Locos Salvatrucha.  We had books for

12    other cliques as well, and then when we would show the photo

13    book, just the book, to the witness or any witness, they just

14    see the photograph of a person, and we would have the key next

15    to us that when they would identify someone, they could say

16    this is who I know this to be, and we could mark our books,

17    and, okay, that's Number 1, they've identified this person, and

18    Number 4, they've identified this person, so the key matches up

19    in this case to the photo book that we had.

12:28PM 20    Q.    And with respect to Number 8, that was Jose' Argueta

21    Rodriguez, correct?

22    A.    Yes.

23    Q.    And he was photograph Number 8 in this photo book?

24    A.    Yes.

25    Q.    And on all the other names, you put the street names down

1   next to him, correct?

2   A.   The person who made this, yes.

3   Q.   The person who made this put all the street names next to

4   the individual who was purportedly in the picture, correct?

5   A.   Yes.

6   Q.   And no one put down "Lobo" next to Jose' Argueta

7   Rodriguez, correct?

8   A.   That's correct.

9   Q.   And it's fair to say it would be certainly confusing to

12:28PM 10   have two Lobos in an investigation when it's top heavy with

11   recordings?

12   A.   I would say it's confusing, but it's not the first time

13   we've seen multiple street names, the same street names for

14   people in the same gang.

15        MR. IOVIENO:  I would offer that as an exhibit, your

16   Honor.

17        THE CLERK:  It would be 224.

18        MR. POHL:  Objection to relevance.

19        THE COURT:  Sustained.

12:29PM 20   Q.   With respect to the two names in this case, it doesn't

21   necessarily mean when there's a reference to "Lobo" it refers

22   to Mr. Larios, correct?

23   A.   When we would look at and review the videotapes, we would

24   see who was on the videotapes and then make our decision on who

25   was who.

1    Q.   But when you didn't have a videotape, when it was an

2    audiotape of a phone call or audiotape inside the car, when

3    there's a reference to "Lobo," it doesn't necessarily mean

4    Mr. Larios, does it?

5    A.   I'd have to see the reports in question to see how it was

6    done or how that person wrote it, but typically once we have

7    identified someone and we're listening to the tapes, our

8    Spanish speakers in this case, a lot of our recordings were

9    reviewed by Trooper Jose' Depena and Trooper Brian Estevez, who

12:30PM 10   are Spanish speakers assigned to the task force, they become

11   familiar with the voices of who they're listening to over the

12   course of the investigation, and they'll know who they're

13   talking about on audio recordings, they'll know exactly which

14   person is talking when they hear the voice.

15   Q.   So they know exactly who's talking, whose voice they hear,

16   they know exactly who's talking?

17   A.   Once we've identified who it is and we've listened to the

18   voice, they'll recognize that voice.  If I'm having a phone

19   call with someone, they'll be able to recognize the person

12:30PM 20   because they've heard it over the course of three years that

21   voice, so they'll know whose voice is whose.

22   Q.   So, if someone is on a tape and they yell out, "Hey,

23   Lobo," it doesn't necessarily mean they're talking about

24   Mr. Larios?

25   A.   In that case, no, it could be the other Lobo.

1    Q.    Now, you testified a little bit about the morphine, if you

2    will, of MS-13?

3    A.    The morphine, yes.

4    Q.    And you indicated that the leader, if you will, in the

5    prison in El Salvador had runners that would send out

6    information, and he would send out orders?

7    A.    Yes, yes, the leader is L.D. Oblido, and he's in charge of

8    MS-13, and he has his 12 apostles, and that is the leadership,

9    the council of MS-13, and they're all in prison, and they

12:31PM 10    communicate from the jail to leaders outside of jail, and those

11    leaders will continue passing down orders all the way down to

12    clink leaders, who then pass those orders down to clique

13    members.

14    Q.    And I think you indicated that towards at some point

15    during the investigation, the issue of the East Coast Program

16    came up?

17    A.    Yes.

18    Q.    And the East Coast Program was an attempt by the

19    leadership to centralize certain cliques to have them answer to

12:32PM 20    one program, correct?

21    A.    They put cliques into programs, yes.

22    Q.    And there were other programs, there was a Hollywood

23    Program?

24    A.    There's the Hollywood Program, which it's such a large

25    clique, it became their own program, but Hollywood has cliques

1    around the country, and it's such a big clique that they've

2    become their own program, the Hollywood Program.

3    Q.    And it was designed so that the cliques would report to

4    the East Coast Program and the East Coast Program would then

5    report to El Salvador; is that a simple way of putting it?

6    A.    Simple, clique leaders would report to regional officers

7    who would report to the East Coast program leader based in the

8    United States who would report back to the East Coast leader in

9    El Salvador who would report back to the Ranfla.

12:33PM 10    Q.    And you're aware during the course of your investigation

11    Eastside had refused to join the East Coast Program, correct?

12    A.    They initially said no, then they said yes, then they said

13    no, and then they contemplated joining, and they were working

14    out to join the Hollywood Program.

15    Q.    Okay.  Did you write an affidavit in this case?

16    A.    I did.

17    Q.    And it was used for the purposes of this case, and it was

18    drafted and you signed it February 9th, 2016 under oath?

19    A.    Yes, the detention affidavit.

12:33PM 20    Q.    And did you write in that affidavit that Herzzon Sandoval,

21    the leader of Eastside, refused to join the East Coast Program?

22    A.    Yes.

23    Q.    So he did refuse to join the program?

24    A.    After -- as I said, he initially said no with the clique,

25    then they said, okay, we will, and then they said no, and that

1    was the ultimate decision not to join the East Coast Program.

2    THE COURT:  I'm sorry, let me just explain what an

3    affidavit is.  An affidavit is just a sworn statement, it's

4    another lawyer word, it's a written statement that you swear to

5    under oath.  Go ahead.

6    Q.   And you swore to this under oath that when you wrote this

7    produced in this case February 9th, 2016, and you didn't write

8    in that affidavit that they first agreed, then they didn't

9    agree, and then they joined another program, you didn't write

10   that in the affidavit at all?

11   A.   No, I didn't.

12   Q.   You wrote that he refused?

13   A.   Yes.

14   Q.   And you testified on direct examination that you became

15   aware of information that a green light had been issued,

16   correct?

17   A.   Yes.

18   Q.   And that was a green light against Eastside, correct?

19   A.   No, I think I testified here in this case that the green

20   light was initially initiated against Casper and Playa, but in

21   the specific question that was asked me, it was Casper that I

22   warned because we didn't have -- that was a question posed to

23   me.

24   Q.   So a green light in order to kill was going to be issued

25   that you had information that an order to kill was issued

1     against Mr. Sandoval and Mr. Guzman?

2     A.    We received information that there were discussions they

3     were debating whether or not to green light Casper.  We had

4     conversations where they said remove the leaders, so that would

5     be Guzman as well, but the specific name that came up over and

6     over again was Casper, and we warned Casper that they were

7     looking to possibly kill him.

8     Q.    Kill him for refusing to join the East Coast Program?

9     A.    I didn't put it like that.

12:36PM 10    Q.    No, you said they refused to join the program?

11    A.    No, no, I said when I warned him, I warned him that the

12    gang was looking to kill him or could be possibly looking to

13    kill him, so I didn't give specifics of what I knew, but I did

14    my job of warning him that there was a good possibility that

15    his life was threatened.

16    Q.    Because he didn't want to join the East Coast Program?

17    A.    Well, that was the reason, yes.

18    Q.    You didn't tell him that?

19    A.    No, I didn't tell him the reason why he was being green

12:36PM 20    lighted.

21    Q.    They didn't want to follow the rules of the East Coast

22    Program?

23    A.    Not of the East Coast Program, no.

24    Q.    They didn't want to pay any dues to the East Coast

25    Program?

1    A.    They paid dues.

2    Q.    Not to the East Coast Program?

3    A.    I don't know if it went to the East Coast Program when

4    they paid dues.  When I had the source send money back to the

5    El Salvador, I thought at that point it was to the East Coast

6    Program, but I knew they were sending money back to

7    El Salvador.  I couldn't tell you what went.

8          Over the course of the investigation, I know that I

9    participated in having the CW who accepted money from Playa to

12:37PM 10   send to El Salvador, and I watched him take the money to a

11   Western Union type facility, and he wire transferred the money

12   back to El Salvador.

13   Q.    How many occasions did you observe him do that, how many

14   occasions?

15   A.    He was instructed to do that at least twice, and I was

16   with him on those two occasions.

17   Q.    In two occasions in a three-year investigation, you

18   observed CW-1 go to Western Union and send money back to

19   El Salvador?

12:37PM 20   A.    Yes, those were the times he was asked to do it.

21   Q.    How much money did he send back on each occasion?

22   A.    $50.

23   Q.    $50, so $100 in a three-year investigation --

24   A.    Yes.

25   Q.    -- he sent back to El Salvador?

1   A.   He did, yes.

2   Q.   And you realize people have relatives back in El Salvador?

3   A.   Yes.

4   Q.   And people send money back to El Salvador or any other

5   country they come from all the time?

6   A.   That does occur, yes.

7   Q.   And during the course of a three-year investigation, you

8   made observations of two transfers of $50?

9   A.   Yes.

12:38PM 10   Q.   From a member through CW-1, and CW-1 is the one who told

11   you what it was for?

12   A.   Yes.

13   Q.   And on one of those occasions, I think you indicated it

14   was Mr. Guzman who had sent the money on behalf?

15   A.   No, I said he accepted, he collected the dues, and on two

16   occasions he provided the money that needed to go back to

17   El Salvador to the CW, and then the CW came to us, and said

18   here's the money I need to send to El Salvador by the second

19   and command of Eastside, and we said, okay, let's go do it, and

12:38PM 20   we took him to the -- it wasn't a Western Union, but it was a

21   wire transfer place, and then he did it.

22   Q.   It was Mr. Guzman, right?

23   A.   It was Playa, yes.

24   Q.   You call him "Playa."  He has a name, "Mr. Guzman"?

25   A.   Yes.

1    Q.    And he sent the money down through CW-1 to El Salvador,

2    correct?

3    A.    Yes.

4    Q.    Who did he send it to?

5    A.    I can't remember his name.  I'd have to look at the

6    receipt.

7            MR. IOVIENO:  This is just for the witness.

8    A.    Yes.

9    Q.    Who did he send it to?

12:39PM 10    A.    Juan Fernando Flores Guzman.

11    Q.    Same last name as Mr. Guzman, right?

12    A.    Yes.

13    Q.    Now, you spoke about the time in which you warned

14    Mr. Sandoval that a green light had issued or was going to be

15    issued, and you obtained that information.  That information

16    came from a meeting that you recorded, correct?

17    A.    No, it came from many different sources.

18    Q.    One of those sources was a meeting you recorded?

19    A.    Yes.

12:40PM 20    Q.    That meeting was in Virginia?

21    A.    Yes.

22    Q.    And the only participant at that meeting from the Eastside

23    was CW-1?

24    A.    That is correct, yes.

25    Q.    And he had driven other members from other cliques down

1    there, right?

2    A.    He drove members from the Molinos clique down to Virginia,

3    yes.

4    Q.    And there was a meeting held in Richmond?

5    A.    The meeting was held in Richmond, yes.

6    Q.    And during that meeting, which was recorded, you learned

7    that --

8             MR. POHL:  Objection.

9             THE COURT:  Let me see counsel.

12:41PM 10    (THE FOLLOWING OCCURRED AT SIDEBAR:)

11             THE COURT:  What do you expect the answer to be?

12             MR. IOVIENO:  The answer to be that he learned that

13    the order to kill had originated, they talked about it down in

14    Virginia.

15             THE COURT:  Mr. Pohl.

16             MR. POHL:  I think Special Agent Wood is right, that

17    there were a series of recordings and that actually I think his

18    warning to Casper predated this tape.  The fact that it's also

19    talked about on the tape I don't think relates necessarily to

12:41PM 20    the threat or to the warning.

21             I also think to the extent it's admissible at all,

22    it's a co-conspirator statement from a tape that's not -- it's

23    co-conspirator statements, and it wouldn't be admissible

24    through Mr. Iovieno, and I don't believe that the tape or the

25    recording has been authenticated, in any event.

1          THE COURT:  Well, isn't it a statement against

2    interest, in other words, he's eliciting that another member of

3    MS-13 issued an offered to kill; isn't that the thrust of it?

4          MR. POHL:  Yes.

5          THE COURT:  I think I'll allow it.  Overruled.

6          (SIDEBAR CONFERENCE WAS CONCLUDED)

7          THE COURT:  Go ahead.

8    Q.    Sir, you learned from CW's attendance at that meeting in

9    Virginia and the recording that was made that you learned that

12:42PM 10   the order to kill or the green light, if you will, had

11   originated down in this meeting in Virginia, right?

12   A.    No, that's an incorrect statement.

13   Q.    That was part of the source that you had, correct?

14   A.    The source attended that meeting, and he was asked why

15   haven't they killed Casper yet, but no one had received an

16   official green light order at that time.  He was being asked.

17   Q.    And he was asked, "Why don't you kill him?"

18   A.    Yes.

19   Q.    Referring to Mr. Sandoval, Casper?

12:43PM 20   A.    Correct.

21   Q.    Because Mr. Sandoval and Eastside was not following the

22   rules of the Eastside Program, were they?

23   A.    They were not joining the clique of the East Coast

24   Program.

25   Q.    And by not joining the clique, they were not following the

1    rules?

2    A.    Well, no, they could have joined another clique, and they

3    were, as I said, discussing joining the Hollywood Program,

4    so...

5    Q.    They didn't join the East Coast Program?

6    A.    They did not join the East Coast Program.

7    Q.    They did not join the Hollywood Program?

8    A.    Well, we ended the case before they had an opportunity of

9    joining the Hollywood Program.

12:43PM 10              MR. MURPHY:  Objection.

11              THE COURT:  Overruled.  I'll let it stand.

12    Q.    So the answer to my question is they didn't join the

13    Hollywood Program?

14    A.    We didn't give them an opportunity, no.

15    Q.    And is it your testimony that you then warned Mr. Sandoval

16    after the Virginia meeting or was this before?

17    A.    No, I warned him in the summer of 2015.  That meeting

18    occurred in December, 2015.

19    Q.    This was afterwards, you had additional information in

12:44PM 20    December of 2015, you had warned him previously that a green

21    light was going to be issued against him?

22    A.    Yes.

23    Q.    And that wasn't as a result of the Virginia meeting?

24    A.    No, that was before.

25    Q.    So there was another green light that was issued before?

A.    No.  I told you earlier when I testified that there was

the possibility of a green light being issued, and at that

point, when we had received that information, we warned him

because that was information that wasn't coming from the CW.

Q.    So that was in the summer of 2015?

A.    Yes.

Q.    And, again, that was because Eastside had refused to join

the East Coast Program?

A.    Yes.

Q.    And, again, in December of 2015, the issue had still not

resolved itself, Eastside was still not joining any program,

and there was a meeting in Virginia when another green light

against Mr. Sandoval was discussed as well as Mr. Guzman?

A.    As I said, there was no green light issued in December.

The question was asked --

        THE COURT:  Let him answer.  Let him answer.  Go

ahead.

A.    The question was asked of the CW, "Why don't they kill

him?"  There's a difference between saying we're ordering you

to kill him and why don't you kill him, so the green light had

not been issued yet.

        As I said, in the summer, we heard information that

there could be a green light being issued, and we warned him.

There was no green light issued in that December meeting, it

was a discussion of the possibility of killing him.

```
 1    Q.    Well, "Why haven't you killed him yet?"

 2    A.    "Why haven't you killed him?"

 3    Q.    Was from the leaders of the East Coast Program?

 4    A.    It was from a leader of the East Coast Program, yes.

 5    Q.    And what was his name?

 6    A.    The East Coast Program leader in the United States,

 7    Chucky.

 8    Q.    And Chucky said, "Why haven't you killed him?"

 9    A.    Yes.

10    Q.    And they didn't issue a green light, but they asked Pelon,

11    your informant, "Why haven't you killed Mr. Sandoval --"

12    A.    Yes.

13    Q.    "-- for not joining the program?"

14    A.    Correct.

15    Q.    You had had additional information in the summer of 2015

16    about this?

17    A.    Yes.

18    Q.    And that's what you warned him about?

19    A.    Yes.

20    Q.    So this issue had gone on for months?

21    A.    The issue occurred, it went away and then it reoccurred

22    because, as I told you earlier, initially they said no, then

23    there was a meeting that we recorded, and during the meeting,

24    Casper and Playa or specifically Casper wanted Pelon --

25    Q.    I'm not asking -- sir, just answer my question, please.
```

1    A.    I'm trying to answer your question, sir.

2    Q.    Specifically during the summer of 2015 through December of

3    2015, Eastside had not joined the East Coast Program?

4    A.    That's incorrect.  They said no, they joined, they

5    reneged, so at one point the threat went away because they had

6    joined the program, and then when they reneged, they left the

7    program.

8    Q.    According to you, they joined the program for how long a

9    period did they join?

12:47PM 10    A.    I don't know because at that point the threat went away,

11    we had helped direct to mitigate that threat, and then the

12    issue arose when they said, We're not going to join, we've

13    changed our minds, we're now going to think about and we're in

14    negotiations to join the Hollywood Program.

15    Q.    And they never joined any program?

16    A.    Well, no, because we arrested everyone.

17    Q.    You arrested everybody, and no one joined a program?

18    A.    Correct.

19    Q.    They never followed the rules of the East Coast Program?

12:47PM 20    A.    They did when they initially said we're joining the

21    program, and that's why the threat went away.

22    Q.    You wrote in your affidavit they refused to join the East

23    Coast Program?

24    A.    That is correct because --

25    Q.    You said in your affidavit --

1           THE COURT:  We're just going around in circles.  You

2    already covered this ground.

3    Q.    Now, on September 20th, 2015, Mr. De Paz was killed, and

4    it was by Joel Martinez, correct, Animal?

5    A.    Yes, that is correct.

6    Q.    And Mr. Martinez was not a member of the Everett clique,

7    right?  He wasn't a homeboy?

8    A.    He was not a homeboy, no.

9    Q.    He was a paro?

12:48PM 10    A.    He was a paro, yes.

11    Q.    So he was a member of the Everett clique?

12    A.    Yes.

13    Q.    September of 2015, he wasn't a member of Eastside?

14    A.    That is correct.

15    Q.    As far as you know, Mr. Larios did not know Mr. Martinez

16    in September of 2015?

17    A.    I have no idea.  I would agree with that statement.

18    Q.    And, subsequently, a couple weeks later, I think 12 days

19    later, October 2nd of 2015, you testified there was a

12:48PM 20    consensual recording inside the taxi with CW-1, Pelon, and

21    Mr. Martinez, right?

22    A.    That is correct.

23    Q.    You heard that or we read that English translation, and

24    when did you first hear that recording?

25    A.    When did I what?

1    Q.    When did you first hear it?

2    A.    After the recording was made, we downloaded it.  Well, he

3    debriefed us, the CW-debriefed us of the conversation, and we

4    downloaded the recording equipment, and immediately the

5    translator started listening to the conversation.

6    Q.    So, on October 2nd, about the same day you were aware that

7    Joel Martinez had basically confessed to the murder of

8    Mr. De Paz?

9    A.    Yes.

12:49PM 10    Q.    And you knew where Mr. Martinez was?

11    A.    We knew -- yes.

12    Q.    In fact, he had been taken to New Jersey?

13    A.    He did go to New Jersey, yes.

14    Q.    Who took him to New Jersey?

15    A.    I don't remember.

16    Q.    But you knew where he was in New Jersey because CW-1 had

17    told you?

18    A.    We didn't know where in New Jersey.  CW-1 told us he was

19    in New Jersey, and then in November, CW-1 went down to

12:50PM 20    New Jersey to talk to him so we could identify where he was

21    living, yes.

22    Q.    So you didn't know where he was in New Jersey around

23    October 2nd of 2015?

24    A.    We knew he was in the Newark area.

25    Q.    And this is a young man who had just confessed to a

1    murder?

2    A.    Correct.

3    Q.    And you had CW-1 go down in November?

4    A.    Yes.

5    Q.    And you also contacted the Boston Police Department

6    through the State Police, someone in your investigation?

7    A.    Absolutely.

8    Q.    And you knew they had an investigation going on about the

9    murder of Mr. De Paz?

12:50PM 10   A.    We knew that, yes.

11   Q.    And someone had a conversation with the detective in

12   charge of the investigation, right?

13   A.    We had the -- we had -- there was that discussion, and

14   then we had a meeting.

15   Q.    And you asked them to hold off on their investigation,

16   right?

17   A.    That's not how we phrased it, no.

18   Q.    How do you know phrase it?

19   A.    Well, we asked that due to the safety concerns that we had

12:51PM 20   for the CW and his family and that we were indicting people,

21   that they -- and that we could not expose the identity of the

22   CW at that time until we had the safety measures in place that

23   they don't make an arrest until we have all the safety measures

24   in place to keep people safe and alive.

25   Q.    Didn't you testify when Mr. Pohl was asking you some

1    questions that during this period of time, November of 2015,

2    the investigation was transforming into the indictment phase,

3    if you will?

4    A.   Yes, and in October, November, we said, okay, we've got to

5    end this because we just had I would say one -- I would say

6    five people admitted to different homicides that they had

7    committed, to two specific homicides, and we said we have to

8    take these people off the street as quickly as we can, but we

9    have to do it in a way that we can ensure the safety of the CW

12:52PM 10   and his family, so that process took a long time, longer than

11   we expected.

12        We initially wanted to arrest everyone in December.

13   We couldn't make that deadline, so we pushed it to February --

14   well, January, then February, then we were able to make it in

15   January.

16   Q.   You just testified that it was five murders?

17   A.   There was actually six murders that occurred in this

18   investigation.

19   Q.   And people had admitted to those, correct?

12:52PM 20   A.   Yes.

21   Q.   And none of those people were Mr. Larios?

22   A.   That is correct.

23   Q.   And you were in the phase where you were preparing

24   charges, right?

25   A.   Yes.

1    Q.    And even though Mr. Martinez had committed a violent

2    murder, you left him out in the street?

3    A.    Yes.

4    Q.    And you told the Boston Police, We want to protect other

5    people, don't move on him yet, basically?

6    A.    Basically for the safety of the CW and his family, we said

7    we have to get them into safety before we can make an arrest.

8    Q.    No other reason?

9    A.    No.

12:53PM 10    Q.    Did it have anything to do with having Joel Martinez come

11    up in January of 2016 to go to an Eastside meeting?

12    A.    No.

13    Q.    Had nothing to do with him getting beaten in?

14    A.    No.

15    Q.    Joining the Eastside gang, had nothing to do with that?

16    A.    Not at all.

17    Q.    It had only to do with the safety of CW-1 and his family?

18    A.    And the other witnesses in the case, their families.

19    Q.    What about the safety of the community in New Jersey, did

12:53PM 20    that come into your consideration?

21    A.    Absolutely.

22    Q.    But you didn't know where he was, he was in New Jersey

23    somewhere?

24    A.    We knew he was in New Jersey, and then in November, we

25    found out where he was.

1    Q.    What about the De Paz family, did you consider them?

2    A.    We considered everybody.

3    Q.    Do you think it was possible for the De Paz family, that

4    they maybe wanted to have closure and have somebody arrested in

5    this case?

6    A.    We knew that would occur.

7    Q.    But you let him go down to New Jersey, and you knew where

8    he was?

9    A.    We found out where he was, yes.

12:54PM 10    Q.    CW-1 told you where he was?

11    A.    He told us he was in New Jersey.

12    Q.    He actually went down and picked him up and brought him

13    back, right?

14    A.    Yes, he did.

15    Q.    So he drove him all the way back from New Jersey, and you

16    knew where he was inside the car?

17    A.    Yes.

18    Q.    And you could have arrested him at any time?

19    A.    And, again, that would have placed CW-1 and his family at

12:54PM 20    risk, and we weren't ready to do that yet.

21    Q.    It would have placed CW-1 at risk.  How would it have

22    placed CW-1 at risk or his family?

23    A.    Because we would have had to play the video that we had

24    showing the confession that Animal made, and at that point --

25    Q.    How would you play it if you arrested somebody?  How would

1    it be played anywhere?

2    A.    Because you'd have to charge him, and then you'd have your

3    probable cause hearing and your detention hearing.

4    Q.    That doesn't happen right away, does it?

5    A.    Probably cause hearings and detention hearings usually

6    occur within three days of the arrest.

7    Q.    That's in federal court.  This is a state court crime

8    being investigated by Boston Police.

9    A.    And they would have had our evidence to prove that case,

12:55PM 10    and we know that we were already having issues with other

11    homicides where we were able to make an arrest based on CW's

12    information partly, but we could make the arrest without his

13    information, but as they were getting closer to trial, his name

14    would have come out.

15    Q.    You've been an FBI agent for how long?

16    A.    Over 18 years.

17    Q.    And you're aware that there are ways in which identity of

18    informants can be protected in court proceedings, right?

19    A.    Yes.

12:55PM 20    Q.    It was done extensively in this case, wasn't it?

21    A.    Yes.

22    Q.    And names can be redacted and nondisclosed, it's normal?

23    A.    Voices would not have been disclosed when the video was

24    played.

25    Q.    And if someone is arrested, there's going to be a video

1    played?

2    A.    To show the probable cause.

3    Q.    And that's the only reason you didn't arrest Mr. Martinez,

4    that's the only reason?

5    A.    As I said, the reason why we did not arrest until we did

6    was we had families in El Salvador and Honduras that we had to

7    protect.  We spent a lot of money to keep them protected, and

8    we made the arrest as soon as we could when we had them secure.

9    Q.    How much money did you spend to protect them?

12:56PM 10    A.    I know we spent almost $100,000 for the family in

11    Honduras, and I know we spent at least $30,000 for the family

12    while they were in El Salvador, and then once we moved them

13    back to the United States and they were here in the

14    United States, the majority of that almost $200,000 was spent

15    on their security.  Then the U.S. Marshals spent almost

16    $300,000 to continue to make sure they were secure, they had a

17    place to live while they learned a skill so they could work and

18    be productive citizens and not rely on the United States

19    Government to pay for everything that they had.

12:56PM 20    Q.    So CW-1's family comes from El Salvador and now lives in

21    the United States, right?

22    A.    Yes.

23    Q.    And all the money that CW-1 was given, all the benefits he

24    was given was in return for him working for the FBI, right?

25    A.    And his safety and his family's safety.

1    Q.    And his value to you in the course of this investigation

2    was to obtain evidence against MS-13, right?

3    A.    We directed him to gather evidence of criminal activity

4    committed by MS-13 gang members, yes.

5    Q.    And as long as he continued to do that, those benefits

6    that you just disclosed and discussed with us would continue to

7    come, right?

8    A.    While he was working, yes, those benefits continued as he

9    continued to gather evidence at our direction.

12:57PM 10    Q.    During the investigation, if you terminated him and didn't

11    need him anymore, he wouldn't get those benefits anymore?

12    A.    If he gathered evidence and we made arrests, he'd get at

13    the benefits that we've already laid out, which occurred.

14    Q.    But if he didn't produce any -- he wasn't a value to you

15    anymore, those benefits would stop?

16    A.    I'm not sure I understand.

17    Q.    His family wouldn't get to come to the United States if

18    you didn't use him during the investigation, right?

19    A.    Well, if he wasn't successful in gathering evidence, then

12:58PM 20    we would have ended his cooperation, but he was successful, so

21    we didn't end his cooperation.

22    Q.    And he was successful with you in gathering information

23    during the course of this investigation that gave you

24    information, right?

25    A.    Well, he gave us intelligence, gave us evidence, and when

1    he spoke to us, when he gathered evidence because we provided

2    him the equipment to gather evidence so that we would not have

3    to rely on his word, we'd have audio and video evidence of the

4    criminal activities committed by MS-13 gang members.

5    Q.    It's fair to say you have thousands of hours of video and

6    audio recordings?

7    A.    We have thousands of hours of consensual T3 conversations,

8    text messages, we have audio recordings, audio/video

9    recordings, a lot of recordings, yes.

12:59PM 10    Q.    And you mentioned that CW-1 went down and picked up

11    Mr. Martinez and drove him back, and he stayed in the Boston

12    area, you knew where he was?

13    A.    Yes.

14    Q.    And he stayed there throughout November, December and into

15    January, right?

16    A.    No, we brought him back in December, and we brought him

17    back so that we would have a better chance of getting him

18    arrested when we had the arrest warrant.

19    Q.    And did you and the agents get together and decide a game

12:59PM 20    plan with respect to having CW-1 vouch for Animal?  Did you

21    come up with a plan?

22    A.    Yes, we directed the CW-1 that when we learned that Animal

23    was not happy with Everett, we said, hey, why don't you ask him

24    to see if he would be interested in joining Eastside.  He said

25    yes.  We then asked, go to the leaders and the homeboys in the

1    clique and see if they would be willing to welcome a paro from

2    another clique into their clique.  It happens all the time.

3    Q.   And you did that in November and December of 2015, right?

4    A.   We did that in December and January of 2015.

5    Q.   The period of time you were preparing the charges?

6    A.   Oh, yes.  It was the most stressful time of my entire

7    Federal Government experience, which is over 25 years.

8    Q.   So, correct me if I'm wrong, you were looking at how to

9    charge people?

01:00PM 10   A.   I was in the grand jury weekly.  My partners were in the

11   grand jurors weekly.  I was working 16, 17 hours a day from

12   November to the take-down.  As I said, I've been in

13   Afghanistan, I've been in Panama, I've been in Bosnia.  I've

14   never been as stressed in my life until that part of the

15   investigation.

16   Q.   With all the stress going on that you had going on in

17   December, 2015, you came up with a plan to have Joel Martinez

18   and CW-1 vouch for Joel Martinez to get into the Eastside?

19   A.   To bring him back, yes, absolutely because I wanted him

01:01PM 20   here so I could arrest him.

21   Q.   But he was here?

22   A.   In December, but while we were still getting the

23   indictments, we were working nonstop to get the indictments,

24   but I said if they will bring him into the program or into the

25   clique, make it happen.  I want you to see if that will happen.

1    Q.    If it happens, it's good for the charges, right?

2    A.    Well, I said make it happen in the sense of ask

3    permission.  I'm directing you, go ask permission.  The leaders

4    of the clique said yes, they had a meeting.  The initial

5    meeting was a phone call, come here and let us observe you,

6    which happened.  He went down, picked him up with Muerto, they

7    came back, and they hung out for a month, and during that

8    month, the clique said we'll accept him into the program.

9    Q.    Because you came up with a plan to do that?

01:02PM 10    A.    Absolutely.  I directed him to ask if that would be

11    acceptable, and the clique said yes.

12              MR. IOVIENO:  Is it a good time to stop, your Honor?

13              THE COURT:  Yes.  How much more do you have.

14              MR. IOVIENO:  Probably another 40 minutes.

15              THE COURT:  All right.  We will break there for the

16    day.

17              Ladies and gentlemen, four things:  Number 1, I'm a

18    little concerned about the pace that we're moving at because

19    the breaks had been longer than I had hoped with all the jurors

01:02PM 20    and we've been talking to the lawyers.  I may experiment next

21    week with taking one break in the middle of the day to make

22    sure we stay on track, but I want to talk to the lawyers but

23    just to warn you.  If I do that, I don't want anyone in a

24    position where because they have to go to the bathroom or they

25    are tired, they aren't paying attention.  I do want to make

 1      sure you are focused.  I'm alerting you, I want to make sure we

 2      move, Number 1.

 3              Number 2, again, because it's winter, it's possible to

 4      have some kind of snow event.  Remember to call the number and

 5      check.

 6              3, remember my cautions not discuss the case among

 7      yourselves or with anyone else or to read anything about it.

 8              And, Number 4, I hope we all have a smile on our face

 9      Monday morning after a Patriots victory, so have a good

01:03PM 10      weekend, and I'll see you on Monday.

11              THE CLERK:  All rise.

12              (JURORS EXITED THE COURTROOM.)

13              THE COURT:  You heard what I had to say.  I'm

14      concerned about the pace.  I know we're only a couple days into

15      this.  I do want counsel to watch it.  It would help if the

16      questioning on direct was a little crisper and cleaner and if

17      the questioning on cross was less repetitive, but let's make

18      sure that we're moving along.

19              Mr. Pohl, are we behind in a serious way as far as you

01:04PM 20      can tell?

21              MR. POHL:  I don't think so, your Honor.

22              THE COURT:  All right.  I'm going to keep an eye on

23      that.  Is there anything we need to discuss or take up before

24      8:30 Monday morning?  Mr. Murphy.

25              MR. MURPHY:  Your Honor, I believe that our proposed

1    jury instructions or our comments on your prior jury

2    instructions are due Monday?

3                THE COURT:  Yes.

4                MR. MURPHY:  In light of the likely distractions, I

5    wonder if we could have an extra day or two to do that?

6                THE COURT:  I am happy to make sure Ms. Rodriguez'

7    weekend is not ruined and give you that extra day.

8                MR. MURPHY:  Thank you, your Honor.

9                THE COURT:  Obviously, it's some ways away.  I don't

01:05PM 10    want anyone to -- well, I'll give you the extra 24 hours and we

11    will see where we are at that point.  Okay.  Otherwise, have a

12    good weekend, all, and I will see you 8:30 Monday morning.

13                THE CLERK:  All rise.

14                (Whereupon, the hearing was adjourned at 1:05 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7              I do hereby certify that the foregoing transcript was

8    recorded by me stenographically at the time and place aforesaid

9    in Criminal Action No. 15-10338-FDS, UNITED STATES vs. HERZZON

10   SANDOVAL, et al., and thereafter by me reduced to typewriting

11   and is a true and accurate record of the proceedings.

12             Dated this 3rd day of February, 2018.

13                        s/s Valerie A. O'Hara

14                   _____

15                   VALERIE A. O'HARA

16                   OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25