1             UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
2


3

UNITED STATES OF AMERICA              )
4                                     )
vs.                                   )  Criminal Action
5                                     )
HERZZON SANDOVAL,                     )  No. 15-10338-FDS
6  EDWIN GUZMAN,                      )
CESAR MARTINEZ,                       )
7  ERICK ARGUETA LARIOS,             )
                   Defendants        )
8


9


BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10


11

                   JURY TRIAL DAY 13
12


13                    TESTIMONY ONLY


14

        John Joseph Moakley United States Courthouse
15                  Courtroom No. 2
                  1 Courthouse Way
16                 Boston, MA 02210


17            15th day of February, 2018


18


19


20


21


22


23                 Valerie A. O'Hara
                 Official Court Reporter
24      John Joseph Moakley United States Courthouse
             1 Courthouse Way, Room 3204
25                 Boston, MA 02210
              E-mail: vaohara@gmail.com

1 | APPEARANCES:

2 | For The United States:

3 |     United States Attorney's Office, by CHRISTOPHER J. POHL,
ASSISTANT UNITED STATES ATTORNEY, and KELLY BEGG LAWRENCE,

4 | ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
Boston, Massachusetts 02110;

5 |

6 | For the Defendant Herzzon Sandoval:

7 |     Foley Hoag LLP, by MARTIN F. MURPHY, ESQ. and
MADELEINE K. RODRIGUEZ, ATTORNEY,
155 Seaport Boulevard, Boston, Massachusetts 02210;

8 |

9 | For the Defendant Edwin Guzman:

10 |     Lawson & Weitzen, by SCOTT P. LOPEZ, ESQ.,
88 Black Falcon Avenue, Suite 345, Boston, Massachusetts 02210

11 | For the Defendant Erick Arueta Larios:

12 |     THOMAS J. IOVIENO, ESQ., 345 Neponset Street
Canton, MA 02021;

13 |

14 | For the Defendant Cesar Martinez:

15 |     Stanley W. Norkunas, 11 Kearney Square,
Howe Building, Suite 202, Lowell, Massachusetts 01852.

16 |     ROBERT M. SALTZMAN, ESQ., 1 Central Street, Suite 5,
Stoneham, Massachusetts 02180.

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1                          I N D E X

2   WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

3    MAURICIO SANCHEZ
      By Ms. Lawrence              4
4      By Mr. Lopez                        69

5

6   EXHIBITS                          FOR I.D.   IN EVIDENCE

7     22                                           23
      105.1                                         48
8     105.2 and 105.3                               49
      114                                           51
9     115                                           52
      116                                           58
10    202                                           24
      229                                           72
11    230                                           97
      231                                           97

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    TESTIMONY ONLY

2              THE CLERK:  All rise.

3              (JURORS ENTERED THE COURTROOM.)

4              THE COURT:  Good morning, everyone.  Ms. Lawrence, are

5    you ready?

6              MS. LAWRENCE:  I'm ready, your Honor.  Thank you.

7              THE COURT:  And, Mr. Sanchez, do you understand that

8    you're still under oath?

9              THE WITNESS:  Yes.

09:02AM 10              THE COURT:  All right.  Go ahead.

11                    MAURICIO SANCHEZ, RESUMED

12                    DIRECT EXAMINATION

13    BY MS. LAWRENCE:

14    Q.    Good morning, Mr. Sanchez.

15    A.    Good morning.

16    Q.    Yesterday you testified that you were a member of MS-13?

17    A.    Yes.

18    Q.    When did you become a member of MS-13?

19    A.    2013.

09:03AM 20    Q.    What is a member of MS-13 called?

21    A.    Homeboy.

22    Q.    How is MS-13 organized?

23    A.    In cliques.

24    Q.    And does each clique have a leader?

25    A.    Yes.

1    Q.    What is that leader called?

2    A.    Runner or first word.

3    Q.    And which MS-13 clique are you a member of, Mr. Sanchez?

4    A.    Eastside.

5    Q.    Does the Eastside clique, did you hold meetings to discuss

6    MS-13 business?

7    A.    Yes.

8    Q.    Did you attend some of those meetings?

9    A.    Several.

09:04AM 10    Q.    And did you spend time with other MS-13 Eastside clique

11    members outside of meetings?

12    A.    Yes.

13    Q.    And what did you do when you spent outside of meetings

14    with your fellow clique members?

15    A.    Go out on weekends to the bars to look for chavalas.

16        MS. LAWRENCE:  May I have admitted Exhibit 2, please.

17    Q.    Who is this, Mr. Sanchez?

18    A.    Casper.

19    Q.    Who is Casper?

09:04AM 20    A.    He's the first word of the clique.

21    Q.    Do you see Casper here in court today?

22    A.    Yes.

23    Q.    Can you point him out, please, and describe what he's

24    wearing?

25    A.    He's wearing a pink shirt, a pinkish shirt.

1    MS. LAWRENCE:  May the record reflect that the witness

2  has identified defendant, Herzzon Sandoval?

3    THE COURT:  Yes.

4  Q.   When did you first meet Casper?

5  A.   The day that I was jumped in.

6  Q.   All right.  Since that time, have you talked to Casper in

7  person?

8  A.   Yes.

9  Q.   Have you talked to him on the phone?

09:05AM 10  A.   Yes.

11  Q.   Have you heard him speak at clique meetings?

12  A.   Yes.

13  Q.   Are you familiar with his voice?

14  A.   Yes.

15    MS. LAWRENCE:  May I have Exhibit 3, please, in

16  evidence.

17  Q.   Who is this, Mr. Sanchez?

18  A.   Playa.

19  Q.   Who is Playa?

09:06AM 20  A.   He's the second word of the clique.

21  Q.   What is the second word?

22  A.   That is a person that if the first word is not there, then

23  he can make decisions for the clique.

24  Q.   Okay.  Do you see Playa here in court today?

25  A.   Yes.

1    Q.    Can you point him out, please, and describe what he's

2    wearing?

3    A.    The fifth person down from you.

4          MS. LAWRENCE:  And may the record reflect that the

5    witness has identified the defendant, Edwin Guzman?

6          THE COURT:  Yes.

7    Q.    When did you first meet Playa?

8    A.    At work.

9    Q.    Where did you work?

09:06AM 10    A.    At a company that collects garbage for the city.

11    Q.    Have you talked to Playa in person since you've met him?

12    A.    Yes.

13    Q.    Have you talked to him on the phone?

14    A.    Yes.

15    Q.    Have you heard him speak at clique meetings?

16    A.    Yes.

17    Q.    Are you familiar with his voice?

18    A.    Yes.

19          MS. LAWRENCE:  Can I have Exhibit 4, please, in

09:07AM 20    evidence.

21    Q.    Who is this, Mr. Sanchez?

22    A.    Checha.

23    Q.    Who's Checha?

24    A.    He's a member of the Eastside clique.

25    Q.    Do you see Checha here in court today?

```
 1    A.   Yes.

 2    Q.   What is he wearing?

 3    A.   A white shirt and black tie.

 4         MS. LAWRENCE:  May the record reflect that the witness

 5    has identified the defendant, Cesar Martinez?

 6         THE COURT:  Yes.

 7    Q.   When did you first meet Checha?

 8    A.   I met him through Lobo.

 9    Q.   Since you met him, have you spoken to him in person?

10    A.   Yes.

11    Q.   On the phone?

12    A.   Yes.

13    Q.   Have you heard him speak at clique meetings?

14    A.   Yes.

15    Q.   Are you familiar with his voice?

16    A.   Yes.

17         MS. LAWRENCE:  May I have Exhibit 5, please.

18    Q.   Who's this?

19    A.   Lobo.

20    Q.   And who is Lobo?

21    A.   A member of the Eastside clique.

22    Q.   When did you first meet Lobo?

23    A.   2010 at work.

24    Q.   And I believe you identified Lobo in court yesterday?

25    A.   Yes.
```

|  |  |  |
|---|---|---|
| 1 | Q. | Since you met Lobo, have you talked to him in person? |
| 2 | A. | Yes. |
| 3 | Q. | Have you heard him speak at clique meetings? |
| 4 | A. | Yes. |
| 5 | Q. | Are you familiar with his voice? |
| 6 | A. | Yes. |
| 7 | | MS. LAWRENCE:  And admitted Exhibit 6, please. |
| 8 | Q. | Who is this, Mr. Sanchez? |
| 9 | A. | Muerto. |
| 09:09AM 10 | Q. | Who is Muerto? |
| 11 | A. | He's one of the most solid homeboys in the clique. |
| 12 | Q. | What do you mean by solid? |
| 13 | A. | He's one of the people that has the most respect in MS-13. |
| 14 | Q. | How long have you known Muerto? |
| 15 | A. | Since the time I've been in the MS-13. |
| 16 | Q. | And have you talked to him in person? |
| 17 | A. | Yes. |
| 18 | Q. | On the phone? |
| 19 | A. | Yes. |
| 09:09AM 20 | Q. | At clique meetings? |
| 21 | A. | Yes. |
| 22 | Q. | Are you familiar with his voice? |
| 23 | A. | Yes. |
| 24 | | MS. LAWRENCE:  May I have Exhibit 8, please. |
| 25 | Q. | Who is this, Mr. Sanchez? |

1      A.    Brujo.

2      Q.    Who is Brujo?

3      A.    A member of the Eastside clique.

4      Q.    Okay.  Have you talked to Brujo in person since you've

5      known him?

6      A.    Yes.

7      Q.    Actually when did you meet him?

8      A.    When I was jumped in in 2013.

9      Q.    Okay.  Have you talked to him on the phone?

09:10AM 10   A.    Yes.

11     Q.    At clique meetings?

12     A.    Yes.

13     Q.    Are you familiar with his voice?

14     A.    Yes.

15          MS. LAWRENCE:  Can I have Exhibit 9, please.

16     Q.    Mr. Sanchez, who is this?

17     A.    Animal.

18     Q.    How long have you known Animal?

19     A.    I met him in 2015.

09:10AM 20   Q.    And who is Animal?

21     A.    He was a chequeo with the Everetts.

22     Q.    And he was a chequeo.  What did he become later?

23     A.    He became a homeboy with the Eastside.

24     Q.    Do you talk to Animal in person?

25     A.    Yes.

1    Q.    On the phone?

2    A.    Yes.

3    Q.    Did he attend any of your clique meetings?

4    A.    Not while I was present.

5    Q.    Okay.  Are you familiar with his voice?

6    A.    Yes.

7          MS. LAWRENCE:  May I have Exhibit 10, please.

8    Q.    Who is this, Mr. Sanchez?

9    A.    Chentino.

09:11AM 10   Q.    Do you know him by another gang name?

11   A.    I only know him as Chentino.

12   Q.    How long have you known Chentino?

13   A.    I met him in 2012.

14   Q.    Have you talked to him in person?

15   A.    Yes.

16   Q.    On the phone?

17   A.    Yes.

18   Q.    And at clique meetings?

19   A.    Yes.

09:12AM 20   Q.    Are you familiar with his voice?

21   A.    Yes.

22          MS. LAWRENCE:  Exhibit 11, please.

23   Q.    Mr. Sanchez, who is this?

24   A.    Caballo.

25   Q.    Who is Caballo?

        1    A.    Another one of the most solid homeboys in the clique.

        2    Q.    When did you meet Caballo?

        3    A.    In 2013, when I was jumped in.

        4    Q.    And have you talked to him in person?

        5    A.    Yes.

        6    Q.    On the phone?

        7    A.    Yes.

        8    Q.    At clique meetings?

        9    A.    Yes.

09:12AM 10    Q.    Are you familiar with his voice?

       11    A.    Yes.

       12    Q.    Mr. Sanchez, as a member of MS-13, were there rules that

       13    you had to follow?

       14    A.    Yes.

       15    Q.    What were those rules?

       16    A.    The first rule is when you're jumped in and you're placed

       17    in the center to get a beating, a kicking.

       18    Q.    What is that like?  Can you describe that a little more?

       19    A.    It's at the meeting when you get jumped and there has to

09:13AM 20    be a minimum number of homeboys, not all of them, like at least

       21    four or five.  Mainly the runners have to be there.  The

       22    runners indicate who is going to kick him, and they count to 13

       23    seconds.

       24    Q.    How many people typically do the kicking or beating?

       25    A.    Three.

1    Q.    Okay.  And you were jumped in in 2013, you said?

2    A.    Yes.

3    Q.    And were you present at other meetings when other homeboys

4    were jumped into your clique?

5    A.    Yes.

6    Q.    So that's one rule.  What were some other rules?

7    A.    Attend the meetings.

8    Q.    Okay.  Were there others?

9    A.    Not let a homeboy down.

09:15AM 10    Q.    Anything else?

11    A.    Represent through colors and represent being solid with

12    the MS-13.

13    Q.    Okay.  You said earlier what it means to be solid with the

14    gang, that it was someone -- you said, if someone is solid, the

15    person has respect?

16    A.    Yes.

17    Q.    How do you earn that respect?

18    A.    Doing hits on the rivals and the chavalas.

19    Q.    Who were your rivals?

09:15AM 20    A.    The main ones are the 18s.

21    Q.    And how would someone in the clique know if you had done a

22    hit on a chavala?

23           MR. LOPEZ:  Objection.

24           THE COURT:  Hold on.  Sustained in that form.

25    Q.    Did you, Mr. Sanchez, participate in hits on chavalas?

1    A.    Yes.

2    Q.    And did you earn respect for doing hits on chavalas?

3          MR. LOPEZ:  Objection.

4          THE COURT:  Overruled.

5    A.    In a certain way, yes.

6    Q.    Okay.  How did you tell -- how did other members of the

7    clique give you respect?

8    A.    I don't understand the question.

9    Q.    Okay.  Were you alone when you did hits on chavalas?

09:16AM 10    A.    No.

11    Q.    Who were you with?

12          MR. LOPEZ:  Objection, your Honor.

13          THE COURT:  Overruled.

14          MR. LOPEZ:  Time frame?

15          THE COURT:  All right.  Let's have a time frame on

16    that.

17          MS. LAWRENCE:  Actually, I'll ask a different

18    question, your Honor.  That's fine.

19    Q.    How did you communicate with members of your clique?

09:17AM 20    A.    With signs.

21    Q.    And what were those signs?

22    A.    Should I show you?

23    Q.    Yes, please.

24    A.    The MS. (Indicating)

25    Q.    Okay.  Were there any others?

1   A.   Yes.

2   Q.   Can you show us those?

3   A.   Just flashing signs like this.  (Indicating)

4   Q.   And when would you do that, when would you flash signs?

5   A.   Mainly when we'd see a rival.

6   Q.   Did you also -- I think you said you communicated with

7   your own members of the clique that way?

8   A.   Yes, when we would meet.

9   Q.   Okay.  And you also mentioned wearing colors.  What does

09:18AM 10   that mean?

11   A.   We were not allowed to use red.

12   Q.   What were you allowed to use?

13   A.   Blue and white.

14        MS. LAWRENCE:  Could we have Exhibit 18, please.

15   Q.   Mr. Sanchez, do you recognize the man in this photograph?

16   A.   Yes.

17   Q.   Who is it?

18   A.   Lobo.

19   Q.   What is he doing with his hands in this photograph?

09:18AM 20   A.   Flashing MS.

21   Q.   Okay.  Are there any other ways that members of your MS-13

22   clique or the gang would identify themselves as gang members?

23   A.   You mean with the Eastsides?  Each clique has a name.

24   Q.   Yes.  How would you show yourselves to other members of

25   MS-13 or rivals as a member of the Eastside or as a member of

1   MS-13?  You use hand signs, you use colors.  Are there other

2   ways that you would show yourself?

3   A.    By saying "Here is Mara Salvatrucha."

4   Q.    You would do that to rivals?

5   A.    Yes.

6   Q.    Mr. Sanchez, do you have a tattoo?

7   A.    No.

8   Q.    Do other members of your clique have tattoos?

9   A.    Yes.

09:20AM 10         MS. LAWRENCE:  May I have Exhibit 13, please.

11  Q.    Mr. Sanchez, who is this a picture of?

12  A.    Muerto.

13  Q.    And what are those markings on his chest?

14         MR. MURPHY:  Objection, your Honor.

15         THE COURT:  Overruled.

16  A.    MS.

17  Q.    MS.  What does that stand for?

18  A.    Mara Salvatrucha.

19         MS. LAWRENCE:  Can I have Exhibit 16?  This is in

09:20AM 20  evidence.

21  Q.    Who is this a picture of?

22  A.    Playa.

23  Q.    And what are the markings on his arm?

24  A.    MS-13.

25         MS. LAWRENCE:  Can I have admitted Exhibit 17, please.

1    Q.   Who is this a picture of?

2    A.   Brujo.

3    Q.   What are the markings on his arm?

4    A.   The clique initials.

5         MS. LAWRENCE:  Can I have Exhibit 126, please.

6    Q.   Mr. Sanchez, do you recognize these photographs?

7    A.   Yes.

8    Q.   What are they?

9    A.   Two figures.  One is forming an M and the other one an S.

09:21AM 10   Q.   Okay.  And what are the initials next to the figure?

11        THE INTERPRETER:  I'm sorry.

12   Q.   What are the initials, markings next to the figure?

13   A.   The Eastside clique initials.

14   Q.   Do you know whose body these markings are on?

15   A.   Casper.

16   Q.   Mr. Sanchez, you said earlier that your clique has

17   meetings to discuss MS-13 business.  How often did you meet?

18   A.   Every two or three months.

19   Q.   Who called the meetings?

09:22AM 20   A.   The runners.

21   Q.   And the runners for your clique were?

22   A.   Casper and Playa.

23   Q.   When you had your clique meetings, where did you meet?

24   A.   At a shop in Everett or at a parking lot in Cambridge.

25   Q.   Can I have Exhibit 1.1, please.  Do you recognize this

1    photograph, Mr. Sanchez?

2    A.    Yes, we would meet there.

3    Q.    Okay.  What did you do at the meetings?

4    A.    We would discuss problems, what was going on internally in

5    the clique and also in MS-13 at large.

6    Q.    And what kind of problems did you talk about?

7    A.    Such as we would discuss serious problems such as when

8    Chentino refused to participate in the murder committed by

9    Vida Loca.

09:24AM 10    Q.    Okay.  And you said you also discussed things that were

11    happening with the gang?

12    A.    Yes.

13    Q.    What do you mean by that?

14    A.    What was happening with other cliques, how they were

15    running, and what were they doing.

16    Q.    Did you talk about activities that you, the clique

17    members, were doing?

18    A.    Yes.

19              MR. LOPEZ:  Objection.

09:24AM 20              THE COURT:  Overruled.

21    Q.    Did you also have to contribute money to the clique?

22    A.    Yes.

23    Q.    Did you have to do that at every meeting?

24    A.    Yes.

25    Q.    How much did you have to pay?

1    A.    $30.

2    Q.    And who collected the money?

3    A.    Playa.

4    Q.    And why Playa?

5    A.    He was a more serious person and he was trusted with the

6    money.

7    Q.    What was the money that you gave to the clique used for?

8    A.    To help homeboys that were down below in El Salvador, to

9    buy guns, to pay the money for the program, or in an emergency

09:25AM 10    if a homeboy was arrested and something serious would happen to

11    him to help him out.

12    Q.    Okay.  What is a program, Mr. Sanchez?

13    A.    It's an organization of MS-13 with the older leaders and

14    the cliques have to report and to pay a certain amount of money

15    and reporting activities to members of MS-13 to remain active.

16    Q.    What kind of things was the clique required to report?

17    What kinds of activities?

18    A.    That the members are attacking the rivals and doing more

19    hits.

09:26AM 20    Q.    Who was required to report -- to make that report to the

21    program?

22    A.    The runners.

23    Q.    How did the runners know what to report?

24    A.    Each homeboy would report what he had done.

25    Q.    To the runners?

1    A.    Yes.

2    Q.    When would you have to report that?

3    A.    Well, for instance, the day that I committed the attempted

4    murder with Animal, the following day I reported that to

5    Casper.

6    Q.    So you're supposed to report soon after you've done

7    something?

8              MR. MURPHY:  Objection, your Honor.  Leading.

9              THE COURT:  All right.  Sustained as to the leading.

09:27AM 10   Q.    You said that you used some of the clique money to help

11   out deported members who were down below.  By down below, what

12   do you mean?

13   A.    That they have been deported.

14   Q.    To what country, where?

15   A.    To El Salvador.

16   Q.    Okay.  Do you know how the money got from your clique to

17   El Salvador?

18   A.    Through money orders.

19   Q.    Okay.  Do you know who sent the money?

09:28AM 20   A.    Playa is the person who had the money.

21   Q.    Okay.  Mr. Sanchez, did you have to go to every meeting of

22   your clique?

23   A.    It was mandatory.

24   Q.    What happened if you didn't go to a meeting?

25   A.    You would have to have a very good excuse such as being

1    sick and not able to walk or being at work.

2    Q.    What if you didn't have a good excuse and you missed a

3    meeting?

4    A.    You were put under observation.  Maybe the first time it

5    would be allowed to pass by, but if it happened again, then

6    you'd be put in the center.

7    Q.    What does that mean to be put in the center?

8    A.    To be corrected and so that the person would understand

9    that that must be respected.

09:29AM 10    Q.    What does that correction entail?

11    A.    Receive a 13-second kicking.

12    Q.    Mr. Sanchez, were you asked to listen to some recordings

13    before you came to court?

14    A.    Yes.

15    Q.    Where did you listen to those recordings?

16    A.    In a room, a conference room.

17    Q.    Here in the courthouse?

18    A.    Yes.

19    Q.    Who was with you when you listened to the recordings?

09:30AM 20    A.    The prosecutors, some agents, and the interpreter.

21    Q.    Okay.  How did you listen to the recordings?

22    A.    Through a computer.

23    Q.    When you were listening to the recordings, what were you

24    asked to do?

25    A.    Recognize a voice and what was being spoken about.

1    Q.    Okay.  And was that something you did with the

2    interpreter?

3    A.    Yes.

4    Q.    Okay.  And how exactly did that work?

5    A.    I don't understand the question.

6    Q.    You listened to the recordings with the interpreter.  Did

7    you tell her who was speaking as you were listening to the

8    recordings?

9    A.    Yes.

09:31AM 10    Q.    And did you also tell her what was being said?

11    A.    Yes.

12    Q.    Okay.  When you listened to a recording and identified who

13    was speaking, as you just described, did you do anything to the

14    disk of the recording?

15    A.    Yes, I wrote my initials.

16         MS. LAWRENCE:  Could I have the document camera for

17    the witness, please.

18    Q.    Mr. Sanchez, I'm showing you a disk.  It's been marked as

19    Exhibit 202 of a recording that was made on June 14, 2014.  Did

09:32AM 20    you listen to the recording on this disk?

21    A.    Yes.

22    Q.    How do you know?

23    A.    How do I know?

24    Q.    How do you know you listened to it, to this disk and this

25    recording as opposed to another one?

1    A.    Because of the date.

2    Q.    And did you also mark the disk?

3    A.    Yes.

4          MS. LAWRENCE:  Your Honor, the disk that has been

5    marked as Exhibit 202 goes with the transcript that has been

6    marked as Exhibit 22, which I believe Ms. Huacuja testified

7    about making the transcript.

8          THE COURT:  I'm sorry, what was the last?

9          MS. LAWRENCE:  Exhibit 22, which I believe Ms. Huacuja

09:33AM 10  testified about having prepared the transcript.

11          THE COURT:  All right.

12          MS. LAWRENCE:  And now that we've authenticated the

13    voices, I move to admit both the disk, Exhibit 202 of the

14    recording, and the transcript, Exhibit 22 into evidence.

15          MR. MURPHY:  Same objection as to the last round.

16          THE COURT:  I'll give you a standing objection,

17    assuming there's a set of transcripts here, I'll give you a

18    standing objection.

19          MR. MURPHY:  Thank you.

09:33AM 20        THE COURT:  All right.  Overruled.  It's admitted.

21    Exhibit 22.

22          (Exhibit No. 22 received into evidence.)

23          MS. LAWRENCE:  And the disk, also, please, your Honor.

24    Exhibit 202.  We'd like to admit the recording of this as well.

25          THE COURT:  202 is admitted.

1          (Exhibit No. 202 received into evidence.)

2     Q.   Mr. Sanchez, you testified a minute ago that you were

3     present at Eastside clique meetings when new members were

4     jumped in?

5     A.   Yes.

6     Q.   Was someone jumped in at an ESLS clique meeting on

7     June 14, 2014?

8     A.   Extrano.

9          MS. LAWRENCE:  Could I have Exhibit 22.  Could I ask

09:34AM 10    the jury to pull your transcript binders out and turn to tab

11    22.  We're going to play a clip of the recording that was just

12    admitted and the transcript portion that corresponds is in the

13    middle of the page.  We're not going to read the transcript,

14    we're going to play the recording.

15         THE INTERPRETER:  What page did you say?

16         MS. LAWRENCE:  Tab 22 in the middle of page 2, then on

17    page 3 at the top.

18    Q.   Mr. Sanchez, where did the ESLS meeting take place when

19    Extrano was jumped in?

09:35AM 20    A.   At the garage in Everett.

21    Q.   Okay.  I'm going to play a clip of that meeting and ask

22    you to listen to it.

23         (Video played.)

24    Q.   The part we're playing correspond to the transcript on

25    page 3.  Starting below the first ellipsis, please.

1          (Video played.)

2    Q.    Okay.  Mr. Sanchez, what just happened there?

3    A.    When he was jumped in.

4    Q.    Okay.  Do you remember who did the beating?

5    A.    Myself, Brujo, and Flaco.

6          MS. LAWRENCE:  Can I have Exhibit 22 on the screen.

7    Q.    And, Mr. Sanchez, I'm going to read part of this

8    transcript and ask you some questions about it.  Starting on

9    page 1.

09:38AM 10          Playa:  "Hey, dude for those who don't know, we gave

11   the money that was there, Sinzon.  After that I gave him 400,

12   how much was it you told me.  You said 430, right?  From the

13   last that we did (unintelligible), owes me 100 bucks, right?

14   Because the dude still hasn't paid the money for Sinzon and

15   there was 100 bucks that we sent two times to, a hundred to

16   (unintelligible), then the other dude was the one that asked

17   me, please give me 50 pesos, the same deal and because Duke'

18   gave me 40 during the day."

19          Mr. Sanchez, do you know who Sinzon is?

09:38AM 20   A.    He was a member of the Eastsides.

21   Q.    Do you know why Playa was talking about giving him money?

22   A.    Because he wanted to come to the United States.

23   Q.    Okay.  And what else is Playa doing here, he's talking

24   about owing people money?

25   A.    He was collecting the money.

1    Q.    Okay.  And on page 2, please, toward the bottom.

2          Playa says, "We need to help the dudes directly rather

3    than through the program."

4          Then Risa:  "About that issue with the money, I don't

5    know.  It has not been explained clearly to me.  I mean --"

6          Casper:  We are to give 30 bucks each time we meet."

7          Checha:  "Every time a dude gets deported, we give

8    $100 to help him."

9          Risa:  "And that is for when the dude is locked up?"

09:39AM 10          Casper:  "Uh-huh, no, for when I told you.  I said to

11    help the dudes who have family here, near where they're locked

12    up, to give money to his wife, to his family, once in a while

13    to put money in his canteen, or to send it to (unintelligible),

14    or to use it for (unintelligible).  It's Roca's decision."

15          Playa:  "That money is there in case there is a cheap

16    gun around or something.  We need it."

17    Q.    Who is Risa?

18    A.    He was the one that was jumped in.

19    Q.    You said that person's name was Extrano, though?

09:40AM 20    A.    Yes, but he was called Risa at the previous clique that he

21    belonged to.

22    Q.    And he took a new name when he jumped into your clique?

23    A.    Yes.

24    Q.    So what are Casper and Playa and Checha talking to Risa

25    about in that passage we just read?

1    A.    About the amount of money that's given each time that we

2    meet.   And that each time a homeboy is deported and needs money

3    to come back, each homeboy gives $100.

4    Q.    And you also -- when Playa says, "We can use that money

5    for a gun"?

6    A.    Yes.

7    Q.    Mr. Sanchez, you also said earlier you were present when

8    other members of your clique were beaten for not following

9    clique rules?

09:41AM 10    A.    Yes.

11         MS. LAWRENCE:   Okay.   Can we have Exhibit 20.

12    Q.    Mr. Sanchez, there was a clique beating on January 25,

13    2014.   Did you review a recording of this meeting prior to your

14    testimony here today?

15    A.    Yes.

16    Q.    And were you present for this meeting?

17    A.    Yes.

18         MS. LAWRENCE:   Page 3.   We're on tab 20 now in the

19    binder on page 3, please.   We're going to start at the top of

09:42AM 20    the page.

21         Casper:   "Another issue I wanted to discuss is the

22    issue with cocaine.   You said that the coke use was going to

23    stop to an indefinite date.   I felt bad because the dude was

24    telling me that it had been said that it was just for two

25    months.   We're going to fix that issue here, because I know the

1  dudes who used the cocaine.  Chentino, get in the center.  The

2  rules impose it on you.  Now comes the issue.  You, Chentino,

3  did you do it?"

4          Chentino:  "Yes."

5          Casper:  "There are rules, homeboy.  If you fucked up,

6  you fucked up, so into the middle for a beating."

7          Casper:  "Ready?  1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11,

8  12, 13.  Stop."

9  Q.   Mr. Sanchez, what do you understand Casper to be talking

10 about there with Chentino?

11 A.   We had said a rule that people weren't allowed to use

12 cocaine.

13 Q.   And Chentino did use cocaine?

14 A.   Yes.

15 Q.   So what happened to him?

16 A.   He was corrected.

17 Q.   And the counting?  Was he corrected by a beating?

18 A.   Yes.

19 Q.   Okay.  Were you ever beaten for using cocaine?

20 A.   The same day.

21 Q.   Okay.  Before we talk about that, I want to read a little

22 bit more down the page that we were just reading on page 3.

23          Muerto:  "Everyone talks big, but when it's time to go

24 out to the street to do something, no one shows up.  That

25 pisses me off."

1          Tigre:  "No one is in the street."

2          Muerto:  "Here, we are thinking about things like

3     that, dude.  Everyone has to participate at the party, dude.

4     There's nothing more important than going out like that in the

5     street."

6          Casper:  "No one has made rules that we all have to go

7     every day into the street like that.  We all have to go out,

8     but on different days.  So everyone goes out, but they go out

9     on different days.  We can't go out in groups."

09:44AM 10          Casper:  "How are you to know who's going out and who

11     isn't?"

12          Muerto:  "Fuck, that's the first thing I'm going to

13     find out, dude."

14          Casper:  "I also know who goes out and who doesn't.

15     But I do.  Like I'm telling you, I go out with them and to get

16     drunk, too.  I know who goes out and who doesn't."

17          Chacon:  "It looks bad that Flaco just comes to talk

18     at meetings, but --"

19          Playa:  "Look, Flaco, try to get out in the street

09:45AM 20     more.  I'm out in the street all the time, and all the dudes

21     know that."

22          Mr. Sanchez, what do you undersand -- what were you

23     discussing during this part of the meeting?

24          MR. MURPHY:  Objection, your Honor.

25          THE COURT:  I'll allow him to give his interpretation

1    of the conversation.  He was present.  Overruled.

2    A.    This is when I was kicked by -- people that beat me were

3    Flaco and Chamuco, and we were talking about that they hardly

4    go out on the weekends.  They just come to meetings to kick

5    homeboys and Muerto is saying that people have to go out.

6    Q.    Okay.  What is your understanding of what Casper meant

7    when he said, "Everybody goes out, but they go out on different

8    days, we can't go out in groups?"  What was he talking about?

9         MR. MURPHY:  Objection.

09:46AM 10        THE COURT:  Overruled.  I'll give you a standing

11   objection to this.

12        MR. MURPHY:  Thank you, your Honor.

13        THE INTERPRETER:  I'm sorry.  Could you repeat the

14   question?

15   Q.    What do you understand Casper to have meant when he said,

16   "So everyone goes out but on different days?"

17   A.    That we would go out on weekends to different bars in

18   different groups.

19   Q.    Okay.  And when Casper says, "I also know who goes out and

09:47AM 20   who doesn't," what do you know -- how did Casper know?

21   A.    All the homeboys had to keep reporting to the runners.

22   Q.    All right.

23        MS. LAWRENCE:  Could we have Exhibit 28, please.

24   Q.    This is another transcript, tab 28 in the binder.

25   Mr. Sanchez, this is a clique meeting on October 24, 2015.  Did

1    you review the recording of this meeting prior to your

2    testimony today?

3    A.    Yes.

4    Q.    Okay.  I'm going to start reading on the first page

5    towards the bottom.

6          Casper:  "Pay attention, dudes.  We're going to

7    discuss the problem, homeboys.  To begin with, if someone

8    calls, it's not necessary to keep on talking on the phone.  The

9    less we talk about the same subject, the better.  So we will

09:48AM 10    make one single call.  The person calls you and tells you what

11    time to come and go and that's all.  We already know at what

12    time it is.  Then we have a problem with this.  You know, what

13    you're getting."

14          Master:  "Yes."

15          Casper:  "This dude is getting the beating, dudes.  We

16    had ordered him to be on the wagon, and he failed, as you all

17    know, dudes.  So I don't know what decisions you will make

18    after you give this dude the beating, if he will continue the

19    same or what, but that we will decide after the beating.  We

09:48AM 20    will talk about the subject, because I will go over point by

21    point, you know."

22          Master:  "You also have a beating, dude.  The dudes

23    sentenced you with that for disappearing.  A fucking lot of

24    time that we hadn't heard from you, doggie.  Whenever one is

25    out of touch, doggie, for more than a month, two months, dude,

1    then you've fucked up."

2         You were at this meeting, correct?

3    A.   Yes.

4    Q.   Okay.  Who was Casper talking about getting a beating for

5    falling off the wagon?

6    A.   To me.

7    Q.   Okay.  And who's Master?

8    A.   One of the members of Eastside.

9    Q.   And Casper ordered him to get a beating, too, for

09:49AM 10   disappearing?

11   A.   Yes, he had not reported for a long time.

12   Q.   Okay.

13        MS. LAWRENCE:  Could we have admitted Exhibit 29,

14   please.

15   Q.   This is a clip of the same meeting that we were just

16   talking about on October 24, 2015.  I'd like to play that,

17   please.

18        (Video played.)

19   Q.   Mr. Sanchez, who received the beating just then?

09:51AM 20   A.   Me.

21        MS. LAWRENCE:  Can we continue?

22        (Video played.)

23   Q.   And the second person who got the beating was Master?

24   A.   Yes.

25   Q.   Do you remember who beat you that day?  Do you remember

1    who beat you that day?

2    A.    Playa, Rebeldon, and Negro.

3    Q.    And do you remember who beat Master?

4    A.    Lobo, Checha.  That's all I remember.

5    Q.    Okay.  Mr. Sanchez, earlier you mentioned a meeting where

6    someone was punished for not helping a fellow homeboy.

7            THE INTERPRETER:  I'm sorry, could you repeat the

8    question?

9    Q.    You mentioned a meeting where you were present where

09:54AM 10   someone was beaten for not helping another homeboy?

11   A.    Yes.

12   Q.    And who was the person who was punished?

13   A.    Chentino.

14   Q.    Do you remember when that meeting was?

15   A.    No.

16   Q.    You said earlier that he was punished because he hadn't

17   come to someone's aid?

18           MR. MURPHY:  Objection, your Honor.

19           THE COURT:  Overruled.

09:55AM 20           MR. MURPHY:  Leading.

21           THE COURT:  It was from prior testimony, so overruled.

22   Q.    Why was Chentino punished at that meeting?

23   A.    For letting someone down because he didn't participate

24   with Brujo and Vida Loca when they asked him to.

25   Q.    When did they ask him to help?

1    A.   It was a problem that Vida Loca had with the guy that he

2    killed.  He had been present there and he had seen how

3    everything went down, and Vida Loca had said that he had told

4    him that the person that he later killed was a chavala.

5    Q.   And "he" in your sentence is Chentino that you're talking

6    about?

7    A.   Yes.

8    Q.   So Chentino was there, and he saw what was going on, and

9    Chentino didn't help Vida Loca?

09:56AM 10   A.   Correct.

11   Q.   Okay.  How did the clique decide to punish Chentino at the

12   meeting?

13           MR. LOPEZ:  Objection.

14           THE COURT:  Do you mean the form of the punishment?

15           MS. LAWRENCE:  No.

16   Q.   I mean, who at the meeting recommended that Chentino be

17   punished or asked that Chentino be punished?

18   A.   First Casper put it on the table and also Crazy was

19   brought in later to give his version.

09:57AM 20           MS. LAWRENCE:  Can I have admitted Exhibit 13, please.

21   Q.   Mr. Sanchez, who is this?

22   A.   Crazy.

23   Q.   Is this the Crazy you just referred to being at the

24   meeting?

25   A.   Yes.

|     |      |                                                          |
|-----|------|----------------------------------------------------------|
| 1   | Q.   | And who is Crazy?  Why was he at your meeting?            |
| 2   | A.   | Because he was present when Vida Loca killed that guy.    |
| 3   | Q.   | Crazy was.  Is Crazy a member of your clique?            |
| 4   | A.   | No, he's from the Everett clique.                         |
| 5   |      | MS. LAWRENCE:  Could I have Exhibit 40, please.          |
| 6   | Q.   | Who is this, Mr. Sanchez?                                 |
| 7   | A.   | Vida Loca.                                                |
| 8   | Q.   | Was Vida Loca a member of your clique?                    |
| 9   | A.   | No.                                                       |

09:58AM 10  Q.   Do you know what clique he was a member of?

11   A.   Chelsea.

12   Q.   Okay.  So you said Casper put on the table that Chentino

13   should be punished, and Crazy was also there?

14   A.   Yes.

15   Q.   Crazy wanted Chentino to get a beating?

16   A.   Yes, he was in agreement.

17   Q.   Do you remember who did the beating?

18   A.   Chacon, Brujo, and Checha.

19   Q.   Mr. Sanchez, you testified earlier that some of the money

09:59AM 20   collected at clique meetings from ESLS members was used to buy

21   guns?

22   A.   Yes.

23   Q.   Did you talk about that at clique meetings?

24   A.   Yes, almost always.

25   Q.   Did the clique buy guns?

1    A.    Yes.

2    Q.    Why did the clique buy guns?

3    A.    To be armed and have protection.

4    Q.    Did you ever see or possess a clique gun?

5    A.    Yes.

6          MS. LAWRENCE:  Okay.  May I approach, your Honor?

7          THE COURT:  Yes.

8    Q.    Okay.  Mr. Sanchez, I'm showing you what has been marked

9    as Exhibit 69.  Do you recognize this?

10:00AM 10    A.    Yes.

11    Q.    What is it?

12    A.    It's a gun that I bought.

13    Q.    Okay.  When did you buy it?

14    A.    I bought it in December 2014.

15    Q.    Was it your own personal gun?

16    A.    I had it for a period of time.

17    Q.    What happened after?

18    A.    I had it on me while I was drunk, so I was like a crazy

19    person, and I did not know what I was doing, so I took it to

10:01AM 20    the shop, and I was showing it around to everybody like an

21    idiot.  So Casper noticed that and he came and took it away

22    from me.

23    Q.    Do you know what happened after Casper took it away from

24    you?

25    A.    He kept it for a while.

1    Q.    And then what?

2    A.    Then a decision was made after Lobo had a problem with

3    some 18s at a bar.  He said that he had been shot at, and,

4    therefore, he needed something to protect himself with.

5    Q.    Did Lobo keep that gun?

6    A.    Casper gave it to him.

7    Q.    Okay.

8          THE COURT:  I'm sorry, can I get you to go back to the

9    podium?

10:02AM 10          MS. LAWRENCE:  Oh, yes.  Sorry.

11    Q.    Do you know how long Lobo had possession of the gun?

12    A.    Two or three months.

13    Q.    What happened after that?

14    A.    He went -- he took it into a bar in Chelsea and the police

15    saw him with it.

16    Q.    Did he keep it?  Did he keep the gun?  Did Lobo keep the

17    gun after the police saw him with it?

18    A.    No, they took it from him.

19    Q.    Okay.  What happens when a clique member loses a clique

10:03AM 20    gun?

21          MR. LOPEZ:  Objection.

22          THE COURT:  I'll allow him to testify as to his

23    understanding.

24    A.    It has to be that he did a hit or fired at a rival.  It

25    can't be that he's just like hanging, having it in his waist

1       and walking around like that.

2              MR. LOPEZ:  Motion to strike, your Honor, as

3       unresponsive to the question.

4              THE COURT:  Okay.  It is nonresponsive.  I'll strike

5       it.  Ask again, Ms. Lawrence.

6       Q.   After Lobo had the gun taken from him by the police, did

7       he replace that gun that he had lost and given a new one to the

8       clique?

9       A.   We had a meeting to discuss that.  He had to explain how

10      he had lost it.

11      Q.   Okay.

12      A.   And it was decided that he either had to pay for the gun

13      or return it.

14      Q.   Did he do either of those things?

15      A.   He said he was going to replace it, and he brought a gun,

16      but it didn't work.

17      Q.   You said that was your gun originally.  Where did you get

18      it?

19      A.   I got it from a guy called Pelon.

20      Q.   Was that Pelon a member of the Eastside MS-13 clique?

21      A.   No.

22      Q.   Was there a member of the Eastside MS-13 clique named

23      Pelon?

24      A.   Yes.

25      Q.   So you knew two people named Pelon?

```
 1   A.   Yes.
 2            MS. LAWRENCE:  Permission to approach, your Honor?
 3            THE COURT:  Yes.
 4   Q.   Showing you what's been marked as Exhibit 51, do you
 5   recognize this?
 6   A.   Yes.
 7   Q.   What is it?
 8   A.   This is the gun that was bought by the clique.
 9   Q.   Okay.  And how did the clique get this gun?
10   A.   Through Negro.  He had a friend that was selling it.
11   Q.   And who --- had you ever used that clique gun for any
12   hits?
13   A.   I had it one time when I was going to go and murder -- I
14   was going to go with Animal to get Gallo.
15   Q.   Who is Gallo?
16   A.   A member of the 18th Street gang.
17   Q.   When -- how did you get the clique gun?  Who had it?
18   A.   Muerto.
19   Q.   And did you murder Gallo?
20   A.   No.
21   Q.   What did you do with the gun after your mission?
22   A.   I returned it to Muerto.
23            MS. LAWRENCE:  Okay.  May I approach, your Honor?
24            THE COURT:  Yes.
25   Q.   Mr. Sanchez, I'm showing you Exhibit 82.1.  Do you
```

1   recognize this?

2   A.    Yes.

3   Q.    What is it?

4   A.    That's Caballo's gun.

5   Q.    Was this Caballo's own gun or a clique gun?

6   A.    It was his personal gun.

7   Q.    Do you know where he got it?

8   A.    Through Checha.

9           MS. LAWRENCE:  May I approach again, your Honor?

10:08AM 10           THE COURT:  Yes.

11           MR. IOVIENO:  Judge, can we approach sidebar briefly?

12           THE COURT:  Yes.

13           (THE FOLLOWING OCCURRED AT SIDEBAR:)

14           MR. IOVIENO:  Your Honor, I understand the government

15   is putting in this gun evidence, but I would instruct a

16   limiting instruction once again.

17           THE COURT:  Okay.  I've given it twice.  I'm going to

18   give it at the end of the trial.  I think that's enough.

19           MR. POHL:  Thank you.

10:08AM 20           (SIDEBAR CONFERENCE WAS CONCLUDED)

21   Q.    Mr. Sanchez, this is marked as Exhibit 46.1.  Do you

22   recognize that?

23   A.    Yes.

24   Q.    What is it?

25   A.    That's a .380 gun.  I was with Crazy in Lawrence, and I

1    introduced him to the guy who sold it to me.

2              THE COURT:  I'm sorry, what exhibit number was that?

3              MR. POHL:  46.1, your Honor.

4              THE COURT:  Thank you.

5              MS. LAWRENCE:  I'm sorry, I didn't hear the end of

6    the --

7    A.    It's a gun -- it's a .380 gun.  It was with Crazy in

8    Lawrence, and the guy that sold it to Crazy also had shown it

9    to me and asked me if I wanted to buy it.

10:10AM 10    Q.    Okay, but Crazy bought it instead of you?

11    A.    Yes.

12    Q.    Okay.  Mr. Sanchez, I'd like to turn your attention to

13    December 27, 2015.  Did you go out on a mission to find rival

14    18th Street members that day?

15              MR. MURPHY:  Objection.  Leading.

16              THE COURT:  Sustained in that form.

17    Q.    Okay.  What do you remember happening that day on

18    December 27, 2015?

19    A.    I called Animal to hang out for a while, and afterwards I

10:10AM 20    told him to come out with me to look for culeros.

21    Q.    Okay.  Could I have -- did you and Animal go alone, just

22    the two of you?

23    A.    No, he called the kids that were with him as well.

24    Q.    Do you know who those kids were?

25    A.    Yes.

42

1    Q.    Who were they?

2    A.    Luis, David, and Sergio.

3    Q.    Were they MS-13 members?

4    A.    No.

5    Q.    Who were they?

6    A.    They were in observation.

7    Q.    With your clique?

8    A.    At that time, we were discussing that with the clique.  We

9    wanted to bring them into the clique.

10:11AM 10    Q.    Before we go further into the events of December 27, I

11    would like to ask you when did you first meet Animal?

12    A.    October of 2015.

13    Q.    Do you remember who introduced him to you?

14    A.    Brujo.

15    Q.    And what did you know about Animal when you met him or

16    what did you learn?

17              MR. MURPHY:  Objection, your Honor.

18              THE COURT:  Sustained.

19    Q.    At the time that you met Animal, was he a member of MS-13?

10:12AM 20    A.    He hadn't been jumped in yet.

21    Q.    Okay.  Was he hanging around with your clique?

22    A.    Yes.

23    Q.    When you met him in October he was -- or later?

24    A.    It was later.

25    Q.    Okay.  What clique was he hanging out with before yours?

```
 1    A.    With the Everetts.

 2    Q.    Okay.  And at some point did Animal become a homeboy in

 3    the Eastside clique?

 4    A.    Yes.

 5    Q.    Who invited him to join?

 6    A.    It was through Pelon and Muerto.

 7    Q.    Okay.  and who decided in the end whether he would be made

 8    a homeboy?

 9          MR. MURPHY:  Objection, your Honor.

10:13AM 10          THE COURT:  Overruled.

11    A.    We had a meeting with Casper and Playa and everyone in the

12    clique.

13    Q.    You were at that meeting when you talked about Animal

14    becoming a homeboy?

15    A.    Yes.

16    Q.    And why did you make Animal -- why did you decide to make

17    Animal a homeboy?

18          MR. MURPHY:  Objection, your Honor.

19          THE COURT:  Why don't you rephrase.  It was a group

10:14AM 20    meeting?

21          MS. LAWRENCE:  Group meeting.

22    Q.    What did the clique members -- you were present for the

23    meeting?

24    A.    Yes.

25    Q.    You heard other members of your clique talking about
```

1    making Animal a homeboy?

2    A.    Yes.

3    Q.    What is your understanding of the reasons why your clique

4    had decided to make Animal a homeboy?

5            MR. MURPHY:  Objection, your Honor.

6            THE COURT:  Overruled.

7    A.    For the hit he had carried out in East Boston.

8    Q.    All right.  I'd like to go back to December 27, 2015.

9            MS. LAWRENCE:  Can I have Exhibit 111, please, in

10:15AM 10   evidence.

11   Q.    You said you were with Animal and you wanted to go out and

12   look for 18th Street members.  Where did you start that day?

13   Where were you when you met with Animal?

14   A.    I invited him over to the house.

15   Q.    And where did you go after you left your house?

16   A.    We went to Everett Avenue.

17   Q.    Okay.  And do you recognize the area depicted on this map?

18   A.    Yes.

19   Q.    Is Everett Avenue on this map?

10:15AM 20   A.    Yes.

21   Q.    And is that the place that you were that day with Animal?

22   A.    Yes.

23   Q.    So you can point on the screen to show us where you were

24   and where you walked with Animal that day.

25   A.    With my finger?

1   Q.   Yes, please.

2   A.   We were at this street.  We went to Third and went into

3   Cherry Street, and at this point we met up with Luis and David,

4   and there we saw another guy from the 18th Street gang, so we

5   flashed the MS sign, and we said, "Here is Mara Salvatrucha,"

6   so the guy went and locked himself in the house again.  We went

7   back to Third Street.  At the corner with Broadway, we split.

8   Q.   Just a moment there.  Where did you split?  What did you

9   mean by split?

10:17AM 10   A.   Right at the corner of Broadway and Third.

11   Q.   And how did you split up?

12   A.   Animal went with Luis and David, and I remained behind

13   with Sergio.

14   Q.   Were you on the same side of the street?

15   A.   Yes.

16   Q.   So one group slightly ahead and one behind?

17   A.   Yes.

18   Q.   Why did you do that?

19   A.   So that we wouldn't call attention to ourselves as a large

10:18AM 20   group.

21   Q.   Okay.  What time of day was this, do you recall?

22   A.   It was 4 p.m.

23   Q.   Okay.  So can you continue to show us on the screen where

24   you went from the corner of Broadway and Third Street.

25   A.   Around this point, I saw that Animal flashed MS to some

1   people that were at this other, point and Animal started

2   chasing them, as did I, and I told the others to follow.

3           At this point here, Animal caught him and beat him

4   with a chain that he had in his backpack.

5   Q.   Did you also beat him at that point?

6   A.   Not at that point.

7   Q.   What happened next?

8   A.   I went by him and said that we should follow him, that we

9   had to beat him.

10:19AM 10   Q.   I'm sorry, did he -- Animal hit him with the chain.  But

11   did he get away, is that what you mean?

12   A.   Yes.

13   Q.   Okay.  So you followed him and then what happened?

14   A.   He turned at this corner and stopped at this building and

15   knocked at the door.

16   Q.   Did he go inside?

17   A.   No, at that point Animal caught him again and started

18   beating him again.

19   Q.   Did you beat him at that point?

10:20AM 20   A.   Yes.

21   Q.   What else happened to that person you were beating?

22   A.   He got away from me under my hand.  He was a small guy, so

23   he crossed the street at this corner.  And at that corner, Luis

24   arrived and lifted him up like this with his hand.  He stopped

25   him, and all of us beat him.  I hit him on the head, and we

1   were all beating him.  I saw that the guy was on the floor, on

2   the ground.

3   Q.   Did you kill him?

4   A.   No, but he looked like he was in bad shape.

5   Q.   Did you stop beating him?

6   A.   Yes.

7   Q.   Why?

8   A.   There were a lot of people around.  It was early in the

9   day.

10:21AM 10   Q.   What did you do when the people arrived?

11   A.   We crossed Hawthorne Street, and there were people staring

12   at us, so we went into this building.

13   Q.   Did you stay there?

14   A.   I stayed there for one minute, but I noticed that there

15   were a lot of police were arriving, so I told them that we

16   should leave and go through Chelsea Street.

17          THE INTERPRETER:  I'm sorry, not Chelsea, Chester

18   Street.

19   Q.   And did you leave?

10:22AM 20   A.   I left with Animal and we went into that market.

21   Q.   What happened to the other guys, David, Luis and Sergio?

22   A.   As we left, we saw that the police was knocking at the

23   door where they were.

24   Q.   Do you know what happened to them after that?

25   A.   They were arrested.

1          MS. LAWRENCE:  Okay.  Can I have Exhibit 105.1,

2     please.  It's in evidence.

3          THE CLERK:  What was it?

4          MR. POHL:  105.1.

5          MS. LAWRENCE:  It's just for the witness, sorry.

6     Q.   Mr. Sanchez, do you recognize the person in this

7     photograph?

8     A.   David.

9     Q.   Is this the David that you were with on December 27, 2015?

10:23AM 10   A.   Yes.

11         MS. LAWRENCE:  I move to admit 105.1, please.

12         THE COURT:  All right.  It's admitted, 105.1.

13         (Exhibit No. 105.1 received into evidence.)

14         MS. LAWRENCE:  Can I publish it to the jury, please.

15    Q.   And again, Mr. Sanchez, the individual in the photograph

16    is who?

17    A.   David.

18         MS. LAWRENCE:  Okay.  May I have 105.2 for the

19    witness, please, and 105.3 for the witness.

10:24AM 20   Q.   Do you recognize the person in these two photographs?

21    A.   Luis.

22    Q.   Is this the same Luis you were with on December 27, 2015?

23    A.   Yes.

24         MS. LAWRENCE:  Your Honor, I move to admit Exhibits

25    105.2 and 105.3 into evidence.

1          THE COURT:  All right.  They're admitted.

2          (Exhibit No. 105.2 and 105.3 received into evidence.)

3     Q.    Okay.  And these two photographs, Mr. Sanchez, are

4     photographs of who?

5     A.    Luis.

6     Q.    Okay.  Mr. Sanchez, I think you said earlier, but I want

7     to make sure.  Did you report this attempted murder that you

8     committed with Animal to anyone after you did it?

9          MR. MURPHY:  Objection, your Honor.

10:24AM 10          THE COURT:  Sustained.  Rephrase.

11    Q.    Did you tell anyone about what you did with Animal after

12    you did it?

13    A.    Yes.

14    Q.    Who did you tell?

15    A.    First we went to Mecha's house.

16    Q.    Who is Mecha?

17    A.    He's a member of the Everett clique.

18    Q.    Okay.  Did you tell anyone other than Mecha?

19    A.    And Enano.

10:25AM 20    Q.    Who's Enano?

21    A.    A member of the Everetts.

22    Q.    And anyone else?

23    A.    The following day, I informed Casper.

24    Q.    And when you informed Casper, what did you tell Casper?

25    A.    That we had beaten up a chavala on Broadway in Chelsea.

1    Q.    Why did you tell Casper about this?

2    A.    Because one has to tell the things that one does to one's

3    runners.

4    Q.    I think you said earlier that you met Animal through

5    Brujo; is that right?

6    A.    Yes.

7    Q.    Do you know, did you see Animal and Brujo spending time

8    together?

9    A.    Yes.

10:26AM 10    Q.    Do you know if Animal and Brujo went out to attack

11    chavalas like you did with Animal?

12             MR. MURPHY:  Objection, your Honor.

13             THE COURT:  He can testify as to what they said, if it

14    was disclosed, but he wasn't there.

15    Q.    Did Brujo or Animal tell you about any attacks on rival

16    gang members that they committed?

17    A.    Yes.

18    Q.    Do you know when that -- well, what did they tell you?

19    A.    On January 1, 2016, we were at the house of the owner of

10:27AM 20    the garage, we gathered there to eat and to drink beer, and

21    that's when Brujo told me what they had done, that they had

22    stabbed a guy on Chestnut.

23    Q.    Okay.  Was it just any guy?

24    A.    No, an 18.

25    Q.    Okay.  Mr. Sanchez --

1           MS. LAWRENCE:  Could I have the document camera for

2     the witness, please, Madam Clerk.

3     Q.    This disk, which is marked Exhibit 218 is a recording made

4     on January 1, 2016.  Mr. Sanchez, did you review this recording

5     before you came to court to testify today?

6     A.    Yes.

7     Q.    And did you mark that recording with your initials?

8     A.    Yes.

9     Q.    When you listened to that recording, did you go through

10:28AM 10     the process that we talked about earlier listening to the

11     voices and talking with the interpreter about who was speaking?

12     A.    Yes.

13           MS. LAWRENCE:  Your Honor, the disk that's been marked

14     as Exhibit 218 goes with the transcript that's been marked

15     Exhibit 114.  At this time I move to admit Exhibit 114 into

16     evidence.

17           THE COURT:  Exhibit 114 is admitted.

18           MR. MURPHY:  Standing objection, your Honor?

19           THE COURT:  Yes, overruled.

10:29AM 20           (Exhibit No. 114 received into evidence.)

21     Q.    Okay.  Mr. Sanchez, this is a disk of a recording made on

22     January 2, 2016.  It's marked as Exhibit 219 for

23     identification.  Did you review this recording before you came

24     to court today?

25     A.    Yes.

1    Q.   And did you mark your initials on this disk after you

2    reviewed it?

3    A.   Yes.

4    Q.   And when you listened to the recording, did you tell the

5    interpreter who was present, who was speaking and what was

6    being said?

7    A.   Yes.

8         MS. LAWRENCE:  Your Honor, this disk, the recording on

9    this disk, 219 --

10:30AM 10         THE COURT:  I thought you said 218.

11         MS. LAWRENCE:  That was the prior one.  This is 219,

12   I'm sorry, goes with the transcript that's been marked as

13   Exhibit 115, and I'd move to admit Exhibit 115 now.

14         THE COURT:  All right.  It's admitted, 115.

15         (Exhibit No. 115 received into evidence.)

16         THE COURT:  Why don't we take our break?

17         MS. LAWRENCE:  Yes.

18         THE CLERK:  All rise.

19         (JURORS EXITED THE COURTROOM.)

20         (A recess was taken.)

21         (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

22         THE COURT:  All right.  Quickly, on the December 17,

23   2015 transcript that we were talking --

24         (SIDEBAR CONFERENCE WAS CONCLUDED.)

25         THE COURT:  You can take the witness out.

1          (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

2          THE COURT:  The transcript of the December 17, 2015

3     recording, the selected portion of the transcript is three plus

4     pages long.  It's an excerpt from longer meetings.  Standing

5     alone, the excerpt is not difficult to understand, and if it

6     were simply standing alone, I think any unfair prejudice would

7     be quite minor.  Of course, it is part of a larger recording,

8     and if -- the defense should have a fair opportunity to listen

9     to the context, examine the translation and so forth.

10:32AM 10          What basically happened here is the government

11     produced voluminous recordings, all of which were in Spanish.

12     They were required by various court orders to produce

13     recordings, preliminary transcripts, final transcripts,

14     identify exhibits and so according to various timetables.

15          My understanding is this excerpt was not identified as

16     an exhibit.  It was produced as a recording.  No preliminary

17     transcript was produced.

18          Apparently what I think is a form 1023, it's like a

19     302, was produced kind of summarizing the recording, and my

10:33AM 20     understanding on February 5th, which was 10 days ago, counsel

21     for Guzman, not Mr. Murphy, provided notice that he might want

22     to use a different part of that transcript.  And it was not, in

23     fact, used, and the government three days later on February 8th

24     provided it's own notice that it was going to use the disputed

25     excerpts, all that by way of background.

1          Certainly, we have -- I have a strong preference for

2     the truth, that is, to permit all relevant and admissible

3     evidence to be heard.  There are also countervailing interests

4     of fairness and an orderly procedure that need to be observed,

5     and that's particularly true in a case of this complexity.

6          As a general proposition, the government not having

7     identified it as a potential exhibit, they cannot use it in

8     their case in chief.  The question is really whether they can

9     use it in rebuttal, and rebuttal has a lot of different

10:34AM 10     meanings in this context.

11          It could mean in response to an actual defense case.

12     That is, the government puts on its case, the defense puts on a

13     case and the government rebuts.  That's one possible meaning.

14     Another is a redirect of a specific witness as to an issue

15     raised on cross-examination.  That's a second interpretation.

16     Or a third interpretation is a response to issues raised in

17     opening statements and in cross-examination generally.

18          Here, I think there's no real question that the

19     defendants or some of them have clearly stated or suggested in

10:34AM 20     their openings and their cross that defendants were unhappy

21     with the East Coast Program, either wanted out or didn't want

22     to join, and that they were older men who were not, in some

23     fashion or another, buying into MS-13 or wanted to be calmados

24     or otherwise have a lesser involvement with the gang.

25          This, I think, is directly responsive to that.  There

1    is certainly a good argument that in the broader sense this is

2    rebuttal, so it's a more complicated issue to me than it

3    otherwise might appear.

4         What I'm going to do is this:  I'm going to at least

5    in the first instance adhere to the requirement that the

6    government, not having identified it in its case in chief,

7    can't introduce it in its case in chief, by which I mean with a

8    witness on direct examination.

9         It's not entirely clear to me that that ruling is

10:35AM 10   correct, but I'm going to so hold.  As an aside, for the sake

11   of efficiency, I will permit them to authenticate the

12   transcript in the sense of asking the witness to identify the

13   voices and so on, which, of course, can be done without

14   revealing the content, and that's strictly an efficiency

15   standpoint so that if this witness is the identifying or

16   authenticating witness, we don't have to bring him back.

17        Clearly, if this issue is raised on cross with this

18   witness, the door is opened, and I think it can be rebutted.

19   If a different witness either on cross or called by the defense

10:36AM 20   opens the door, I think this can be admitted in rebuttal, and

21   I'm going to leave the door ajar even if there's no further

22   door opening by the defendants.  I'm going to decide before the

23   government rests whether it should come in based on what has

24   happened thus far.

25        I'm not entirely sure what the appropriate response

1   is, again, given the defense arguments and cross-examination,

2   but effectively I'm going to defer that decision, so this is

3   something of a cobbled together solution here.

4        But, in short, I will not permit the government to

5   elicit testimony about this transcript from this witness on

6   direct except to the extent necessary to authenticate voices,

7   again, for the sake of efficiency only in case it does come in.

8        And, clearly, it seems to me if the defense raises

9   these issues on cross with this witness or another witness or

10:37AM 10   through a defense witness on their own direct that that may

11   open the door, and this is allowable, and I'll make a final

12   decision before the government rests.

13        Okay.  Ms. Lawrence.

14        MS. LAWRENCE:  I'd like to clarify that prior to

15   producing -- offering this transcript specifically, the

16   government did put on its exhibit list a transcript of a

17   recording made on January 2, 2016, when the witness who is on

18   the stand now talking to Muerto says, "We're part of the --

19   we're running with the Hollywoods now, right?  Remember, we

10:38AM 20   talked about it at the meeting."  I had always intended to ask

21   that witness what he meant by that.

22        THE COURT:  Well, if it's on your list, it's on your

23   list, and --

24        MS. LAWRENCE:  I just want to be clear that that's

25   proper to do without --

1          THE COURT:  Yes.  And it's one of the reasons -- the

2     reason I'm leaving the door ajar is I don't know whether this

3     is cumulative.  I don't know, you know, what else is going to

4     be suggested by other direct or cross.  I want to wait until

5     the end and make a final decision, but, you know, we do have

6     the rule, you're supposed to disclose your exhibits as part of

7     your case in chief.  Your direct examination is your case in

8     chief, and I'm -- at least at this stage, I'm going to enforce

9     that rule.

10:38AM 10          MS. LAWRENCE:  Thank you.

11          THE COURT:  Okay.  Let's take a break.

12          THE CLERK:  All rise.

13          (A recess was taken.)

14          THE CLERK:  All rise for the jury.

15          (JURORS ENTERED THE COURTROOM.)

16          THE CLERK:  Thank you.  You may be seated.  Court is

17     now back in session.

18     Q.   Okay.  Mr. Sanchez --

19          MS. LAWRENCE:  Could I have the document camera for

10:52AM 20     the witness, please.

21     Q.   -- I'm showing you a disk of a recording made on

22     January 2, 2016.  It's been marked for identification as

23     Exhibit 220.  Did you review this recording and use the process

24     that we described earlier to identify the voices for the

25     interpreter?

1    A.    Yes.

2    Q.    And are those your initials on the disk, sir?

3    A.    Yes.

4         MS. LAWRENCE:  Okay.  Your Honor, Exhibit 220, the

5    recording goes with the transcript that has been marked as

6    Exhibit 116, and I'd like to move Exhibit 116 into evidence

7    now.

8         THE COURT:  Okay.  It's admitted.

9         (Exhibit No. 116 received into evidence.)

10:53AM 10   Q.    And Exhibit 228 is a disk that has been marked for

11   identification.  It contains a recording made on December 17,

12   2015.  Did you listen to this recording and identify the voices

13   for the interpreter using the process we described earlier?

14   A.    Yes.

15        MS. LAWRENCE:  Your Honor, the recording on

16   Exhibit 228 goes with the transcript that has been marked for

17   identification as 127.

18        THE COURT:  All right.  Are you offering 127?

19        MS. LAWRENCE:  Not at this time, your Honor.

10:54AM 20   Thank you.

21        Could I have Exhibit 114 on the screen, please.

22   Q.    Mr. Sanchez, we're going back to the recording made on

23   January 1, 2016 that we just talked about briefly.  I'm going

24   to read just a portion and then ask you some questions about

25   that.

1        THE INTERPRETER:  Which transcript?

2   Q.   This is on page 1 and we are on tab 114.  114 in your

3   binders.  Starting with Animal:

4        "What's up is that we want to report a hit, doggie."

5        CW-1:  "What the fuck happened?"

6        Animal:  "Brujo, and I just did an awesome hit, dog."

7        CW-1:  "What do you mean?"

8        Animal:  "That we got a chavala with Brujito.  We got

9   off a truck and we got out to stab a chavala, and there is

10:55AM 10  evidence here that we stabbed him, dude."

11       CW-1:  "So what happened?  What do you mean?"

12       Animal:  "We got a chavala, doggie.  I was holding

13  him, doggie, and dangling him while the homeboy stabbed with a

14  knife, and when the culero tried to run, he would scream and

15  hang on him, and this homeboy would lunge at him with the knife

16  and here is the evidence here.  I have the knife and here is of

17  the blood, doggie."

18       CW-1:  "Where are you guys?"

19       Animal:  "We're making some soup here with the Mara

10:55AM 20  family, dog.  Celebrating, dog."

21       And then I'm going to continue down toward the middle

22  of the page starting with Brujo.

23       Brujo:  "Hey, Pelon, Pelon."

24       CW-1:  "What's up, dude?"

25       Brujo:  "I struck that son of a bitch with a knife

1   and --"

2          Animal:  "I captured him and tied him up and set him

3   up for him and then the homeboy lunged at him with the blade,

4   dog.  For real, dog."

5          Mr. Sanchez do you know what Animal and Brujo are

6   talking about in this recording?

7   A.   Yes.

8   Q.   What are they talking about?

9   A.   They're talking about what they also told me when we met

10  with them.  I was at that meeting.

11  Q.   And when Animal says, "We're making some soup here with

12  the Mara family," is that what you were talking about earlier

13  when you were getting together to have dinner?

14  A.   Yes.

15         MS. LAWRENCE:  Okay.  Could I have Exhibit 115,

16  please.

17  Q.   I'd like to read part of this transcript and I'll be

18  starting on page -- sorry, 5.  Thank you.

19         CW-1:  "So who got wet, Brujo?"

20         Animal:  "I was killing him, punching and kicking and

21  I would drag him and leave him in the middle of the street

22  where the cars were.  Then Brujo arrived with everything with a

23  knife and he went and the guys blood."

24         CW-1:  "That's awesome.  Was it just you and Brujo or

25  were the other homeboys, there, too?"

1          Animal:  "Chico, Vago, and Luis."

2          CW-1:  "Luis was there, too?"

3          Animal:  "Yes.  When Luis I want to see, but there was

4     someone who came with everything, too.  Oh, and we got that guy

5     there who was attacked and said I told you that the Mara and

6     the guy was saying I've had it for years, that apparently was

7     when --"

8          CW-1:  "That's how you know that Luis was activated

9     already."

10:58AM 10          Animal.  "That's right.  The day we were out with

11    Tigre he was the one who knocked the guy down."

12          CW-1.  "We'll see if Luis has already done stuff, too,

13    you know, maybe everyone will get in."

14          Animal:  "Brujo told Luis that yes.  That he didn't

15    think there would be a problem and that he should and

16    everything.  Yes, no problem he told me.  That dude told him

17    there that if a dude asked him what's going on, quote 'tell him

18    that there's no problem, that I told you to jump in.'"

19          CW-1:  "That's good because if there were homeboys

10:58AM 20    that saw what happened, they'll know what's going on, you

21    know?"

22          Animal:  "Yes, and Chico, too."

23          CW-1:  "Because I -- if he reports to me quickly, then

24    I'll report it and like that, you know, and say it was like

25    this and like this.  I'll tell Muerto, and after Muerto, and I

1   say it, it's done, you know.  No one can accuse you of any

2   bullshit."

3            Turning the page.

4            Animal:  "Yes.  So, Vago, Brujo, and Chico were

5   there."

6            CW-1:  "That's awesome, because with Tigre there was

7   some doubt, but after Tigre said yes, then it's the guy's word,

8   you know."

9            Animal:  "Yes."

10:59AM 10            All right.  The first question I have, Mr. Sanchez,

11   CW-1 starts off by asking, "So who got wet?"

12            THE INTERPRETER:  Who got what?

13   Q.   Wet.  What does that mean to you?

14   A.   That means to also participate.

15   Q.   Okay.  In what, participate in what?

16   A.   In a hit.

17   Q.   Okay.  And down at the bottom, CW-1 is talking about after

18   Muerto, "And I say it, it's done, you know."  What does that

19   mean, "it's done?"

10:59AM 20            MR. MURPHY:  Objection, your Honor.

21   Q.   What do you understand it's done to mean?

22            THE COURT:  I'll allow it.  Overruled.

23   A.   At that time, they wanted to separate from the Eastside,

24   from the Mara Eastside.  They wanted to do things their way, so

25   because Muerto is a solid member of MS-13, the other dudes

1    would not oppose it.

2    Q.   And on the next page, when you say with Tigre, there was

3    some -- I'm sorry, not you say.  It is said, "Tigre, there was

4    some doubt, but after Tigre said yes, then it's the guy's word,

5    you know."

6         What do you understand that to mean?

7    A.   I spoke the next day with Muerto and Pelon about what I

8    had done with Animal and I told them the guy had stood up well

9    and that he would be a good homeboy to jump in.

11:01AM 10    Q.   The guy being Animal?

11    A.   Yes.

12    Q.   And so do you understand this to be saying that if you

13    stand up and say that and Muerto and Pelon do, too, then he

14    would become a homeboy in your clique?

15         MR. MURPHY:  Objection, your Honor.  Leading.

16         THE COURT:  Sustained.

17    Q.   Do you know why -- do you know why Animal and CW-1 are

18    talking about Luis in this conversation?

19         MR. MURPHY:  Objection.

11:01AM 20    THE COURT:  I'll sustain it in that form.

21    Q.   Can you tell me what you understand the phrase "activated"

22    means when they're talking about Luis?

23    A.   To make them homeboys.

24    Q.   But Luis, you said earlier, was not yet a homeboy; is that

25    correct?

1    A.    Yes.

2    Q.    And Luis was with you when you attacked a rival member,

3    gang member on December 27, 2015?

4              MR. MURPHY:  Objection, your Honor, leading.

5              THE COURT:  Overruled.

6    A.    Yes.

7    Q.    Okay.  And he was also with Animal when he did a mission

8    or did a hit?

9    A.    Yes.

11:02AM 10          MS. LAWRENCE:  Okay.  May I have Exhibit 116, please.

11   Q.    This is a transcript of a recording made on January 2,

12   2016, and you testified earlier that you had reviewed this

13   recording before you came to court today?

14   A.    Yes.

15   Q.    Were you present when this recording was made?

16   A.    Yes.

17   Q.    I'm going to read part of the transcript starting on page

18   2.

19              Tigre:  "There, like that, man.  The chavalas ran, and

11:03AM 20   we were chasing after them, homeboy.  You can imagine how I

21   looked little as I am, but I didn't give a shit, homie.  A huge

22   beast after those little culeros, but you can imagine."

23              CW-1:  "No, but they are real sons of bitches.  If you

24   are not careful, they will stab you."

25              Tigre:  "No, homie.  He had some shit in his hand and

1   with one kick, Animal kicked it out of his hand right away.  I

2   had the knife like that in my hand, dude, and when the woman

3   saw it, homeboy, police, police.  The burglar is going to kill

4   him she said.  There were a lot of fucking people, homeboy,

5   yelling it out there in front of all the people, homie.  Fuck,

6   but you know that he was left there all fucked up."

7          Muerto:  "That boy."

8          Tigre:  "And they picked him up there.  The ambulance

9   picked up that culero."

11:04AM 10          CW-1:  "Oh, yes."

11          Tigre:  "Precisely, homie.  He was beaten up, dude.

12  Homeboy, Luis, that kid, he had the knife like this, hidden

13  like this, dude.  He was going to like this, bloop, homeboy.

14  And I was -- when he was on the ground, I was hitting his head

15  with my foot, dude, I was saying, fuck, the Maras is here, son

16  of a bitch, you can imagine."

17          CW-1:  "You have to be careful, dude.  Because now,

18  like I said to Animal, they are going to put a price on Animal,

19  you'll see."

11:04AM 20          Tigre:  "That is exactly what I told him.  He is a

21  treasure."

22          Mr. Sanchez, in that conversation, are you referring

23  to the attack you described earlier that happened on

24  December 27, 2015?

25  A.   Yes.

1    Q.    Okay.  and what do you understand -- what did you mean

2    when you said that Animal is a treasure?

3    A.    That he had done a lot already, that he had killed a

4    chavala in East Boston and he had done that with me and he had

5    done some other things as well.  And he would tell me that he

6    had contact with and would message with culeros.  He would make

7    fun of them and say I really beat somebody up and they hadn't

8    done anything.

9    Q.    I'm going to continue reading on page -- I'm going to

11:06AM 10    continue reading on the bottom of page 3.

11         Tigre:  "And paros, solid paros from down below, from

12    the Hollywoods they come, and we are running with the

13    Hollywoods, homeboy.  We talked about that at the meeting.  You

14    remember, right?"

15         Muerto:  "Uh-huh."

16         Tigre:  "That we have to get paros, or get chequeos,

17    right?"

18         Muerto:  "That's what it's about, dude."

19         Okay.  What were you talking about with Muerto there

11:06AM 20    when you said we need to get paros and chequeos?

21    A.    I met two paros from the Hollywoods when I was hanging out

22    with the Everetts, and I told one of them to come by and hang

23    out with us, and he said no, he was fine with the Everetts, and

24    that is what I was referring to.

25    Q.    Okay.  And when you said we are running with the

1    Hollywoods, homeboy, we talked about that at the meeting.  What

2    did you mean by that?

3    A.    At that time we were out of the East Coast Program.

4    Q.    Who is "we"?

5    A.    That we had gotten -- that the Eastside had left the East

6    Coast Program.

7    Q.    And what -- you can continue.

8    A.    So the cliques always have to be affiliated with a

9    program.  A clique can't just run like that, just like that.

11:08AM 10    The program is like the high command of the MS.  For instance,

11    when somebody was deported like Eastside had Psycho and

12    Loquillo in El Salvador.  When they were -- when they were

13    found over there, they had to report from which clique they

14    were in order to get the protection, to be protected by the MS

15    down there.

16    Q.    Okay.  Why were you trying to recruit paros or chequeos

17    from the Hollywood or the Everett clique?

18    A.    To do more hits.

19    Q.    Why did you need paros and chequeos to do more hits?

11:09AM 20    A.    Because they're kids, they're young.  That want to be part

21    of the MS-13, and it's easier for them to move through the

22    streets than a person who's 30 years old.

23    Q.    Okay.  And you said earlier that Animal was under

24    observation?

25    A.    Yes.

1    Q.    By your clique?

2    A.    Yes.

3    Q.    And Luis and David, too, you were thinking about making

4    them members?

5              MR. MURPHY:  Objection, your Honor, leading.

6              THE COURT:  Overruled.

7    A.    Yes.

8    Q.    Okay.  And when you said you were recruiting paros from

9    the Hollywood, did you mean the clique, the Hollywood clique?

11:10AM 10    A.    No, just people that run with MS-13.  They're just doing

11    favors, and they don't say hello the same way that a homeboy

12    does.

13    Q.    Okay.  So the Hollywood is a program.  When you referred

14    to Hollywood, you meant program, not clique?

15    A.    Yes.

16    Q.    Okay.  Mr. Sanchez, did the Eastside Locos Salvatrucha

17    clique make Animal a homeboy?

18    A.    Yes.

19    Q.    When did that happen?

11:11AM 20    A.    I don't recall the date.  I wasn't present.

21    Q.    Why weren't you present?

22    A.    I was drinking with some other homeboys.

23              MS. LAWRENCE:  One moment, your Honor.

24    Q.    One more question, Mr. Sanchez.  When you said we are

25    running with the Hollywoods, was the Eastside clique part of

1    the Hollywood program?

2    A.    Yes, at that point we had discussed that several times at

3    meetings.

4         MS. LAWRENCE:  Okay.  All right.  Nothing further at

5    this time, your Honor.

6         THE COURT:  All right.  Cross-examination.  Mr. Lopez.

7         MR. LOPEZ:  Thank you, your Honor.

8                        CROSS-EXAMINATION

9    BY MR. LOPEZ:

11:13AM 10    Q.    Good morning, Mr. Sanchez.

11    A.    Good morning.

12    Q.    My name is Scott Lopez.  I represent Edwin Guzman.  And we

13    have never met before, right?

14    A.    No.

15    Q.    Now, when were you arrested in this case?

16    A.    January 29, 2016.

17    Q.    And I thought I heard you testify yesterday that you've

18    been in prison since you pled guilty in this case.  Is that

19    what you said?

11:13AM 20    A.    Yes.

21    Q.    But that's not true, right?

22    A.    I've been in jail since 2016 and I pled guilty the same

23    year.

24    Q.    But you said that you've been in prison since you've pled

25    guilty?

1    A.    That's how I understood the question, and that's why I

2    responded in that way.

3    Q.    But, in fact, you didn't plead guilty until September of

4    2016?

5    A.    Yes.

6    Q.    And you were arrested in January of 2016?

7    A.    Correct.

8    Q.    And you've been in jail since you were arrested?

9    A.    Yes, sir.

11:14AM 10    Q.    You were not let out on bail?

11    A.    No.

12    Q.    And before this case, had you ever been in jail before?

13    A.    No.

14    Q.    Do you recall how long you were in jail before you decided

15    to talk to the government?

16    A.    About two months.

17    Q.    Are you sure about that?

18    A.    Yes.

19    Q.    Was it more like two weeks?

11:15AM 20    A.    I'm talking about when I came to see them.

21    Q.    Do you recall when you signed your proffer agreement?

22    A.    I don't remember the date.

23    Q.    Well, do you remember entering into a proffer agreement?

24    A.    Yes.

25    Q.    But you don't remember the date?

```
 1    A.    It was the first day that I came to see them.  I don't
 2    remember the date.
 3              MR. LOPEZ:  Your Honor, could I have the document
 4    camera just for the witness?
 5    Q.    Do you see what I've put on the Elmo?
 6    A.    Yes.
 7    Q.    Do you recognize that?
 8    A.    Yes.
 9    Q.    And do you see your name?
10    A.    Yes.
11    Q.    And do you see your lawyer's name?
12    A.    Yes.
13    Q.    And do you see the date?
14    A.    Yes.
15    Q.    And turning to the second page, is that your signature?
16    A.    Yes.
17    Q.    And did you date it?
18    A.    No.
19    Q.    The date that's written there, you didn't write that?
20    A.    Yes, I did.
21    Q.    And your lawyer's signature?
22    A.    Yes.
23    Q.    And he also put in the date?
24    A.    Yes.
25    Q.    So, would you agree that this is the proffer agreement
```

1    that you signed in this case?

2    A.   Yes.

3         MR. LOPEZ:  Your Honor, I move that this be admitted

4    as the next exhibit.

5         THE COURT:  What number?

6         THE CLERK:  228.

7         THE COURT:  228?  All right.  It's admitted 228.

8         (Exhibit No. 229 received into evidence.)

9         MR. LOPEZ:  May I show that to the jury, your Honor?

11:18AM 10    THE COURT:  Yes.

11    Q.   So you entered into a proffer agreement on February 16,

12    2016?

13    A.   Yes.

14    Q.   Right?

15    A.   Yes.

16    Q.   And that -- and I think you said you were arrested on

17    January 29, 2016?

18    A.   Yes.

19    Q.   So roughly 18 days after you were arrested, you started

11:19AM 20    talking to the government?

21    A.   Yes.

22    Q.   And you understood from your proffer agreement that

23    anything you said could not be used against you, right?

24    A.   Yes.

25    Q.   But you did understand that your proffer had to be

1    accurate?

2    A.    Yes.

3    Q.    And what did you understand to mean when something is

4    accurate?

5    A.    That it be exact information.

6    Q.    That it be true?

7    A.    Yes.

8    Q.    That it not be a lie?

9    A.    Yes.

11:20AM 10    Q.    And you understood that it had to be complete?

11    A.    Yes.

12    Q.    And what did you understand by the word "complete"?

13    A.    That I shouldn't say only halfway, but conclusively.

14    Q.    So when you were talking to the government you should tell

15    them everything you knew about anything they asked you about,

16    right?

17    A.    Yes.

18    Q.    And you understood that you could tell the government

19    anything, right?

11:20AM 20    A.    Not anything, only the truth.

21    Q.    You would agree that you could tell them anything so long

22    as it was true and whatever you told them, they could not use

23    against you, right?

24    A.    Yes.

25    Q.    Now, looking at paragraph 2 of the agreement, that reads,

1    "No statements made or other information provided by Mauricio

2    Sanchez will be used by the U.S. Attorney directly against

3    him."

4           Did I read that correctly?

5    A.   Yes.

6    Q.   "Except to rebut any evidence offered or factual

7    assertions made by or on behalf of Mauricio Sanchez at any

8    stage of a criminal or civil proceeding including but not

9    limited to detention hearing, trial, or sentencing which is

11:22AM 10  inconsistent with or contrary to the statements made during the

11   proffer, or in a prosecution of Mauricio Sanchez based on false

12   statements made or false information provided by Mauricio

13   Sanchez."

14           Did I read that correctly, sir?

15   A.   Yes.

16   Q.   So, you understood, sir, that you were protected from harm

17   as long as you did not change what you said to the government

18   in your proffer at a later date, right?

19   A.   Yes.

11:23AM 20  Q.   So if you lied to the government in your proffer, you had

21   to continue to repeat that lie in the future to prevent any

22   harm coming to you, right?

23   A.   I don't understand the question.

24   Q.   Well, let me try it again.  If you told a lie during one

25   of your proffers, you understood that you had to say the same

1    thing at a later time so the government couldn't use the lie

2    against you, right?

3    A.    Yes.

4    Q.    So you understood if you said something later that was

5    different, you might not be protected by this proffer

6    agreement?

7             MS. LAWRENCE:  Objection, your Honor.

8             THE COURT:  Sustained.

9    Q.    And the people present for your first proffer in

11:24AM 10    February of 2016, do you recall who was there?

11    A.    Yes.

12    Q.    Do you recall meeting Assistant U.S. Attorney

13    Peter Levitt?

14    A.    Yes.

15    Q.    Special Agent Benjamin Wallace?

16    A.    Yes.

17    Q.    Massachusetts State Trooper Mario Millett?

18    A.    Yes.

19    Q.    Ms. Huacuja?

11:25AM 20    A.    Who is that?

21    Q.    The interpreter?

22    A.    Yes.

23    Q.    And your attorney Liam Scully?

24    A.    Yes.

25    Q.    And you were interviewed?

1    A.    Yes.

2    Q.    And Ms. Huacuja translated what you said?

3    A.    Yes.

4    Q.    And agents -- the agents were taking notes?

5    A.    Yes.

6    Q.    And they were taking notes as you spoke and Ms. Huacuja

7    interpreted what you said?

8    A.    Yes.

9    Q.    And you knew the proffer was important?

11:26AM 10    A.    Yes.

11    Q.    Now, before I get into your proffer, I want to talk to you

12    a little bit your mental health.  Are you currently on any

13    medications?

14    A.    Yes.

15    Q.    What are you taking on a daily basis?

16    A.    I take medication for an obsessive compulsive disorder,

17    for lack of sleep, for anxiety.

18    Q.    Anything else?

19    A.    For suicidal thoughts.

11:27AM 20    Q.    Now, are you familiar with a medication called

21    Risperidone?

22    A.    Yes.

23    Q.    Is that one of the medications you're on?

24    A.    Yes.

25    Q.    And Luvox?

```
 1   A.   Yes.

 2   Q.   And Mirtazapine?  You're not familiar with that one?

 3   A.   I'm not taking that one.

 4   Q.   Let me strike that.  Do you recall an examination that you

 5   had, a mental health assessment in June of -- June 30, 2017?

 6   A.   Yes.

 7   Q.   And there was a follow-up -- there was a psychiatric

 8   consultation on July 12, 2017?

 9   A.   Yes.

10   Q.   And then there was a further mental health assessment on

11   December 5, 2017?

12   A.   Yes.

13   Q.   And then most recently on December the 6th, 2017, you had

14   a psychiatric consultation; is that correct?

15   A.   Yes.

16   Q.   Now, when you were assessed in June of 2017, did you

17   report to the healthcare provider that you met with that you

18   were having hallucinations?

19   A.   Yes, I was imagining things.

20   Q.   And that you had not slept for five days?

21   A.   Yes.

22   Q.   And that you didn't feel real good about yourself?

23   A.   Yes.

24   Q.   And did you tell her that you tried cutting yourself when

25   you were 16?
```

78

1          MS. LAWRENCE:  Objection, your Honor.

2          THE COURT:  I'll allow it.

3     A.   No.

4     Q.   Do you recall telling her that your mother was shot by a

5     gang member?

6     A.   I didn't say gang member.

7     Q.   But you told her that your mother was shot?

8     A.   Yes, sir.

9     Q.   And that you felt responsible for it?

11:30AM 10   A.   Yes.

11    Q.   And did you tell her that you started abusing cocaine at

12    age 15?

13    A.   Yes.

14    Q.   And you started abusing alcohol at age 15?

15    A.   Yes.

16    Q.   And you were subsequently seen by a psychiatrist by the

17    name of Paul McGuire?

18    A.   At Wyatt, yes.

19    Q.   And you understood he was a psychiatrist?

11:31AM 20   A.   Yes.

21    Q.   And you saw him in July of 2017?

22    A.   No.  No, I saw the psychiatrist after I was arrested in

23    2016.

24    Q.   Do you recall being evaluated by a Paul McGuire in July of

25    2017?

         1    A.    Yes.

         2    Q.    And after you met with him, is that when you started

         3    taking Risperidone?

         4    A.    Yes.

         5    Q.    And prior to him prescribing Risperidone, did you complain

         6    of anxiety?

         7    A.    Yes.

         8    Q.    Did you complain of panic attacks?

         9    A.    Yes.

11:32AM 10    Q.    Hostility towards others?

        11    A.    Yes.

        12    Q.    Paranoid feelings?

        13    A.    Yes.

        14    Q.    You thought people were talking about you?

        15    A.    Yes.

        16    Q.    You thought they were putting you down?

        17    A.    Yes.

        18    Q.    And you told him you were having disturbing thoughts?

        19    A.    Yes.

11:32AM 20    Q.    Inside your head?

        21    A.    Yes.

        22    Q.    You told him you were hearing voices?

        23    A.    No, not voices.

        24    Q.    You didn't tell him that you were hearing voices that were

        25    telling you to do things?

1    A.    No, my mind would indicate that to me, but not voices.

2    Q.    So you were -- your mind was telling you to do things?

3    A.    Yes.

4    Q.    Like it was telling you to strike other people?

5    A.    Yes.

6    Q.    To spit on other people?

7    A.    Yes.

8    Q.    To fight with others?

9    A.    Yes.

11:33AM 10   Q.    In fact, you told him you wanted to walk out of the shower

11   naked to draw attention to yourself, right?

12   A.    Yes.

13   Q.    And you also told him you were having visual

14   hallucinations?

15   A.    Yes.

16   Q.    You were seeing things?

17   A.    Yes.

18   Q.    And you also told him that you had a history of alcohol

19   dependence?

11:34AM 20   A.    Yes.

21   Q.    And that you had previously been diagnosed with obsessive

22   compulsive disorder?

23   A.    Yes.

24   Q.    And you had -- you told him you had a history of cocaine

25   abuse?

```
 1    A.    Yes.

 2    Q.    And you told him you were very upset?

 3    A.    Yes.

 4    Q.    And that you felt like you were going to lose control?

 5    A.    Yes.

 6    Q.    And so he prescribed you Risperidone, right?

 7    A.    Yes.

 8    Q.    Now, do you know whether Risperidone is an antipsychotic

 9    medication?

10    A.    No, he did not say anything.  He just prescribed it.

11    Q.    Did he also prescribe you Luvox?

12    A.    Yes.

13    Q.    And do you know why he prescribed you Luvox?

14    A.    That's for the obsessive compulsive disorder.

15    Q.    And what about Mirtazapine?

16    A.    I haven't taken that.

17    Q.    Okay.  Well, were you prescribed any anti-depressant

18    medication?

19    A.    Yes.

20    Q.    And were you prescribed any anti-anxiety medication?

21    A.    Yes.

22    Q.    Now, you had a follow-up with Dr. McGuire in December of

23    2017, right?

24    A.    Yes.

25    Q.    And did you complain to him that you didn't feel like the
```

1    psychiatric medications you were taking were actually working?

2    A.    Yes.

3    Q.    Did you discuss the antipsychotic affects of Risperidone?

4    A.    Yes.

5    Q.    And did you tell him that you were still struggling with

6    anxiety?

7    A.    Yes.

8    Q.    Panic attacks?

9    A.    Yes.

11:36AM 10    Q.    Poor sleep?

11    A.    Yes.

12    Q.    Obsessive compulsive symptoms?

13    A.    Yes.

14    Q.    And, in fact, you talked to him at length about your OCD

15    diagnosis, right?

16    A.    Yes.

17    Q.    And he increased your Luvox?

18    A.    Yes.

19    Q.    Do you currently have a follow-up appointment with

11:37AM 20    Dr. McGuire scheduled?

21    A.    No.

22    Q.    Have you taken all your medications today?

23    A.    I only take them at night.

24         MR. LOPEZ:  Could you pull up Exhibit 110.2.

25    Q.    I show you what's been admitted into evidence as

1    Exhibit 110.2.  Do you recognize that?

2    A.    Yes.

3    Q.    What do you recognize that to be?

4    A.    It's the cooperation agreement.

5    Q.    Well, look at it, okay.  Let me go back.  Pull up 110.1.

6          MR. LOPEZ:  I apologize, your Honor.

7    Q.    Do you recognize that?

8    A.    Yes.

9    Q.    And do you recognize that as your plea agreement?

11:39AM 10   A.    Yes.

11   Q.    And looking at the second paragraph, could you -- the

12   first paragraph of paragraph 2, could you increase that.  Now,

13   you understand that the potential maximum penalty that you're

14   facing for pleading guilty in this case is incarceration for 20

15   years?

16   A.    Yes.

17   Q.    But you're hoping that based on your substantial

18   assistance that you're going to get a much lower sentence; is

19   that fair to say?

11:39AM 20   A.    Yes.

21         MR. LOPEZ:  And could you -- the first sentence of the

22   next paragraph regarding immigration status?

23   Q.    And you are not an American citizen, right?

24   A.    Yes.

25   Q.    So you understand that if you had pled guilty without a

1    plea agreement or without a cooperation agreement, when you

2    were done serving your sentence, you would have been deported?

3    A.    Yes.

4    Q.    And you're hoping that based on your assistance here that

5    you're not going to be deported?

6    A.    Yes.

7          MR. LOPEZ:    Now, could you go to page 4, the very

8    first -- through subparagraph A of the U.S. Attorney.

9    Q.    And under the plea agreement that you have with the

11:41AM 10    government, the U.S. Attorney's Office has agreed to recommend

11    a sentence to the Court for incarceration within the guideline

12    sentencing range as calculated by the Court at sentencing

13    excluding departures.  What do you understand that provision to

14    mean?

15    A.    I don't understand the question.

16    Q.    Well, under your plea agreement, you're pleading guilty to

17    a crime that carries a potential sentence of incarceration of

18    20 years?

19          MS. LAWRENCE:    Objection, your Honor.

11:42AM 20          THE COURT:    Overruled.

21    Q.    And the U.S. Attorney's Office agrees to recommend a

22    sentence of incarceration within the guideline sentencing range

23    as calculated by the Court at sentencing, so my question is --

24    A.    Yes.

25    Q.    So my question is what is the government giving you in the

1    plea agreement, or what is your understanding of what the

2    government is agreeing to in your plea agreement?

3    A.    A lower sentence.

4    Q.    A sentence lower than 20 years?

5    A.    Yes.

6         MR. LOPEZ:  Now, can I put up Exhibit 110.2.

7    Q.    Now, Exhibit 110.2 is the cooperation agreement, right?

8    A.    I don't understand the question.

9    Q.    Well, is Exhibit 110.2 your cooperation agreement?

11:44AM 10   A.    Yes.

11        MR. LOPEZ:  And can you blow up the first five lines

12   of paragraph 1 starting with "defendant."

13   Q.    Now, in this cooperation agreement, you agree to

14   "cooperate fully with law enforcement agents and government

15   attorneys.  You must provide complete and truthful information

16   to all law enforcement personnel, and if your testimony is

17   requested, you must testify truthfully and completely before

18   any grand jury and at any hearing and trial.  And you also must

19   answer all questions posed by any law enforcement agents and

11:45AM 20   government attorneys and you must not withhold any

21   information?"

22   A.    Yes.

23   Q.    What do you understand that to mean?

24   A.    That I have to tell the truth about the things that I have

25   done, that I did with the gang and the things that I saw and

1    heard other people do as well.

2    Q.   And if you don't tell the truth, you understand that you

3    would be in violation of this agreement?

4    A.   Yes.

5         MR. LOPEZ:  The second page, beginning of the second

6    full paragraph starting with the words "to ensure."

7    Q.   Now, the agreement also provides that, "To ensure that the

8    Court has all relevant sentencing information, you waive any

9    rights to a prompt sentencing and you'll join in any request by

11:47AM 10   the U.S. Attorney that sentencing must be postponed until

11   defendant's cooperation is complete."

12   A.   Yes.

13   Q.   What do you understand that paragraph means?

14   A.   That I have to wait until the conclusion of the case and

15   that I cannot be sentenced until all the -- until the

16   defendants have finished.

17   Q.   So when you signed this agreement, did you understand that

18   you wouldn't be sentenced until you testified in this case?

19   A.   Yes.

11:48AM 20   Q.   And do you understand what substantial assistance is?

21   A.   Yes.

22   Q.   And in your own words, what does substantial assistance

23   mean?

24   A.   It's giving help.

25   Q.   Giving help to the government?

1    A.    Yes.

2    Q.    And paragraph 2 reads, "Should defendant provide

3    substantial assistance in the investigation or prosecution of

4    another person who has committed a criminal offense, the

5    U.S. Attorney agrees that at or before sentencing, the U.S.

6    Attorney will file a motion under United States Sentencing

7    Guidelines Section 5K1.1 to recommend that the Court impose a

8    sentence below the advisory guideline sentencing range."

9          So under this provision, did you understand that it

11:50AM 10   was totally up to the U.S. Attorney's Office to determine

11   whether or not you provided substantial assistance in their

12   investigation or prosecution of another person?

13   A.    Yes.

14   Q.    So if they decide that you haven't provided substantial

15   assistance, you understood that you would potentially receive a

16   sentence within the sentencing guideline range, right?

17   A.    Yes.

18          MR. LOPEZ:   And the next paragraph beginning "the

19   determination" and ending with "or trial."

11:51AM 20   Q.    And the next paragraph reads, "The determination whether

21   defendant has provided substantial assistance rests solely in

22   the discretion of the U.S. Attorney and is not subject to

23   appeal or review.   The U.S. Attorney will make this

24   determination based on the truthfulness and value of

25   defendant's assistance regardless of the outcome or result of

88

1    any proceeding or trial."

2           So you understand that whether or not you are

3    determined to be telling the truth here in this trial is solely

4    up to the discretion of the U.S. Attorney's Office, right?

5    A.    Yes.

6    Q.    And with respect to the sentencing recommendation, the

7    cooperation agreement further provides, "If defendant provides

8    substantial assistance, subject to the provisions of paragraph

9    1 and 2 above," which we just went over, "the U.S. Attorney

11:53AM 10    will advise the Court of the full nature, extent, and value of

11    the assistance provided by the defendant."

12           And then it goes on to read, "In such an event the

13    U.S. Attorney reserves the right to recommend a particular

14    sentence" -- top of page 3 -- "reserves the right to recommend

15    a particular sentence or sentencing range, or to make no

16    recommendation at defendant's sentencing subject to the

17    requirements of paragraph 2 above."

18           So do you understand that even if they determine that

19    your testimony was truthful and they determine that it provided

11:55AM 20    substantial assistance, they're not agreeing to any particular

21    sentence, or sentencing range, or to make any recommendation at

22    all.  Do you understand that?

23    A.    Yes.

24    Q.    So, basically you're totally at their discretion?

25           MS. LAWRENCE:  Objection, your Honor.

1              THE COURT:  Sustained.

2     Q.   Now --

3              MR. LOPEZ:  Can you go to page 4 and the paragraph

4     regarding immigration status.

5     Q.   And the paragraph 6 as to immigration status provides that

6     "Should the U.S. Attorney conclude that you provided

7     substantial assistance as discussed in paragraph 2 above, the

8     U.S. Attorney will consider supporting an application on

9     defendant's behalf by the Federal Bureau of Investigation, or

11:57AM 10     Homeland Security Investigations, or so-called deferred action,

11     an S Visa, or other appropriate relief from removal from the

12     United States, so long as the FBI or his determines in its

13     discretion that such an application is appropriate."

14              Do you understand what that means, sir?

15     A.   Yes.

16     Q.   What does that mean to you?

17     A.   That according to my cooperation, so long as I tell the

18     truth, the prosecutors would make a recommendation for me not

19     to be deported.

11:58AM 20     Q.   That's what you think that paragraph says?

21     A.   Yes.

22     Q.   Are you hoping that's what the paragraph says?

23     A.   I don't understand the question.

24     Q.   Well, you agree to plead guilty?

25     A.   Yes.

1    Q.    You agreed to cooperate?

2    A.    Yes.

3    Q.    And I think you testified that you are hoping to get a

4    lower sentence?

5    A.    Yes.

6    Q.    And you're hoping that you won't be deported?

7    A.    Yes.

8    Q.    But would you agree with me that the plea agreement and

9    the cooperation agreement don't say that?

11:59AM 10            MS. LAWRENCE:  Objection, your Honor.

11            THE COURT:  I'm sorry, was there an --

12            MS. LAWRENCE:  Objection.

13            THE COURT:  Overruled.

14    A.    Could you repeat the question?

15    Q.    You're hoping that you'll get a lower sentence and you're

16    hoping that you won't be deported by testifying in this case,

17    right?

18    A.    Yes.

19    Q.    But the agreements that you signed don't say that you

12:00PM 20    will, in fact, receive a lower sentence, right?

21    A.    Yes.

22    Q.    Or that you won't be deported, right?

23    A.    Yes.

24    Q.    So, again, that's totally up to the discretion of the U.S.

25    Attorney's Office?

1        MS. LAWRENCE:  Objection, your Honor.

2        THE COURT:  Sustained.

3        MR. LOPEZ:  Your Honor, is this a good time to break?

4        THE COURT:  Yes.

5        THE CLERK:  All rise.

6        (JURORS EXITED THE COURTROOM.)

7        (A recess was taken.)

8        THE CLERK:  All rise for the jury.

9        (JURORS ENTERED THE COURTROOM.)

12:17PM 10        THE CLERK:  Thank you.  You may be seated.  Court is

11   now back in session.

12        THE COURT:  Mr. Lopez.

13        MR. LOPEZ:  Thank you, your Honor.

14   Q.   Now, Mr. Sanchez, I think you said earlier today that you

15   came here to --

16        THE INTERPRETER:  I'm sorry, the interpreter cannot

17   hear you.

18   Q.   I think you said earlier today that you came here when you

19   were 20 years old?

12:17PM 20   A.   Yes.

21   Q.   And you are currently 30 years old?

22   A.   Yes.

23   Q.   And you claim that you were jumped into the Eastside

24   clique in 2013?

25   A.   Yes.

```
 1    Q.   Do you remember what month that was?

 2    A.   No.

 3    Q.   Do you remember the season?

 4    A.   It was winter.

 5    Q.   And I think you said -- so at the time you were allegedly

 6    jumped in, you were 27?

 7    A.   Yes.

 8    Q.   And I think you said that when you came here to the

 9    United States, you came here illegally?

10    A.   Yes.

11    Q.   And you used a coyote?

12    A.   Yes.

13    Q.   And your mother paid for it?

14    A.   Yes.

15    Q.   Now, you also testified that the day you jumped in was the

16    day you met Mr. Sandoval, right?

17    A.   Yes.

18    Q.   So, prior to that day, who did you know from the Eastside

19    clique?

20    A.   I knew Playa, Lobo, and Checha and also Brujo.

21    Q.   And what about Pelon?

22    A.   No.

23    Q.   And so it's your testimony that Mr. Sandoval allowed you

24    to be jumped in to the clique having never met you before that

25    evening; is that correct?
```

1          MS. LAWRENCE:  Objection, your Honor.

2          THE COURT:  Overruled.

3     A.    That was the first time I saw him.

4     Q.    Now, you also mentioned that Caballo was a solid homeboy?

5     A.    Yes.

6     Q.    And you said that Muerto was a solid homeboy?

7     A.    Yes.

8     Q.    Did you consider yourself a solid homeboy?

9     A.    Me?

12:20PM 10     Q.    Yes.

11     A.    Somewhat, yes.

12     Q.    And did you consider some cliques more solid than other

13     cliques?

14     A.    Yes.

15     Q.    Now, was there a certain clique that you thought was the

16     most solid in the Boston area?

17     A.    The Everetts.

18     Q.    The Everetts?

19     A.    Yes.

12:21PM 20     Q.    And why did you think that they were the most solid in the

21     Boston area?

22     A.    They were the ones that did the most hits and that went

23     out in the street to look for chavalas the most.

24     Q.    And they also were the clique that also had a clique down

25     in El Salvador, right?

1    A.    Yes.

2    Q.    And do you recall having a conversation with Pelon about

3    the Everett clique in July of 2015?

4          THE INTERPRETER:  I'm sorry, could you repeat the

5    question?

6    Q.    Yes.  Do you recall having a conversation with Pelon in

7    July of 2015 regarding the Everett clique?

8    A.    I don't remember that very clearly.

9          MR. LOPEZ:  I'm going to show the witness an audio

12:23PM 10    file.

11          THE CLERK:  Is it on your computer?

12          MR. LOPEZ:  It's on the -- I have the disk here.

13          THE CLERK:  I'll get the document camera.

14          THE COURT:  Before you ask that question and before I

15    forget, in our last session we inadvertently marked the proffer

16    agreement as 228, it should be 229 because we already had a

17    228.

18          MR. LOPEZ:  That's been corrected, your Honor,

19          Your Honor, with the Court's permission, I would like

12:23PM 20    to begin the audio portion of this audio file so that the

21    witness can listen to it.

22          THE COURT:  All right.  It's in Spanish, I assume?

23          MR. LOPEZ:  It is, your Honor.

24          THE COURT:  All right.  Go ahead.

25          (Audio played)

1        THE COURT:  What we really need here, ladies and

2    gentlemen, is a 10 year-old kid to figure this out.  You can

3    play it on your iPad?

4        MR. LOPEZ:  I can play it.

5        THE COURT:  Why don't you come up here where he can

6    listen to it.

7        MR. LOPEZ:  Let's try that.  Sorry, all.  May I

8    approach, your Honor?

9        THE COURT:  Yes.

12:28PM 10        (Video played in Spanish)

11    Q.   Do you recognize that voice?

12    A.   Yes, that's Pelon.

13    Q.   Do you recognize that voice?

14    A.   That's me.

15        MR. LOPEZ:  Your Honor, with that, can I introduce the

16    translation?

17        MS. LAWRENCE:  Objection.  Foundation for the

18    translation, your Honor.

19        THE COURT:  All right.  Sustained unless it's agreed

12:28PM 20    on.

21        MR. LOPEZ:  Well, your Honor, may I approach?

22        THE COURT:  Yes.

23        (THE FOLLOWING OCCURRED AT SIDEBAR:)

24        THE COURT:  Go ahead.

25        Let me hear the objection first.

1      MS. LAWRENCE:  The objection was the foundation for

2  the translation.

3      THE COURT:  Do you have the translation?

4      MS. LAWRENCE:  We have the translation.  I know you

5  put your personal translator on the witness list.  I know we

6  discussed it.  I just want to be clear that every one of these

7  you've given us are the ones you gave us before and not new

8  ones last night, but with the changes that you noted.

9      MR. LOPEZ:  The one, but for the changes, correct.

12:29PM 10  The one I gave you last night had some minor changes, which I

11  identified for you.  Otherwise, you've had all of these

12  previously.

13      MS. LAWRENCE:  All -- no brand new ones?

14      MR. LOPEZ:  No brand new ones.

15      MS. LAWRENCE:  Okay.  Then we're fine.

16      THE COURT:  So for the sake of efficiency, just let it

17  in.

18      MR. MURPHY:  May I inquire that it's the government's

19  position that this is going to open the door --

12:29PM 20      MS. LAWRENCE:  Some of them might, but this one in

21  particular doesn't seem to.

22      MR. MURPHY:  All right.  We'll take them one at a

23  time.

24      MS. LAWRENCE:  Yes, one at a time.

25      (SIDEBAR CONFERENCE WAS CONCLUDED.)

1          THE COURT:  I'll admit the transcript, which is 230.

2          (Exhibit No. 230 received into evidence.)

3          MR. LOPEZ:  Could we also mark the audio clip for

4    identification purposes?

5          THE COURT:  That will be 231.

6          (Exhibit No. 231 received into evidence.)

7    Q.   Now, Mr. Sanchez, I've put before you a transcript, and I

8    want to read it to you.

9          Pelon:  "(Unintelligible), not many may want to bother

12:31PM 10   also."

11         Tigre:  "This dog, this is an Everett dude.  That dog,

12   he is the only one when I call.  That guy responds to me, dude.

13   He told me, look, dog, I like you.  I love you like a brother.

14   You heard?  He told me I love you like a brother.  He loves my

15   like a brother."

16         Pelon:  "I didn't like."

17         Tigre:  "There are (unintelligible) the same side.

18   There are two leaders Everetts there, dude.  What happens is

19   that they among them, you understand.  There is a KLUP El Mecha

12:31PM 20   Inmenso, but they -- he told me I love you like my brother, he

21   tells me, look, I love you like a brother.  I like people like

22   you do.  I look at them in the face, dude."

23         THE INTERPRETER:  I'm sorry, could you raise the

24   transcript?

25         MR. LOPEZ:  I'm sorry, I apologize.

1    Q.    "I like people like you do.  I look at them in the face,

2    dude.  I know that he can, two or three of them, dudes.  He

3    will fuck them up.  Look, Pelon.  Look, Pelon.  Pelon, listen

4    to this.  Look, dog, I know.  I hang out with all the cliques.

5    To me it is the most solid clique.  The most solid clique here

6    in Boston.  In all of Boston?  Boston and in Salva because it

7    is the only clique that has a clique in Salva.  That's why,

8    look, dude when you want to go to the street."

9            Did I read that correctly, sir?

12:32PM 10    A.    Yes.

11    Q.    So you were talking to Pelon, and you were telling him

12    about the cliques that you thought were solid?

13    A.    Yes.

14    Q.    And you thought that the Everett clique was the most solid

15    because they would respond to you and they would go out and do

16    Mara related activities, right?

17    A.    Mostly because I saw them acting in the street but not

18    because I went out to do things with them.

19    Q.    Well, you would agree with me that at least during that

12:33PM 20    conversation, you didn't say that the Eastside clique was a

21    solid clique, right?

22    A.    No.

23    Q.    Now, in your testimony, you were asked about the rules

24    that you were asked to follow when you became a member of

25    Eastside.  Do you remember that testimony?

1    A.    Yes.

2    Q.    And I think you said that the first rule was that you had

3    to be beat in, the second rule was to attend meetings, right?

4    A.    Yes.

5    Q.    The third rule was to not let a homeboy down, and the

6    fourth rule was to show your colors.  And, sir, those were the

7    rules when you were brought into the Eastside clique; is that

8    correct?

9    A.    Yes.

12:35PM 10    Q.    So you weren't required to do anything for the Eastside

11    clique before you were beat into the Eastside clique, correct?

12    A.    Yes.

13    Q.    Now, sir, do you have any tattoos?

14    A.    No.

15    Q.    So it's not a requirement of MS-13 to have tattoos, right?

16    A.    That's up to each person.

17    Q.    And people get tattoos for many reasons, right?

18    A.    But there are some tattoos that not just anybody can have.

19    Q.    I understand, but my question is that, you know, like

12:36PM 20    sailors get tattoos all the time.  It's not because they're in

21    the Navy, right?

22              MS. LAWRENCE:  Objection, your Honor.

23              MR. LOPEZ:  I'll strike that, your Honor.

24              THE COURT:  All right.

25    Q.    You weren't required to get a tattoo in order to join

1    MS-13, right?

2    A.    Yes.

3    Q.    Now, you also testified that meetings were every two or

4    three months, right?

5    A.    Yes.

6    Q.    So you would agree that they weren't every month, right?

7    A.    That would depend on what was going on.

8    Q.    But as a general rule, they were every two or three

9    months?

12:37PM 10    A.    There was no general rule.  If there was something that

11    was going on with the clique or something that was going on

12    with MS-13, the runners could call a meeting for the following

13    day.

14    Q.    But on direct exam, you were asked an open-ended question

15    how often were meetings.  Do you recall being asked that?

16    A.    Yes.

17    Q.    And do you recall that your response was every two or

18    three months?

19    A.    Yes.  That was approximately, not exact.

12:38PM 20    Q.    Now, you also said that it was Mr. Guzman who would

21    collect money?

22    A.    Yes.

23    Q.    At meetings, right?

24    A.    Yes.

25    Q.    And I think you said he collected the money because he was

1    a more serious person?

2    A.    Yes.

3    Q.    Do you remember saying that?

4    A.    Yes.

5    Q.    What did you mean by that?

6    A.    Well, in the Mara, there were guys like me that would

7    drink a lot and get drunk a lot, so we weren't very serious,

8    and no one is going to give money to people like that.

9    Q.    And you also said that he was trusted with the money?

12:39PM 10    A.    Yes.

11    Q.    So he was trusted not to take the clique's money?  Is that

12    what you meant?

13    A.    Yes.

14    Q.    Now, you were also asked about who sent money down to

15    El Salvador, and you didn't answer that question, did you, sir?

16    A.    No.

17    Q.    You said that Playa has the money?

18    A.    Yes.

19    Q.    But you didn't say that Playa sent the money to

12:39PM 20    El Salvador, right?

21    A.    No.

22    Q.    Because you know that Mr. Guzman didn't or wasn't

23    responsible for sending money to El Salvador, right?

24    A.    Yes.

25         MR. LOPEZ:  Your Honor, can I just have a moment to

1    consult with --

2           THE COURT:  Yes.

3    Q.    Now, you also testified that there was another rule of the

4    Eastside clique and that was no cocaine use, right?

5    A.    That rule is a general rule in MS-13, not only for the

6    Eastsides.

7    Q.    Okay.  So the MS-13 general rule for all the cliques is

8    that there's no cocaine use by members?

9    A.    Yes.

12:42PM 10   Q.    And I think at some point you were corrected for drinking

11   too much?

12   A.    Yes.

13   Q.    And before you were corrected, you were told to stop your

14   drinking?

15   A.    Yes.

16   Q.    And you didn't stop your drinking?

17   A.    No.

18   Q.    Did you know that you would be corrected if you didn't

19   stop your drinking?

12:42PM 20   A.    Yes.

21   Q.    And you went ahead and drank anyway?

22   A.    Yes.

23   Q.    Now, you also talked about Chentino and him being

24   corrected?

25   A.    Yes.

1    Q.    And just to be clear, Chentino was corrected because

2    Vida Loca, the day before he committed murder, was confronted

3    by some 18th Street members and Chentino didn't back him up; is

4    that fair to say?

5    A.    Yes.

6    Q.    So he wasn't corrected because he didn't participate in a

7    murder, right?

8    A.    He was corrected for not participating in a murder.

9    Q.    Well, that's what I'm getting at.  He didn't go with

12:44PM 10   Vida Loca the night that Vida Loca committed murder, correct?

11   A.    He was there at the place, but he didn't do anything.

12   Q.    But it was the night before that he didn't back up

13   Vida Loca when the 18th Street members were giving Vida Loca a

14   hard time, right?

15   A.    Yes.

16   Q.    Now, you said that you bought a gun in December of 2014?

17   A.    Yes.

18   Q.    And it was your personal gun?

19   A.    Yes.

12:45PM 20   Q.    And that was marked as Exhibit Number 69?

21   A.    Yes.

22   Q.    And the gun was taken away from you because you

23   were -- you had it in your possession while you were drunk?

24   A.    Yes.

25   Q.    And Mr. Sandoval was concerned that you might hurt someone

1    with it while you were drunk?

2    A.    Yes.

3    Q.    Thought you were acting a little crazy when you were drunk

4    going around with a gun, right?

5    A.    Yes.

6    Q.    Now, do you recall complaining about the fact that the

7    clique wasn't buying guns?

8    A.    Yes.

9    Q.    And that was in approximately September of 2015?

12:46PM 10    A.    I don't remember exactly.

11    Q.    Well, do you recall talking to Pelon about the clique not

12    wanting to go out and buy guns?

13    A.    Yes.

14    Q.    Do you recall complaining to him that, you know, the other

15    ones are always saying that we're going to go and get guns but

16    they never do anything, so I went out and I bought my own gun?

17    A.    I bought the gun mostly for something else.  I bought the

18    gun because I had a problem at work, so I had it to defend

19    myself.

12:47PM 20    Q.    So it was unrelated to your MS-13 activities?

21    A.    No.

22    Q.    Well, do you recall complaining to Pelon that others in

23    the clique are always saying they're going to go out and get

24    guns and they don't get anything and you told them that you

25    were going to go out and get a gun for yourself?

```
 1   A.   Yes.

 2   Q.   So you weren't going to go out and get a clique gun, you

 3   were going to go out and get a gun for yourself?

 4   A.   It was also for the clique.

 5   Q.   So, did you use your money?

 6   A.   To buy that gun, yes.

 7   Q.   Now, I think that you testified that the first time that

 8   you met the Animal was in October of 2015?

 9   A.   Yes.

10   Q.   And it was Pelon and Muerto who brought him to the clique?

11        MS. LAWRENCE:  Objection.

12        THE COURT:  Overruled.

13   A.   Yes.

14   Q.   And after you met the Animal, you started hanging out with

15   him?

16   A.   Yes.

17   Q.   And you went out and did some hits with him?

18   A.   Yes.

19   Q.   Now, Mr. Guzman never told you to go out and do those

20   hits, did he?

21   A.   It's not necessary for the runner to tell us.  We are in

22   MS-13 and that's what we're supposed to do.

23   Q.   I'll try it again.  Mr. Guzman never told you to go out

24   with the Animal and commit hits, right?

25   A.   At the meetings, we all talked about the homeboys needed
```

1   to go out with the young kids to test them to see how they

2   acted.

3   Q.   Sir, you went out with the Animal to commit hits, right?

4   A.   Yes.

5   Q.   Prior to going out with the Animal -- and that's all I'm

6   focused on, the Animal -- who wasn't a member of the clique,

7   right?  Right?

8   A.   Yes.

9   Q.   Who wasn't a homeboy and who you had only met a couple of

12:51PM 10   months before you, my question to you is Mr. Guzman didn't tell

11   you to go out with the Animal and do any hits, right?

12   A.   No.

13   Q.   Now, at some point, there was a discussion about whether

14   or not the Animal could be beat into the clique?

15   A.   Yes.

16   Q.   And did you -- were you present at that meeting?

17   A.   At the meeting where we talked about bringing him into the

18   clique, yes.

19   Q.   Yes.  And were you in favor of bringing him in?

12:52PM 20   A.   Yes.

21   Q.   Do you remember what Mr. Guzman wanted to do?

22   A.   That we should walk with him for a period of time before

23   making him a member.

24   Q.   Well, it was a little strong than that, right?  Didn't he

25   say that he should stay where he is and not come into the

1    Eastside clique?

2    A.    He said we should walk with him more so that the other

3    homeboys could get to know him.

4    Q.    So your memory is that he wanted to have him in some

5    observation period?

6    A.    Yes.

7    Q.    So you don't have any memory of him saying he didn't want

8    any young kids in the clique and particularly he didn't want

9    the Animal in the clique?

12:53PM 10    A.    At the meeting we had, we all agreed based on what Animal

11    had done, especially because of the hits he had done, based on

12    that.

13    Q.    That's your memory of that meeting?

14    A.    Yes.

15         MR. LOPEZ:  If I could just have a second, your Honor.

16    Q.    Now, I'm going to show you what's been marked and admitted

17    into evidence as Exhibit 115, page -- on the bottom of page 5

18    and it reads, CW says, "Because I -- if he reports to me

19    quickly then I'll report it and like you, you know, and say it

12:55PM 20    was like this and like this.  I'll tell Muerto and after Muerto

21    and I say, it's done, you know.  No one can accuse you of any

22    bullshit."

23         CW is referring is talking to the Animal there, right?

24    A.    Yes.

25    Q.    And he's telling him that I want you to be brought into

1    the clique, right?

2    A.    Yes.

3    Q.    And his best friend Muerto wants him to --

4          MS. LAWRENCE:  Objection, your Honor.

5          MR. LOPEZ:  Well, strike that.

6    Q.    Were Muerto and Pelon friends?

7    A.    Yes.

8    Q.    And they hung out all the time?

9    A.    Yes.

12:56PM 10    Q.    They sold drugs together?

11    A.    As far as I know, yes.

12    Q.    Okay.  And so Pelon is saying to Animal if I want you in

13    the clique and I tell Muerto I want you in the clique, you're

14    going to be in the clique, right?

15    A.    That's what they said to show off with the kids because

16    they were just bragging because they can't go over the rules of

17    the clique or it's only the runners that can present that and

18    put it on the table.

19    Q.    I understand that was your testimony, but my question is

12:57PM 20    at this time in January of 2016, you would agree with me that

21    Pelon had status in the clique, right?

22    A.    No.

23    Q.    No, he wasn't considered solid in the clique?

24    A.    No.

25    Q.    And what about Muerto?

```
 1   A.   Muerto, yes.

 2   Q.   And what about you?

 3   A.   Some did.

 4   Q.   And what about Brujo?

 5   A.   He was considered a solid homeboy.

 6   Q.   So, when CW is talking to Animal, he knows -- strike that.

 7   He's telling the Animal that I want you in the clique, and if I

 8   want you in the clique, Muerto's going to want you in the

 9   clique, and you've already told us you wanted him in the

10   clique, right?

11   A.   Yes.

12   Q.   And he went out with Brujo and did hits with Brujo?

13           THE INTERPRETER:  Who is "he" for the interpreter?

14           MR. LOPEZ:  The Animal.

15   A.   Yes.

16   Q.   So, essentially if all you guys wanted him in the clique,

17   he was going to come into the clique, right?

18   A.   No.

19   Q.   Because you and Pelon and Muerto and Brujo could outvote

20   Mr. Guzman, right?

21   A.   No.

22   Q.   And the way the clique ran was that it was run

23   democratically, right?

24   A.   There are the runners.  They are the ones who put on the

25   table what's going on and who's going to be jumped in.  For
```

1    example, when I was jumped in, it was the two of them that made

2    the decision, and they didn't call other homeboys or many other

3    homeboys to join in the decision.

4    Q.    I'm not talking about 2013, I'm talking about the Animal.

5    A.    I'm only giving an example.

6    Q.    The Animal in 2016.  At that point in time, majority vote

7    was the rule of the clique, right?

8    A.    Yes.

9              MR. LOPEZ:  Your Honor, is this a good place to stop?

01:00PM 10              THE COURT:  Sure.

11              All right.  Ladies and gentlemen, please remember my

12    cautions not to discuss the case with each other or with anyone

13    else and to not to pay attention to any media reports.

14    Tomorrow is Friday heading into a three-day weekend.  I'm

15    feeling optimistic about the timetable, but I'm going to check

16    with the lawyers and give you a status tomorrow about when

17    you're going to get the case, but I think we are again still

18    ahead of where we thought we were going to be.  Don't make

19    other plans just yet, but I think we're in reasonable shape, so

01:01PM 20    we'll see you tomorrow morning at 9:00.

21                              - - - -

22

23

24

25

1                C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7            I do hereby certify that the foregoing transcript was

8    recorded by me stenographically at the time and place aforesaid

9    in Criminal Action No. 15-10338-FDS, UNITED STATES vs. HERZZON

10   SANDOVAL, et al., and thereafter by me reduced to typewriting

11   and is a true and accurate record of the proceedings.

12            Dated this 15th day of February, 2018.

13                  s/s Valerie A. O'Hara

14            _____

15                  VALERIE A. O'HARA

16                  OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25